Date signed January 23, 2007



_____
PAUL MANNES
U. S. BANKRUPTCY JUDGE

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
### at Greenbelt

| | | |
|---|---|---|
| **In re:** | : | |
| | : | |
| USGen New England, Inc. | : | **Case No. 03-30465 PM** |
| | : | **Chapter 11** |
| | : | |
| **Debtor.** | : | |

## MEMORANDUM OF DECISION

Debtor filed an objection to the claim of Tennessee Gas Pipeline Company ("Tennessee Gas") on March 14, 2005 (the "Objection to Claim"). Tennessee Gas filed a response on June 3, 2005. Trial was conducted July 18, 2006 - July 20, 2006 and July 25, 2006 - July 27, 2006. Post-trial briefs were filed by both parties, the last brief being filed October 3, 2006. The claim is based upon the damages sustained as a result of the rejection of an executory contract for transmission capacity on the claimant's pipeline. The principal issue presented in this dispute involves mitigation of that claim by probable future sales by Tennessee Gas of the transmission capacity.

After the court completed a draft of this decision, the Debtor filed a motion on November 16, 2006, to reopen the record to reflect the sale of 19,000 dekatherms of Debtor's fixed

reservation capacity, available as of April 1, 2007, for a 72-month term ending March 31, 2013, to Amerada Hess Corporation ("Hess"), announced by notice dated October 30, 2006. The sale was at maximum rates and will result in the payment of reservation charges by Hess totaling $6,744,240.00 discounted to its net present value of $5,445,701.00 to provide the amount of the diminution of the Tennessee Gas claim. This court issued an Order to Show Cause on November 21, 2006, directing Tennessee Gas to show cause why the record should not be reopened to permit the court to receive evidence regarding the post-trial sale to Hess of the Debtor's fixed reservation capacity and the resulting reduction of the Tennessee Gas claim and the inferences to be drawn from that sale as to the future sales by Tennessee Gas of Debtor's fixed reservation capacity.

The parties submitted extensive briefs in support of their positions. A hearing was held on January 11, 2007. Tennessee Gas did not oppose the reopening of the record for the limited purpose of admitting evidence of the sale to Hess. The court finds the evidence proffered important and probative and therefore, in the exercise of its discretion, will reopen the record to enable it to consider whether to take permissible inferences from this sale. See Matthew Bender & Co. v. West Pub. Co., 158 F.3d 674, 679 (2nd Cir. 1998).

This memorandum comprises the court's findings of fact and conclusions of law.

The parties agree to the following basic facts. Prior to bankruptcy, Debtor operated power generating facilities in New England. Tennessee Gas operates an interstate natural gas pipeline through various parts of the country, including New England. The two contracts at issue in this case are between Debtor and Tennessee Gas for the transportation of natural gas by Debtor over Tennessee Gas' pipeline. The contracts, effective August 1, 2002, provided for firm

transportation[1] of 60,000 dekatherms per day of natural gas (the "fixed reservation capacity") over a portion of Tennessee Gas' pipeline system, beginning in Wright, New York, and terminating in Mendon, Massachusetts (the "Wright to Mendon pipeline"). The contracts ran for a period ending October 31, 2013.

Under the terms of the agreements, Debtor was to pay a fixed reservation charge at Tennessee Gas' FT-A Rates to Tennessee Gas for 60,000 dekatherms per day (hereafter referred to as the "fixed reservation charge"). In addition, Debtor agreed to pay a reservation surcharge through July 31, 2006 (the "surcharge"), as well as standard commodity and fuel charges for gas flowed over the Wright to Mendon pipeline (referred to by the parties as "throughput"). Debtor guaranteed to Tennessee Gas a minimum throughput for forty-two months of ninety percent of the fixed reservation capacity of 60,000 dekatherms, or 54,000 dekatherms. If the actual throughput was less than ninety percent of the fixed reservation capacity, Debtor agreed to compensate Tennessee Gas for the shortfall in commodity and fuel charges (the "throughput commitment"). The guarantee for the throughput expired on January 31, 2006. Tennessee Gas asserts, and the court has no basis to find otherwise, that the additional surcharge fees and the throughput commitment were agreed to by Debtor in exchange for Tennessee Gas' use of the lower FT-A rate schedules.

The Federal Energy Regulatory Commission ("FERC") accepted the contracts on August 2, 2002. The contracts include a choice of law provision, mandating that disputes would be governed by the laws of the State of Texas.

---

[1] "Firm transportation" is capacity that is always available, and must be paid for regardless of actual use. See In re Mirant Corp., 332 B.R. 139, 145 n. 7 (Bankr. N.D. Tex. 2005).

This bankruptcy case under Chapter 11 was filed on July 18, 2003. Debtor rejected the two contracts with Tennessee Gas, effective as of September 5, 2003. Tennessee Gas filed a proof of claim (No. 410) in the amount of $45,705,528 on October 15, 2003, and later amended the claim to account for mitigation of damages, and reduced the amount of the claim to $41,349,873.[2] This amount, according to Tennessee Gas, represents the contract rejection damages arising out of Debtor's rejection of the contracts, consisting of the fixed reservation charges due under the full terms of the contracts, less any mitigation credits owed to Debtor, as well as amounts owed under the surcharge and throughput commitment. As of May 1, 2006, Tennessee Gas reduced its claim to $28,040,731 (net present value), to account for further mitigation credit owed to Debtor.

Specifically, Tennessee Gas' claim includes: (1) fixed reservation charges due under the contract through October 2013, for which Tennessee Gas has applied mitigation credit; (2) the surcharge, totaling $2,634,416 from September 2003 to October 31, 2005, and $1,655,680 from November 1, 2005, to July 31, 2006 (the end of the surcharge commitment period), based upon a 6.376 percent discount rate, and (3) the throughput commitment, totaling $4,366,202 from September 2003 to October 31, 2005, and $1,067,042 from November 1, 2005, to January 31, 2006 (the end of the throughput commitment period), also based upon a 6.376 percent discount rate.[3]

Debtor objected to the claim, arguing that Tennessee Gas had either mitigated its damages from the rejection of the contracts or had failed to mitigate the damages from the

---

[2] The amended claim was filed on September 28, 2004.

[3] The parties dispute the discount rate to be applied to the claim.

rejection. Debtor's Plan of Reorganization was confirmed on May 13, 2005, and Tennessee Gas' claim is a general unsecured Class 3 claim under the confirmed plan.

The parties agree that Tennessee Gas properly credited revenues from twelve contracts for the sale of Debtor's capacity, and that a credit of $1,189,165, with interest, is owed to Debtor on account of collateral securing Debtor's obligations. The parties agree as well that Tennessee Gas' claim includes the amount owed under the contracts for the surcharge, $4,385,016. The parties disagree as to whether mitigation credit is owed to Debtor for several additional contracts for the sale of the fixed reservation capacity. Also, the parties dispute whether mitigation credit should be allowed for possible future sales of fixed reservation capacity, backhaul services, retained fuel recoveries [4] and the throughput commitment.[5]

As stated above, trial was conducted in this case over a period of six days in July 2006. Prior to trial, on June 14, 2006, Debtor filed a petition with FERC, Docket No. RP06-391-000, seeking a declaratory order regarding: (1) the right of Debtor to challenge the reasonableness of Tennessee Gas' rates, and (2) whether Tennessee Gas may refuse to credit certain revenues derived from the sale of Debtor's capacity against Tennessee Gas' claim in this case. Tennessee Gas filed a protest with FERC in response, and Debtor filed an answer to the protest.

---

[4] Backhaul transportation is a service offered by Tennessee Gas on its pipeline and involves the transportation of natural gas against the forward flow of gas on the pipeline. Retained fuel recoveries are the amount Tennessee Gas is permitted to retain from the sale of any fuel remaining after meeting customer requirements. Conversely, under FERC regulations, Tennessee Gas is required to absorb the cost of purchasing gas should there be a shortfall in meeting customer requirements.

[5] Debtor agreed not to seek mitigation credit for sales of interruptible transportation capacity. Interruptible transportation capacity is only paid for when used and can be purchased for shorter time periods than firm transportation capacity. Mirant, 332 B.R. at 145 n. 8.

In an Order on Petition for Declaratory Order, issued on September 25, 2006, FERC provided guidance to this court as to the issues raised by Debtor in its petition. As to the right of Debtor to challenge the reasonableness of the rates charged by Tennessee Gas, the Commission found: "[t]he contracts at issue have been terminated and there is no ongoing contractual or shipper-pipeline relationship. The case is an action in Bankruptcy Court for damages for breach of contract under Texas law." See Paragraph 25 of the Order on Petition for Declaratory Order. The Commission went on to state:

> If the contract provision at issue (paragraph 4 of the [contracts]) were still enforceable under Texas law, then the Commission would likely find it unjust and unreasonable under Commission policy and unenforceable prospectively from the date of such order, but not before such date. . . . Moreover, we do not believe that USGen would benefit from filing a section 5 complaint. The Commission has discretion to decide whether to initiate a section 5 investigation into a pipeline's tariff rates, and could decline to do so in the circumstances of this case. In analogous cases involving exit fees for termination of contracts, we have found that it is not unreasonable for such fees to be based on rates in effect at the time the exit fees are set as it could always be argued that the tariff rates might decrease in the future.

Id. at Paragraphs 25-26 (footnotes omitted). With regard to the issue of mitigation, the Commission stated:

> We clarify that the filed rate doctrine does not preclude the additional mitigation USGen is seeking just as it did not preclude the mitigation Tennessee already agreed to provide for reservation charges it expects to receive from the sale of USGen's turnback capacity. Mitigation does not change the filed rate; it only changes the net amount owed as an equitable remedy for the breach of the contract."

See Paragraph 32 of the Order on Petition for Declaratory Order. As to some of the specific charges at issue here, the Commission found as follows:

> [W]e find that the issue of additional mitigation may be resolved by the Bankruptcy Court by applying state law. Although we take no position on what damages or mitigation may be available under state law, we will note that it is inconsistent with

6

> the Commission's exit fee policies to allow mitigation for future non-reservation charge revenues, like the claimed fuel over-recoveries, because of the speculative nature of such revenues. Therefore, although additional mitigation is not prohibited by the filed rate doctrine, mitigation for fuel over-recoveries claimed by USGen does not appear to involve the types of revenues that the Commission would allow as offsets against the amount of damages USGen owes Tennessee. Further, we will note that USGen would bear the burden to show that the Dracut contract reservation charge revenues, which Tennessee claims are actually backhauls, result from the resale of USGen's former forwardhaul capacity and would not otherwise be obtained but for the resale of that capacity, to warrant their inclusion as mitigation credits.

Id. at Paragraphs 32 and 33 (footnote omitted).

Based upon the guidance provided by FERC in its Order on Petition for Declaratory Order, this court determines that, as to the retained fuel recoveries and backhaul transportation services, no mitigation credit is owed by Tennessee Gas to Debtor. Based upon the choice of law provision in the contracts, the court will apply Texas law prior to addressing the issue of any additional mitigation credit owed to Debtor for the fixed reservation charges and the throughput commitment. See In re Merry-Go-Round Enterprises, 241 B.R. 124, 131-32 (Bankr. D. Md. 1999) (citations omitted).

Under Texas law, "[t]he normal measure of damages for breach of contract is the contract price minus the resale price." In re El Paso Refinery, L.P., 196 B.R. 58, 65 (Bankr. W.D. Tex. 1996). Mitigation is an affirmative defense asserted by the breaching party against a claim for damages for breach of contract. Id. at 64. "Under mitigation principles, the long-standing law of [Texas] requires a claimant to mitigate damages if it can do so with 'trifling expense or with reasonable exertions.'" Gunn Infiniti, Inc. v. O'Byrne, 996 S.W.2d 854, 857 (Tex. 1999) (citing Great American Ins. Co. v. North Austin Mun. Util. Dist. No. 1, 908 S.W.2d 415, 426 (Tex. 1995)). Generally, the standard applied is that a non-breaching party must use ordinary care and

reasonable diligence to mitigate its damages.  Geotech Energy Corp. v. Gulf States Telecommunications and Information Sys., Inc., 788 S.W.2d 386, 390 (Tex. App. 1990).

The burden of proof rests on Debtor to show that Tennessee Gas did not comply with its obligation to mitigate damages resulting from the breach of the contracts.  See Morgan v. Young, 203 S.W.2d 837, 849-850 (Tex. Civ. App. 1947).  In Morgan, defendant asserted a counter-claim against plaintiff for breach of contract, and, in discussing the burden of proof as to defendant's actions in mitigating damages from the breach of contract, the court stated:

> We hold that whatever necessity lay on defendant of procuring funds from sources other than plaintiff was only an incident of defendant's duty to minimize his damages (which we assume to exist) . . . .  Therefore the burden of proof rested on plaintiff to show that defendant breached any obligation [he] may have owed to procure these funds.

Id.  See also Geotech, 788 S.W.2d at 390 ("A defendant claiming failure to mitigate damages has the burden of proving lack of diligence on the part of the plaintiff and the amount by which the damages were increased as a result of the failure to mitigate.") (citations omitted).  Geotech involved the breach of a contract for the lease of a telephone system.  Id. at 388.  In discussing plaintiff's obligation to mitigate its damages after defendant's breach, the court found:

> [Plaintiff] had no duty under the contract, or at common law, to find a third-party to assume all of [defendant's] contractual obligations.  Its only duty was to use ordinary care and reasonable diligence to minimize its damages.  [Defendant] produced no evidence that [Plaintiff] failed to do so.

Id. at 390.  See also Toshiba Machine Co., America v. SPM Flow Control, Inc., 180 S.W.3d 761, 781  (Tex. App. 2005) (citation omitted) ("Mitigation of damages is a rule requiring the injured party to use reasonable diligence to minimize his damages.").  Further, the party alleging failure to mitigate damages has the burden to show that the non-breaching party could have mitigated

8

and the value of such mitigation.  See Bank One, Texas, N.A. v. Taylor, 970 F.2d 16, 29 (5th Cir. 1992) (citations omitted) (Under Texas law, "[o]ne who claims a failure to mitigate damages has the burden to prove not only lack of diligence on the part of the injured party, but also the amount by which damages were increased by such failure to mitigate."); LTV Aerospace Corp. v. Bateman, 492 S.W.2d 703, 709 (Tex. Civ. App. 1973).

In the case of Austin Hill Country Realty, Inc. v. Palisades Plaza, Inc., 948 S.W.2d 293, 299-300 (Tex. 1997), the Supreme Court of Texas reversed long-standing Texas precedent and, after reviewing the law of the several states of the Union and the change in the nature of landlord-tenant law since its inception in medieval times, held that landlords must mitigate damages upon a tenant's abandonment and failure to pay rent.  The parties agree that this principle is applicable to this case.  In addition to laying down the change, the court went further:

> To ensure the uniform application of this duty by the courts of this state, and to guide future landlords and tenants in conforming their conduct to the law, we now consider several practical considerations that will undoubtedly arise. . . .  Nor does the landlord's failure to mitigate give rise to a cause of action by the tenant.  Rather, the landlord's failure to use reasonable efforts to mitigate damages bars the landlord's recovery against the breaching tenant only to the extent that damages reasonably could have been avoided.  Similarly, the amount of damages that the landlord actually avoided by releasing the premises will reduce the landlord's recovery.
>
> Further we believe that the tenant bears the burden of proof to demonstrate that the landlord has mitigated or failed to mitigate damages **and the amount** by which the landlord reduced or could have reduced its damages.

948 S.W.2d at 299 (Emphasis added.).  The nub of this dispute involves a determination of Texas law dealing with degree of certainty of fixing the amount of mitigation credits for future sales.

The Austin Hill ruling is of an historical nature dealing with the status of mitigation of damages for breach of the lease accruing prior to the hearing.  It is focused on events occurring

prior to the trial. As to post-hearing events, the court went on to say that:

> The landlord must have a duty to mitigate when suing for anticipatory repudiation . . . . A suit for anticipatory repudiation, an actual reentry, or a contractual right of reentry subject to the above conditions will therefore give rise to the landlord's duty to mitigate damages upon the tenant's breach and abandonment.

948 S.W.2d at 300.

Tennessee Gas proved the amount of damages that resulted from the rejection of the contracts.[6] Debtor then has the burden of proving the extent that Tennessee Gas mitigated its damages after rejection, as well as the amount of the mitigation credit.

In this case, the initial calculation of rejection damages is not in issue. This case revolves around the amount of mitigation credit owed to Debtor by Tennessee Gas. With regard to mitigation credit for sales of fixed reservation charges, by the date of trial, Tennessee Gas credited $12,159,973 to Debtor, to which it added the credit resulting from the Hess sale; however, this includes no further credit to Debtor for future sales of fixed reservation capacity after the trial through the original contract end of October 31, 2013.

In addition, Tennessee Gas did not give credit for five contracts for sales of fixed reservation capacity in the total amount of $4,659,340.[7] Each of these contracts was entered into prior to trial in this case. As to these five contracts, the court finds that mitigation credit for four

---

[6] Under 11 U.S.C. §502(a) and F.R.C.P. 3001(f), a proof of claim constitutes *prima facie* evidence of the validity and amount of the claim, and an objecting party must produce evidence of equal probative value to overcome the *prima facie* validity of the claim. See Merry-Go-Round Enterprises, 241 B.R. at 134 (citations omitted). Once the objecting party produces sufficient evidence, the burden shifts back to the claimant, who must prove the validity of its claim by a preponderance of the evidence. Id. (citations omitted).

[7] The five disputed contracts include: (1) the Hess Stagecoach to Mendon contract; (2) the Hess Dracut to White Plains contract; (3) the Select contract; (4) the Connecticut Natural Gas contract, and (5) the Southern Connecticut Natural Gas contract.

of the five contracts is properly owed to Debtor.  Debtor contends that the total dollar amount of fixed reservation capacity sold under the four contracts is $3,800,020, less the amount of the Hess Dracut to White Plains contract, valued at $859,320.  The court accepts this valuation and, therefore, finds that mitigation credit of $3,800,020 is owed to Debtor as a result of these contracts and that Tennessee Gas' claim should be reduced by this amount.  The court does not include the revenues from the Hess Dracut to White Plains contract because, unlike the other four contracts, which all utilized specifically Debtor's rejected fixed reservation capacity, this contract involved the sale of capacity on the portion of Tennessee Gas' pipeline system from Dracut to White Plains, rather than the Wright to Mendon pipeline.

      As to the throughput commitment, Debtor argued that it acted as a guarantor that 54,000 dekatherms of gas would be flowed on the Wright to Mendon pipeline each day through January 31, 2006.  Debtor argues that damages from the breach of the throughput commitment are subject to mitigation to the extent the replacement shippers did flow 54,000 dekatherms of gas each day and calculates, after the appropriate mitigation credit is applied, that Debtor owes $2,541,111 ($5,420,253 as value of the throughput commitment minus $2,879,142 in mitigation).  Tennessee Gas disputes that any mitigation credit is owed on the throughput commitment, arguing that it was a promise unique to Debtor's contract and a guarantee by Debtor.  In the alternative, assuming that mitigation credit is owed, Tennessee Gas argues that Debtor owes $3,841,427 under the throughput commitment.  The court determines that mitigation credit is properly owed as to the throughput commitment and accepts Tennessee Gas' valuation as to the amount of damages.

      Tennessee Gas' position as to mitigation for future sales was set forth in the opening

11

statement of its counsel.  "Our position is not that the future might entail selling this capacity.  Our position is that that's not knowable.  There is no certainty that we will sell out.  The potential for selling incremental revenues that would come as mitigation credit here cannot be reasonably ascertained."  (Tr. July 18, 2006, at 40-41.)    The court understands that Texas law is that the tenant must prove the precise amount of mitigation owing to future lease activity.  That being so, Tennessee Gas is correct;  no mitigation credit can be given for potential future transactions.  The Debtor cannot meet this burden and prove the dollar amount of mitigation that will result from future sales.  As far as this court can find, the law of Texas compels a result that, unless the court can find the dollar amount of mitigation credit, the party breaching the contract is not entitled to mitigation credit.  But this analysis is based upon a hodge-podge of Texas opinions, as there is no opinion of the Texas Supreme Court on point.  However, a federal appellate court is empowered under Texas Rule of Appellate Procedure 58.1 to certify a question of law to the Texas Supreme Court where it is presented with a determinative question of Texas law having no Supreme Court precedent.

      The court is firmly convinced that Tennessee Gas will sell out most, if not all, of the future capacity at issue.  But the court cannot find at this time the **amount** of mitigation credit for future sales by Tennessee Gas of Debtor's rejected fixed reservation charges on the Wright to Mendon pipeline.  It can only estimate that degree of future activity that will enable Tennessee Gas to recover not only from Debtor, but a double payment from the replacing shipper taking on Debtor's capacity.  The court finds as a fact that there will be future sales by Tennessee Gas of a large majority of the returned capacity, just as there has been a sale of all the capacity to the date of this writing.

May this court estimate that portion of Tennessee Gas' claim as it related to rejection damages from future sales?  See In re Stone & Webster, Inc., 279 B.R. 748, 810-812 (Bankr. D. Del. 2002).  Estimation seems logical but for the constraints of Texas law that appear to mandate certainty.  As tempting as this approach is, the court will not decide this matter based upon an estimation of the amount of mitigation of damages resulting from sales of future capacity.  But the court cannot avoid finding, based upon the evidence introduced at trial, that it is likely that Tennessee Gas will be able to sell at no less than two-thirds of the fixed reservation capacity in the remaining years of the rejected contracts.  Tennessee Gas asserted in its proof of claim that the future reservation charges had a value of $19,931,990 under the contracts.  But the court is barred by its understanding of Texas law from implementing this dicta in its decision.

Tennessee Gas must discount its claim, minus mitigation, back to its net present value. Mirant, 332 B.R. at 156-57 (citing 11 U.S.C. §502(b); In re Stembridge, 394 F.3d 383, 387-88 (5th Cir. 2004); In re Loewen Group Int'l, Inc., 274 B.R. 427, 434-35 (Bankr. D.Del. 2002)).  In Mirant, the court found that the discount rate to be applied had to account for the risk associated with the non-performance of the breaching party at the time the parties entered into the contract, as the purpose of the discount rate is "to reduce the [c]laim to an amount consistent with the allowed amounts of other claims."  332 B.R. at 158.  According to 2002 financial statements, Debtor's credit facility bore an interest rate of LIBOR plus credit spread.  As the contracts here were entered into in August 2002, this is the appropriate discount rate to be applied to Tennessee Gas' claim.

The parties will submit an order consistent with the findings and conclusions in this memorandum.

cc: Gordon Coffee, Esq.
　　Kenneth W. Irvin, Esq.
　　Marc Richards, Esq.
　　Office of the United States Trustee

**End of Memorandum**