Date signed August 16, 2007



THOMAS J. CATLIOTA
U. S. BANKRUPTCY JUDGE

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
## at GREENBELT

| | | |
|---|---|---|
| In re: | * | |
| | * | **Case No.  03-30465** |
| **USGen New England, Inc.,** | * | **(Chapter 11)** |
| | * | |
| **Reorganized Debtor.** | * | |
| | * | |
| ********************************* | * | |
| | * | |
| | * | |
| **USGen New England, Inc.,** | * | **Docket Nos. 2187, 2191, 2198** |
| | * | |
| **vs.** | * | |
| | * | |
| **TransCanada Pipelines, Ltd.** | * | |
| | * | |
| | * | |
| | * | |
| | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## MEMORANDUM OPINION

Several pre-trial disputes arose in this litigation over the objection by the Debtor,

USGen New England, Inc. ("USGen"), to the Proof of Claim of TransCanada Pipelines

Ltd. ("TransCanada").  USGen filed a motion (Docket No. 2191) to compel TransCanada

to produce materials and information concerning TransCanada's expert witnesses.

TransCanada filed a motion and a supplemental motion (Docket Nos. 2187 and 2198)

seeking to strike the expert reports of Gordon Cameron and Roland Priddle, two expert witnesses proffered by USGen. The parties have fully briefed these issues and the court heard argument on July 26, 2007.

TransCanada's Proof of Claim stems from USGen's rejection of a natural gas transportation contract. The claim, as amended, is in the approximate amount of $50 million Canadian ("CAD").[1] Two central issues in the claim litigation are whether TransCanada has mitigated its damages and whether TransCanada has been held harmless through rate-making procedures before the National Energy Board of Canada ("NEB").

In Docket No. 2191 (the "USGen Motion"), USGen seeks a ruling compelling TransCanada to produce: (1) materials that are protected by the attorney work product doctrine or the attorney-client privilege that were considered by Charles Kemm Yates, Esq. ("Yates"), TransCanada's retained expert, in forming his opinion, or which are otherwise relevant to the opinion; (2) a statement of the amount of fees that Yates' law firm billed to TransCanada in the past seven years; and (3) materials that are protected by the attorney work product doctrine or the attorney-client privilege that were considered by four TransCanada employees who have been designated under Fed. R. Civ. P. 26(a)(2)(A) as witnesses who will provide opinion testimony.[2]

---

[1] The parties have not yet addressed the requirement of 11 U.S.C. §502(b) that the Court must determine the amount of the claim in United States currency.

[2] Fed. R. Civ. P. 26 is made applicable to this proceeding by Fed. R. Bankr. P. 9014(c) and the court's scheduling orders.

In Docket Nos. 2187 and 2198 (collectively the "TransCanada Motion"), TransCanada contends that the expert reports of Messrs. Cameron ("Cameron") and Priddle ("Priddle") should be stricken because the reports: (1) are not proper rebuttal reports, but rather offer opinions that support USGen's case-in-chief and should have been previously produced; and (2) include improper legal opinion testimony and are otherwise improper under Fed. R. Civ. P. 44.1 and Fed. R. Evid. 702.[3]

For the reasons set forth herein, the court will:

(1) compel TransCanada to produce any materials protected by the attorney work product doctrine or attorney-client privilege that were considered by Yates in forming his opinion, as required by Fed. R. Civ. P. 26(a)(2)(B);

(2) compel TransCanada to produce any materials protected by the attorney work product doctrine or the attorney-client privilege that Yates did not consider in forming his opinion, but that are relevant to specific statements or opinions contained in Yates' expert report (which statements or opinions are identified herein) because such statements have been put in issue by TransCanada;

(3) not compel TransCanada to produce the requested billing information of Yates' law firm because there is no pending discovery request for the information;

(4) not compel TransCanada to produce materials that are protected by the attorney work product doctrine or attorney-client privilege with respect to three of the employee hybrid fact/expert witnesses, Kay Coad, Sean Brett and Rob Whitmore, with respect to his initial affidavit dated November 2, 2006;

(5) compel TransCanada to produce a log of privileged or withheld materials and information that were considered by Rob Whitmore in the preparation of his supplemental affidavit dated January 15, 2007, subject to further proceedings;

(6) require the parties to supplement the record on the source of the facts considered and the scope of the opinions offered by Zafir Samoylove, the fourth employee hybrid fact/expert witness;

---

[3] Fed. R. Civ. P. 44.1 is made applicable to this proceeding by Fed. R. Bankr. P. 9017, which also makes all of the Federal Rules of Evidence applicable to this proceeding.

(7) deny the TransCanada Motion to strike the expert reports of Cameron and Priddle to the extent it is based on the claim that the reports are improper rebuttal reports, but the court will allow TransCanada to serve a surrebutal report;

(8) deny the TransCanada Motion to strike the expert reports of Cameron and Priddle to the extent it is based on the claim that expert submissions under Fed. R. Civ. P. 44.1 cannot include legal opinion testimony on foreign law or apply foreign law to the facts; and

(9) defer ruling on the remaining objections in the TransCanada Motion to strike the expert reports of Cameron and Priddle until the parties have fully briefed their cross-motions for summary judgment, so that TransCanada's remaining objections to the reports can be properly addressed in the context of the merits of the objection to the TransCanada Claim.

## I. BACKGROUND

**A.    The TransCanada Claim Litigation.**

On January 6, 1992, USGen's predecessor-in-interest, New England Power Company, and TransCanada entered into a Firm Transportation Contract (the "Agreement").  The contract price for firm transportation capacity under the Agreement was set at the regulated tariff rate approved by the NEB.  As a firm contract, the pipeline capacity for the transport of natural gas specified in the Agreement was available for USGen's transportation and use whenever needed, provided that all other obligations of the Agreement were met.

Under the Agreement, TransCanada was required to reserve capacity on the TransCanada Mainline pipeline to enable the transport of a maximum daily quantity of natural gas of 53,904[4] gigajoules (GJ) per day.  The receipt

---

[4] The record reflects several different amounts for the maximum daily quantity of natural gas under the Agreement.  These differences are not material to the issues addressed herein.

4

point for natural gas was at the head of the TransCanada Mainline at Empress, Alberta.  The delivery point under the Agreement was the interconnection of the TransCanada Mainline to the Iroquois Gas Transmission System at the U.S.-Canada border near Waddington, New York.    Performance under the Agreement was to continue through October 31, 2006.

USGen filed a voluntary chapter 11 petition on July 8, 2003.  On August 12, 2003, USGen filed a motion to reject the Agreement (Docket No. 186), which was deemed rejected as of September 5, 2003.  <u>See</u> <u>Order Authorizing Rejection of Certain Gas Transportation Agreements</u>, September 12, 2003 (Docket No. 275).

On October 20, 2003, TransCanada filed a Proof of Claim, No. 37, in the amount of $71,133,275.63 CAD.  The claim was based on the alleged contractual damages that resulted from the rejection of the Agreement.  TransCanada amended its claim on October 12, 2005, and on November 2, 2006 (as amended, the "TransCanada Claim").  The TransCanada Claim is asserted as an unsecured nonpriority claim in the amount of $50,966,472.00 CAD and a secured claim in the amount of $1,460,094.00 CAD.

USGen filed its objection to the TransCanada Claim on April 12, 2005.  Docket No. 1620.  In the objection, USGen contended that the TransCanada Claim should be disallowed in its entirety because:

> . . .TransCanada has mitigated almost all of its damages, as required
> by applicable law, and, to the extent TransCanada has not been able
> to mitigate, TransCanada has been held harmless, through its annual
> cost recovery and rate-making processes, against any impact from
> the rejection of the [Agreement].

5

<u>Debtor's Objection to Claim of TransCanada Pipelines, Ltd. [Claim No. 37]</u>, Docket No.
1620 at p. 3.  TransCanada filed a response to the objection on May 18, 2005.  Docket
No. 1716.

Since that time, the parties have engaged in discovery and filed initial cross-
motions for summary judgment, but agreed to defer filing final briefs on the cross-
motions pending completion of expert discovery.  The current disputes arose during that
process.

**B.    The Current Disputes.**

USGen has retained three experts, Mr. Peter J. Milne ("Milne") and Cameron and
Priddle; USGen designated Milne as its expert for its case-in-chief and Cameron and
Priddle as rebuttal experts.[5]

TransCanada retained Yates as its expert.  As described by TransCanada, Yates is
an expert in Canadian law and Canadian regulatory processes.  It is not disputed that
Yates is also TransCanada's lead outside Canadian regulatory counsel and has
represented TransCanada in numerous regulatory proceedings before the NEB.

In addition, TransCanada served USGen a notice of expert disclosures that
designated four TransCanada employees as so-called hybrid fact/opinion witnesses.  The
four employees are Kay Coad, Sean Brett, Rob Whitmore and Zafir Samoylove

---

[5] In support of its cross-motion for summary judgment, USGen submitted the declaration of Milne. After
TransCanada moved to strike the declaration., USGen served TransCanada with Milne's expert report and
TransCanada deposed him.  The motion to strike the Milne declaration has been deferred while
TransCanada files a supplemental motion to strike Milne's report, since his report is more comprehensive
than his declaration and it has been supplemented by his deposition testimony.

(collectively, the "hybrid fact/expert witnesses").  TransCanada described their role as

follows:

> Kay Coad - Although she is not a "retained expert" as described in
> Fed. R. Civ. P. 26(a)(2)(B), TransCanada designates its employee
> Kay Coad as an expert witness as to matters respecting its marketing
> and sale of pipeline capacity and the regulatory requirements that
> effect the marketing and sale of pipeline capacity to the extent they
> are relevant to this case, including without limitation the matters set
> forth in Ms. Coad's affidavit in this case, her depositions in this case,
> and the exhibits thereto.
>
> Sean Brett - Although he is not a "retained expert" as described in
> Fed. R. Civ. P. 26(a)(2)(B), TransCanada designates its employee
> Sean Brett as an expert as to matters respecting the appropriate
> discount rate.
>
> Rob Whitmore - Although he is not a "retained expert" as described
> in Fed. R. Civ. P. 26(a)(2)(B), TransCanada designates its employee
> Rob Whitmore as an expert witness as to matters respecting its toll
> design and regulatory requirements, including without limitation the
> matters set forth in Mr. Whitmore's affidavit in this case, and the
> exhibits thereto.
>
> Zafir Samoylove - Although he is not a "retained expert" as
> described in Fed. R. Civ. P. 26(a)(2)(B), TransCanada designates its
> employee Zafir Samoylove as an expert witness as to matters
> respecting its proof of claim, damages, and potential mitigation,
> including without limitation the matters set forth in TransCanada's
> proof of claim, Mr. Samoylove's depositions in this case, and the
> exhibits thereto.

See TransCanada's Notice of Expert Disclosures, Docket No. 2191, Exhibit J.

USGen served TransCanada with the expert reports of Cameron and Priddle.

Cameron's report states that he is a Canadian attorney who has taught the Law of

Remedies at the University of Toronto Law School and currently teaches that subject at

the University of Ottawa Law School.  Cameron also states that he has particular

experience in the Canadian federal regulation of natural gas pipelines, and of TransCanada in particular, before the NEB. Priddle's report states that he is a consultant on matters of energy, principally having to do with regulation. He states that he was Chairman of the NEB from 1986 through 1997.

USGen contends that Cameron's and Priddle's reports rebut Yates' report and portions of Cameron's report also rebut the affidavit of Rob Whitmore. The specific statements in the reports or affidavits of the foregoing witnesses will be addressed further as appropriate in the context of the pending motions.

## II.  DISCUSSION

**A.     The USGen Motion.**

### 1.     Yates' law firm's billing information.

USGen seeks the amount of fees billed by Yates' law firm, Stikeman Elliott LLP ("Stikeman Elliott"), to TransCanada since 2000, breaking out those fees for which Yates received supervisory or billing credit in the firm's compensation structure. The court will deny this request.

This issue arose during Yates' deposition. Yates is a Canadian regulatory lawyer and a partner in Stikeman Elliott. He and his firm do legal work for TransCanada. Yates testified at his deposition that TransCanada was his largest client over the past two to three years. He testified that he could not estimate his total billings or billable hours for TransCanada for those years or the current year. He estimated that his billings to TransCanada were more than half but less than three-quarters of his total billings.

TransCanada did not object to questions to Yates about his personal billings. However, when Yates was asked for the amount of billings by Stikeman Elliott to TransCanada, he was initially instructed not to answer. The stated basis for the instruction was that:

> [w]hat TransCanada paid to this law firm other than Mr. Yates is not an issue and not relevant to this proceeding. . . . If you want to know how much they paid to Mr. Yates, that's different. The law firm is not the expert; it's Mr. Yates.

Yates deposition transcript at p.139; Docket 2201, Exhibit A.  Yates was then asked a series of questions about the amount of the fees Stikeman Elliott billed to TransCanada from 2004 through 2007, and was instructed not to answer each question.

If the record ended there, the court would not hesitate to order TransCanada to produce the requested information.  From the questions that Yates answered, it was apparent that TransCanada is a significant client of Yates and it further appeared that TransCanada was a significant client of the firm.  As a partner in the firm, Yates' personal economic well-being is potentially affected by matters that can either benefit or harm clients of his firm, especially significant clients.  That is especially true when Yates himself is serving in a capacity that can effect whether the client is benefited.  Thus, the economic relationship between Yates' law firm and TransCanada is the proper subject of exploration for Yates' potential bias.  The scope of the economic relationship is certainly relevant, as that term is used in Fed. R. Civ. P. 26(b)(1), and the inquiry "appears reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1); see e.g., Behler v. Hanlon, 199 F.R.D. 553 (D. Md. 2001) (finding that an expert's financial relationships are relevant under Fed. R. Civ. P. 26(b)(1) to show bias).

Further, as USGen points out, Fed. R. Civ. P. 30(d)(1) provides that a witness may be instructed not to answer a question at a deposition "only when necessary to preserve a privilege, to enforce a limitation directed by the court, or to present a motion under Rule 30(d)(4)." Thus, TransCanada's instruction to Yates was clearly improper.

The record, however, does not end there. After the series of questions concerning Stikeman Elliott's annual billings to TransCanada, the deposition transcript reflects a "discussion off the record." Yates deposition transcript at p. 142; Docket 2201, Exhibit A. When the parties were back on the record, Yates was asked a series of questions about the scope of the relationship between Stikeman Elliott and TransCanada, including the same questions concerning the amount of the law firm's billings to TransCanada that he had previously been instructed not to answer. Those questions were asked without objection. With respect to questions concerning the amount of Stikeman Elliott's billings to TransCanada, Yates stated that he did not know the amounts. Id. at pp. 142-144. The deposition continued without further dispute on this point.

USGen asks the court to require TransCanada to produce the billing information as a sanction for the improper instruction not to answer. But while the initial instruction was improper, TransCanada allowed the same questions to be asked without asserting the instruction within a matter of minutes – or, perhaps to be more accurate, within 2-3 pages of the deposition transcript. Thus, USGen was not prejudiced by the instruction.

Moreover, because Yates answered all questions put to him about the billing information and scope of relationship between Stikeman Elliott and TransCanada, there is no pending discovery request to which TransCanada has not responded and as to which

the court could compel a response.[6]  Accordingly, the court will not compel TransCanada

to produce the billing information.

> **2.      Materials protected by the attorney work product doctrine or attorney-client privilege that were considered by Yates or are relevant to his opinion.**

The scope of the dispute between TransCanada and USGen with respect to the

protected materials is fairly narrow, although potentially significant.[7]  The parties do not

dispute that TransCanada identified Yates as a Fed. R. Civ. P. 26(a)(2)(B) expert, and

that Rule 26 and the Rule 26(a)(2)(B) disclosure obligations apply to Yates.[8]  Yates

prepared a report, produced materials in response to USGen's discovery requests, and has

been deposed by USGen.  USGen does not dispute that Yates complied with the Rule

26(a)(2)(B) disclosures and responded to discovery requests, other than the issues raised

here.

USGen seeks an order compelling TransCanada to produce documents and Yates

to answer deposition questions relating to his representation of TransCanada in the 2004

regulatory proceeding before the NEB on TransCanada's Mainline Tolls and Tariff

Application.   In that proceeding, the NEB allowed TransCanada to recover the $5.8

million deferral account, which purportedly represented the gross amount of the Firm

---

[6] TransCanada's counsel stated at the hearing that the off-the-record discussion at the deposition resulted in an understanding that TransCanada would allow Yates to answer questions concerning whether he knew the billing amounts.  If so, TransCanada would decide whether to press its objection; if not the objection would be moot. As stated above, the discussion was off the record and the court cannot determine whether any understanding was reached.  That point is not controlling.  It is clear from the record that after the discussion, USGen was allowed to ask Yates questions about the billing information without objection.

[7] The dispute is "potentially" significant because the court has not been provided with a list of any specific documents that have been withheld by TransCanada.

[8] See TransCanada's reply to the USGen Motion. Docket No. 2201 at pp. 3-5.

Transportation ("FT") tolls payable by USGen in 2003 after the rejection of the Agreement. USGen contends that because Yates has stated that there is a risk that the NEB could reconsider its 2004 decision, any materials and information related to that process should be the subject of discovery, even if privileged or protected. USGen also seeks materials and information relevant to specific statements in Yates' report that are allegedly protected by the attorney work product doctrine or the attorney-client privilege.

### a.    Materials considered by Yates in forming his opinion.

The first category the court will address is information protected by the attorney work product doctrine or the attorney-client privilege that Yates considered in forming his expert opinion. For the reasons set forth below, the court will order TransCanada to produce materials and information considered by Yates in forming his opinion that are protected by the attorney work product doctrine or the attorney-client privilege.

Fed. R. Civ. P. 26(a)(2) provides disclosure requirements for expert witnesses.[9]

---

[9] Fed. R. Civ. P. 26(a)(2) provides:

(2) Disclosure of Expert Testimony.

(A) In addition to the disclosures required by paragraph (1), a party shall disclose to other parties the identity of any person who may be used at trial to present evidence under Rules 702, 703, or 705 of the Federal Rules of Evidence.

(B) Except as otherwise stipulated or directed by the court, this disclosure shall, with respect to a witness who is retained or specially employed to provide expert testimony in the case or whose duties as an employee of the party regularly involve giving expert testimony, be accompanied by a written report prepared and signed by the witness. The report shall contain a complete statement of all opinions to be expressed and the basis and reasons therefor; the data or other information considered by the witness in forming the opinions; any exhibits to be used as a summary of or support for the opinions; the qualifications of the witness, including a list of all publications authored by the witness within the preceding ten years; the compensation to be paid for the study and testimony; and a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years.

It mandates that the expert's report must include "the data or other information considered by the witness in forming the opinions." Fed. R. Civ. P. 26 (a)(2). "The commentary to the Rule makes it clear that 'other information' considered by the expert includes work product[10] provided by the attorney who retained the expert." Musselman v. Phillips, 176 F.R.D. 194, 197 (D. Md. 1997).

> Rule 26(a)(2)(B) does not preclude counsel from providing assistance to experts in preparing the reports, and indeed, with experts such as automobile mechanics, this assistance may be needed. . . . The report is to disclose the data and other information considered by the expert and any exhibits or charts that summarize or support the expert's opinions. <u>Given this obligation of disclosure, litigants should no longer be able to argue that materials furnished to their experts to be used in forming their opinions-whether or not ultimately relied upon by the expert-are privileged or otherwise protected from disclosure when such persons are testifying or being deposed.</u>

<u>Id</u>. (quoting Commentary to Fed. R. Civ. P. 26(a)(2)(B)) (emphasis in original).

"[W]hen an attorney communicates otherwise protected work product to an expert witness retained for the purposes of providing opinion testimony at trial-whether factual in nature or containing the attorney's opinions or impressions-that information is discoverable if it is considered by the expert." <u>Musselman</u>, 176 F.R.D. at 199; <u>See</u> <u>also</u>,

---

[10]Work product is divided into two categories: fact work product and opinion work product that encompass the mental impressions, conclusions, opinions or theories of an attorney concerning litigation. Generally, the former enjoys only qualified immunity while the latter is protected by absolute immunity that gives way only in extraordinary circumstances. <u>See</u> <u>Better Gov't Bureau, Inc. v. McGraw</u>, 106 F.3d 582, 607 (4th Cir. 1997) ("In contrast to fact work product, which is discoverable 'upon a showing of both a substantial need and an inability to secure the substantial equivalent of the materials by alternate means without undue hardship,' opinion work product 'enjoys a nearly absolute immunity and can be discovered only in very rare and extraordinary circumstances'" (quoting <u>In re Grand Jury Proceedings, Thursday Special Grand Jury</u>, 33 F.3d 342, 348 (4th Cir. 1994))). "Whether the applicable immunity from discovery is qualified-as for fact work product-or "nearly absolute"-for opinion work product-it may, of course, be waived." <u>Musselman</u>, 176 F.R.D. at 197 (citing <u>United States v. Pollard (In re Martin Marietta Corp.)</u>, 856 F.2d 619, 623-27 (4th Cir. 1988)).

Elm Grove Coal Co. v. Director, O.W.C.P, 480 F.3d 278, 303 (4th Cir. 2007) ("... draft expert reports prepared by counsel and provided to testifying experts, and attorney-expert communications that explain the lawyers concept of the underlying facts, or his view of the opinions expected from such experts, are not entitled to protection under the work product doctrine.").  Work product provided to a retained expert is "…discoverable even if the expert did not rely upon it in forming his or her opinions, so long as the expert considered it while developing them."  Musselman, 176 F.R.D. at 202 (citing Karn v. Ingersoll-rand Co., 168 F.R.D. 633, 634 (N.D. Ind. 1996)).

In accordance with the foregoing, TransCanada must produce any materials or information protected by the attorney work product doctrine or the attorney-client privilege that were considered by Yates in forming his opinion and preparing his report, whether or not he relied upon them.

### b. Materials that are relevant to Yates' opinion or report but which he did not consider in forming his opinion.

The second category raised by the USGen Motion is information or materials protected by the attorney-client privilege that are relevant to Yates' opinion but that he did not consider in forming his opinion.[11]  These materials would include legal memoranda or analyses that Yates provided to TransCanada during the course of his representation of TransCanada in prior years.  Yates may not have "considered" (as that

---

[11] With respect to this second category of materials, the court focuses on materials protected by the attorney-client privilege.  One would expect that if Yates were given attorney work product, he would have "considered" those materials and their production is governed by Section II.A.2.a, above. To the extent Yates has in his possession or control attorney work product materials that he did not consider in forming his opinion, but which are relevant to his opinion, those materials would be included in this second category.

14

term is used in Fed. R. Civ. P. 26(a)(2)(B)), these materials in forming his opinion, but they may be relevant to his opinion.

The distinction between materials considered by Yates, on the one hand, and materials that he did not consider but that are relevant to his opinion, on the other hand, arises from the application of Rule 26(a)(2)(B).  As stated above, <u>supra</u> at Section II.A.2.a., Rule 26(a)(2)(B) requires a party to disclose, with respect to an expert who has been retained to provide expert testimony in the case, the data and information considered by the expert and the basis and reasons for the opinion.  The disclosures required by Rule 26(a)(2)(B) are affirmative obligations imposed on the party who intends to call the retained expert.  Accordingly, to the extent Yates has in his possession or control materials relevant to his opinion but which he did not consider in forming his opinion, Rule 26(a)(2)(B) imposes no affirmative obligation on TransCanada or Yates to identify those materials.

USGen, however, is entitled to seek those materials through usual discovery processes.  It is well established that, in addition to the disclosures required by Fed. R. Civ. P. 26(a)(2)(B), a party is entitled to obtain discovery from designated experts by other methods authorized by the Federal Rules of Civil Procedure.  <u>See</u> <u>e.g.</u> Fed. R. Civ. P. 26(b)(4)(A) (permitting depositions of testifying experts).  "The enumeration in Rule 26(a) of items to be disclosed does not prevent a court from requiring by order or local rule that the parties disclose additional information . . . . Nor are parties precluded from using traditional discovery methods to obtain further information regarding these matters . . . ."  Fed. R. Civ. P. 26 Advisory Committee's Note; <u>see</u> <u>also</u>, <u>Behler v. Hanlon</u>, 199

F.R.D. 553 (D. Md. 2001) (contemplating the use of Fed. R. Civ. P. 34 to permit discovery from experts of relevant information).  The scope of such discovery is governed by Fed. R. Civ. P. 26(b)(1), which permits discovery of information that "appears reasonably calculated to lead to the discovery of admissible evidence."

The parties apparently do not dispute the foregoing, as USGen apparently has served document requests on Yates and has deposed him. The battle lines have been drawn, however, over the production of attorney-client privileged materials and the scope of  Yates' opinion.

"[I]t is well established that a party waives the attorney-client and work product privileges whenever it puts an attorney's opinion into issue, by calling the attorney as an expert witness or otherwise."  Herrick Co., Inc. v. Vetta Sports, Inc.; No. 94 Civ. 905, 1998 U.S. Dist. LEXIS 14544, 1998 WL 637468, at *1 (S.D. N.Y. Sept. 17, 1998) (citing United States v. Bilzerian, 926 F.2d 1285, 1292 (2d Cir.), cert. denied, 502 U.S. 813, 112 S. Ct. 63 , 116 L. Ed. 2d 39, (1991)).  "[C]ourts cannot sanction the use of the privilege to prevent effective cross-examination on matters reasonably related to those introduced in direct examination."  Bilzerian, 926 F.2d at 1293.

In Herrick, the defendant law firm designated an expert, Wolfram, in legal ethics. Wolfram had a close relationship with the defendant for a number of years, and served as an expert on matters of legal ethics for the defendant and its clients in connection with numerous matters.  The plaintiffs sought to compel the production of documents from Wolfram related to advice previously rendered to the defendant on the same subject matter as Wolfram's opinion but that Wolfram did not consider in forming his opinion.

16

The defendant contended that documents related to prior advice that they received from Wolfram and that were not considered by Wolfram in forming his opinion were not discoverable because they were protected by the attorney-client privilege.   The court disagreed and stated:

> By designating Wolfram as an expert trial witness, [the defendant] has opened the door to such discovery, which covers documents other than those directly considered by Wolfram in forming his opinions.  Prior inconsistent opinions by Wolfram on the same subject matter would be highly relevant material.

Herrick, 1998 U.S. Dist. LEXIS 14544 at 7-8.

TransCanada contends that it has not put in issue any advice Yates has provided to TransCanada in connection with TransCanada's 2004 NEB toll application or any other regulatory matter.  TransCanada states that although Yates offered the opinion that, under the NEB regulatory scheme, there is a risk the NEB will reverse its 2004 decision, Yates provided no opinion on the likelihood that any party would seek a review of the decision or whether the review would be successful.  Therefore, according to TransCanada, documents that may be relevant to an opinion that quantifies or assesses the magnitude of those risks are not relevant to Yates' opinion.  USGen contends that Yates' opinion goes far beyond the limited description offered by TransCanada and seeks Yates' file from the 2004 regulatory proceeding, whether privileged or not.

The court disagrees with USGen that the entire file is relevant to Yates' opinion. Yates took care in writing his report to state that a risk exists that a party may seek reconsideration of the NEB 2004 decision or that the NEB would grant reconsideration. He offered no opinion on the likelihood that either event would occur.  More

17

significantly, his opinion on these two points is largely, although not exclusively, based on the NEB regulatory scheme, as opposed to particular facts concerning TransCanada's application. Further, it does not appear that there is substantial dispute between TransCanada's expert and USGen's experts on the general framework of the NEB regulatory scheme. Thus the wholesale inquiry by USGen into all privileged matters relating to TransCanada's 2004 NEB application process is unwarranted.[12]

Yates' opinion, however, is not merely the sterile discussion of Canadian regulatory law and procedure that TransCanada suggests. His report contains a number of statements that provide a factual context to his opinion or apply the facts to the law. The court has reviewed the report and concludes that the following statements have been put in issue by Yates' opinion, such that a waiver of the attorney-client privilege is warranted.

- The statements in ¶ 16 of his report that other parties have alleged that TransCanada is exposed to no risk because of the existence of the deferral account, and that this position has been rejected by the NEB, which explained "[t]he Board [NEB] wishes to emphasize that the existence of that deferral account does not mean that unrecovered fixed costs will automatically be allowed to be passed on to the shippers by the Board." The NEB has denied recovery of a balance in a deferral account where it determined that TransCanada had not "made every effort to ensure that the interests of its tollpayers are protected. . ." in other legal proceedings.

- A decision by this court in favor of USGen could be viewed as a "changed circumstance" or "new fact" that would raise a doubt as to the correctness of the decisions of the NEB (RH-2-2004 Phase I) to (1) permit recovery of the USGen 2003 default amount, recorded in the Firm Service Revenue Deferral Account, in 2004 Mainline tolls, and (2) approve reallocation of

---

[12] To be sure, USGen's proposed rebuttal experts, Cameron and Priddle, both assess that risk. But merely because the materials are relevant to USGen's rebuttal expert opinions does not provide a basis for compelling the production of information or materials that are protected by the attorney-client privilege from the expert whose opinion they are purportedly rebutting.

18

billing determinants to permit the Mainline to recover the impact of the US Gen default in 2004 from other Mainline shippers.

· The premise for NEB approval of recovery of the effect of the USGen defaults from Mainline shippers through tolls was that TransCanada would prudently pursue recovery of the loss and would credit any net recovery to the Mainline revenue requirement. Destruction of that premise through a judicial decision could provide an incentive to Mainline shippers to seek review and variance of the NEB decisions that visited the effect of the USGen default on them.

· The amount in question is not insignificant in a Mainline toll context. Currently, a variation of approximately $16 million in revenue equates to approximately 1 cent in the Eastern Zone Toll which is approximately $1 CAD per gigajoule. The $50 million CAD in question would therefore result in an impact of approximately 3 cents (3 percent) if applicable to one year, or 1 cent (1 percent) in each of the three years 2004, 2005, 2006. The amounts are certainly significant enough to warrant consideration by stakeholders of a review and variance application.

· To the extent the cost of USGen's breach was "shifted" to TransCanada's non-breaching shippers, it was done with the expectation that TransCanada would prudently pursue its claims against USGen and that any net recovery would be credited to TransCanada's revenue requirement.

· The Supreme Court of Canada's decision in British Columbia v. Canadian Forest Products Ltd. [2004] 2 S.C.R. 74, is entirely inapplicable to the facts of this case.

Accordingly, TransCanada must produce any privileged or protected materials that

address or relate to the matters contained in the foregoing bulleted statements.


**3.      Discovery of attorney work product or attorney-client privileged materials from the hybrid fact/expert witnesses**.

As stated above, TransCanada designated four employee hybrid fact/expert

witnesses to offer opinion testimony at trial. USGen does not seek an order compelling

TransCanada to submit a report containing the disclosures required by Fed. R. Civ. P.

26(a)(2)(B) for these witnesses.  USGen, however, contends that by designating these employees under Fed. R. Civ. P. 26(a)(2)(A), TransCanada has waived the protection of the attorney work product doctrine and the attorney-client privilege for materials that they have considered.  USGen concedes that the only basis for obtaining the protected materials is that TransCanada designated these witnesses under Fed. R. Civ. P. 26(a)(2)(A).  Thus the issue is whether a party must produce information protected by the attorney work product doctrine or the attorney-client privilege that was provided to an employee witness designated under Fed. R. Civ. P. 26(a)(2)(A).

Fed. R. Civ. P. 26(a)(2) distinguishes between witnesses who may be used at trial to present evidence under Fed. R.  Evid. 702, 703 or 705, and witnesses who are retained or specially employed to provide expert testimony in a case.  Rule 26(a)(2)(A) requires disclosure of the identity of the former; Rule 26(a)(2)(B) requires a party to make the mandatory disclosures contained therein for the latter.

Consistent with Rule 26(a)(2), Local Rule 104.10 of the United States District Court for the District of Maryland makes it clear that a party need not make the "disclosures" required by Fed. R. Civ. P. 26(a)(2)(B) for hybrid fact/expert witnesses.[13]

---

[13] D. Md. Loc. R. 104.10 (amended 8/16/04) provides:

Actions and Witnesses Exempted From Provisions of Fed. R. Civ. P. 26(a)(2)(B)

Unless otherwise ordered by the Court a party must provide the disclosures required by Fed. R. Civ. P.26(a)(2)(B) only as to experts retained or specially employed by a party to provide expert testimony. The disclosures need not be provided as to hybrid fact/expert witnesses such as treating physicians. The party must disclose the existence of any hybrid fact/expert witness pursuant to Fed. R. Civ. P. 26(a)(2)(A), and an adverse party may obtain the opinions of such witnesses (to the extent appropriate) through interrogatories, document production requests, and depositions.

The Local Rule provides, however, that a party may obtain the "opinions" of such witnesses, to the extent appropriate, through usual discovery means.

The seminal case in this District that discusses the differences between hybrid fact/expert witnesses and retained experts is <u>Sullivan v. Glock, Inc.</u>, 175 F.R.D. 497 (D. Md. 1997).  In that case, the defendant sought to exclude an expert's testimony at trial pursuant to Fed. R. Civ. P. 37(c)(1) on the grounds that the plaintiff had failed to produce all the required disclosures mandated by Fed. R. Civ. P. 26(a)(2)(B).  The court denied the request, finding that the subject experts were hybrid witnesses for whom no Fed. R. Civ. P. 26(a)(2)(B) disclosures were required.  <u>Id</u>. at 499.

In determining whether a party is required to make the Rule 26(a)(2)(B) disclosures for a hybrid fact/expert witness, Judge Grimm cautioned that "it is a mistake to focus solely on the status of the expert, instead of the nature of the testimony which will be offered at trial."  <u>Id</u>. at 500.  The court held that:

> . . . to the extent that the health care experts identified by the plaintiff in her Rule 26(a)(2)(A) disclosures are intended to testify at trial regarding their treatment of the plaintiff, any opinions regarding the existence of her medical condition, its causation, her treatment and prognosis, then they are hybrid witnesses and the plaintiff was not obliged to provide the defendant with the comprehensive disclosures required under Rule 26(a)(2)(B) . . . . However, to the extent that the plaintiff intends for these witnesses to offer opinion testimony based on facts not obtained from their actual treatment of the plaintiff, they may not do so unless complete Rule 26(a)(2)(B) disclosures have been made.

<u>Id</u>. at 508.

The message of the <u>Sullivan</u> case is that merely because a party designates a witness as a hybrid fact/expert witness under Rule 26(a)(2)(A), as opposed to a retained

expert under Rule 26(a)(2)(B), does not necessarily make him or her so.  The court should analyze the source of the information that forms the basis of the witness' opinion and determine whether the information was obtained in the ordinary course of the witness' responsibilities or was provided by litigation counsel in order for the witness to form an opinion for the case.  Id. at 501; accord, Stanley Martin Companies, Inc. v. Universal Forest Products Shoffner LLC, 396 F.Supp.2d 606 (D.Md. 2005).

The court adopts the Sullivan approach for purposes of determining whether TransCanada must produce information protected by the attorney work product doctrine or the attorney-client privilege that may have been provided to the hybrid fact/expert witnesses.  To be sure, the court was not required to address in Sullivan whether, if a party was required to make the disclosures required by Rule 26(a)(2)(B) for a designated hybrid fact/expert witness who the court determines is serving in the role of a retained expert, those disclosures must include information protected by the attorney work product doctrine or attorney-client privilege.  But two weeks after issuing the Sullivan decision, Judge Grimm penned Musselman, which held that the disclosures required by Rule 26(a)(2)(B) for retained experts included privileged and protected materials considered by the expert. See supra at II.A.2.b.  And the Musselman decision has been cited with approval by the Fourth Circuit Court of Appeals.  Elm Grove Coal Co., 480 F.3d at 302.

Accordingly, the court will review the source of the facts relied upon and the scope of the opinions offered by TransCanada's hybrid fact/expert witnesses to determine if they are truly hybrid fact/expert witnesses, or are really retained expert wolves hiding in hybrid fact/expert sheep's clothing.  If they are hybrid fact/expert witnesses, the court

will not require the production of materials protected by the attorney work product

doctrine or attorney-client privilege which they considered.  This is consistent with Local

Rule 104.10, which does not require a party to produce the "disclosures" required by

Rule 26(a)(2)(B) for a hybrid fact/expert witness (which disclosures, as stated above,

include all matters considered, even if privileged or protected.)  Supra at n. 13.  Rather,

Local Rule 104.10 only requires that an opposing party may obtain the "opinions" of the

hybrid fact/expert witness.

      If, however, the witness is serving in the role of a retained expert, and has been

fed facts or opinions to support his or her opinion testimony, a party should not be able to

shield the privileged materials merely because the witness has been designated under

Rule 26(a)(2)(A).  The issue is one of substance, not form.

      The Sullivan approach is admittedly more cumbersome than and not as

convenient as a bright-line test.  See e.g., United States v. American Elec. Power Service

Corp., No. 2:99-cv-1182, 2:99-cv-1250, 2006 WL 3827509 at *1 (S.D. Oh. Dec. 28,

2006), and cases cited therein.  However, it balances two important competing interests.

The protection of materials under the attorney work product doctrine and the attorney-

client privilege allows counsel to develop opinions and strategies and effectively

communicate with clients in a way that is essential to effective representation.  Disclosure

should be compelled only in very limited circumstances.  On the other hand, a party

should not be able to circumvent the important disclosure obligations of Rule 26(a)(2)(B)

by simply using an employee to serve in the role of a retained expert.

The court will turn to the proposed testimony of the four hybrid fact/expert witnesses.

**Kay Coad**:  According to her affidavit, Ms. Coad is an employee of TransCanada who served as the Sales Representative for Eastern Sales and Marketing from April, 1997, through January, 2006.  Her affidavit states: (1) she participated in the marketing of the capacity that became available because of USGen's rejection of the Agreement; and (2) from the time of the rejection of the Agreement in September, 2003, through January, 2006, she had primary day-to-day responsibility for managing and administering the open seasons for capacity on the TransCanada Mainline.  Her affidavit addresses TransCanada's efforts to sell the capacity that was made available by USGen's rejection of the Agreement, which efforts are relevant to TransCanada's mitigation efforts and are clearly factual in nature.  According to her affidavit, Ms. Coad will also offer the opinion that TransCanada marketed the available capacity to all potential purchasers and did so in accordance with her understanding of applicable Canadian law and regulations.

The Court concludes that, as presented, Ms. Coad is a hybrid fact/expert witness governed by Rule 26(a)(2)(A).  She will testify primarily, if not exclusively, about facts that arose in the ordinary course of her employment.  Her opinion testimony appears primarily to be her view that when she did her job, she did it well (i.e, she marketed the capacity to all potential purchasers and complied with Canadian law and regulations).  The court will not compel TransCanada to produce materials protected by the attorney work product doctrine or the attorney-client privilege that may have been provided to Ms. Coad.

**Sean Brett**: At the time USGen rejected the Agreement, the Agreement had approximately three years remaining on its term.  In determining the damages that flow from the rejection, a discount rate may be needed to determine the value, as of a particular date, of the stream of some or all of the payments that USGen would have made under the Agreement if it had not been rejected.  TransCanada contends that the discount rate should be the interest rate set forth in USGen's confirmed plan of reorganization and no testimony is needed on the appropriate discount rate.  USGen disagrees, and contends that the appropriate discount rate is TransCanada's cost of capital.

TransCanada has identified Sean Brett to testify on the discount rate, if necessary. As explained at the hearing on these motions, Brett is an employee with substantial knowledge of TransCanada's cost of capital.  Thus, to the extent the dispute over the discount rate focuses on TransCanada's cost of capital, Brett will testify in that regard. Further, TransCanada made it clear that Brett's testimony would not include general opinion testimony on the appropriate discount rate to use under the circumstances.

The court concludes that, as presented, Brett is a hybrid fact/expert witness governed by Rule 26(a)(2)(A).  He will testify primarily, if not exclusively, about facts that he learned in the ordinary course of his employment.  The court will not compel TransCanada to produce materials protected by the attorney work product doctrine or the attorney-client privilege that may have been provided to Brett.

**Rob Whitmore**: According to his initial affidavit dated November 2, 2006, Whitmore is the Manager, Rates East, Market Development, for TransCanada and has held that position for over six years.  His affidavit states that in that capacity, he is responsible for rate design and tolls on the TransCanada Mainline pipeline, including rate design and tolls as applied to the pipeline capacity formerly reserved by USGen for the Agreement.  His affidavit describes TransCanada's services and its "toll design" process (i.e., the process by which TransCanada's tolls for its services are derived).  He describes the effect on TransCanada's toll process of Miscellaneous Discretionary Revenues, which are the revenues derived from the sale of Discretionary Services such as Short Term Firm Transportation Service ("STFT"), Interruptible Service ("IT") and diversions.  He states that the toll design process has resulted in lower FT tolls since USGen's rejection of the Agreement as a result of the revenues derived from the sale of Discretionary Services of the capacity made available from the rejection.

In his supplemental affidavit dated January 15, 2007, he disputes Milne's opinion that USGen should receive a direct dollar-for-dollar credit for revenues derived from the sale of Discretionary Services of capacity made available from the rejection of the Agreement because, under the toll design process, any such revenues reduce the cost of service for all shippers and thus reduce all FT tolls.  He further states that because lower tolls were used to calculate TransCanada's damages resulting from the rejection of the Agreement, USGen has received, pro rata, the benefit from the sale of Discretionary Services of capacity made available from the rejection of the Agreement.

The court concludes that, at least with respect to the opinions and matters in his initial affidavit dated November 2, 2006, Whitmore is a hybrid fact/expert witness governed by Rule 26(a)(2)(A). His initial affidavit testimony is primarily about TransCanada's toll design process and how revenues derived from the sale of Discretionary Services are factored into that process. As presented, he will testify about facts that he learned in the ordinary course of his employment. The court will not compel TransCanada to produce materials protected by the attorney work product doctrine or the attorney-client privilege that may have been provided to Whitmore in the preparation of his initial affidavit.

The resolution is not so clear with respect to Whitmore's supplemental affidavit dated January 15, 2007. There he disputes Milne's opinion, as described above. TransCanada must produce a log of materials and information provided to Whitmore in the preparation of his supplemental affidavit, to the extent it has not done so. USGen can seek an order compelling the production of any materials it deems appropriate under the rationale of this opinion. Any disputes can be resolved in due course.

**<u>Zafir Samoylove</u>**: USGen states that Mr. Samoylove is the principal architect of TransCanada's mitigation and damages analysis and calculation, and that the analysis does not reflect information he obtained in the ordinary course of employment. USGen states that Mr. Samoylove obtained the information from, and performed the analysis on instructions by, TransCanada's counsel. TransCanada contends that the substance of Mr. Samoylove's testimony will be based on matters that arose in the ordinary course of his employment.

27

The record before the court is not adequate to determine the source of Mr. Samoylove's facts or the scope of his opinion. TransCanada did not submit an affidavit of Mr. Samoylove in support of the motion for summary judgment. Neither party submitted Mr. Samoylove's deposition transcript, other than three pages submitted by USGen.

Accordingly, USGen will be allowed to supplement the record with any deposition transcripts or other materials that would aid the Court in the analysis described herein. Similarly, TransCanada shall be allowed to file a responsive brief or other materials in accordance with a scheduling order that the Court will enter.

**B.    The TransCanada Motion**.

In the TransCanada Motion, TransCanada seeks to strike the expert reports of Cameron and Priddle because the reports: (1) are not proper rebuttal reports; and (2) constitute inadmissible legal-opinion testimony, improperly apply foreign law to the facts and improperly assist the court in resolving factual issues.

By way of background, TransCanada filed its motion for summary judgment on November 2, 2006. USGen filed its opposition and cross-motion for summary judgment two weeks later. In its cross-motion, USGen argued that TransCanada was never at risk under the NEB rate-making process because it passes all gains and losses to its shippers in the form of higher or lower tolls; accordingly, TransCanada suffered no loss as a result of the rejection of the Agreement. USGen contended that the Supreme Court of Canada's decision in <u>Canadian Forest Products</u> applies. USGen argued that in that case the Canadian Supreme Court categorically rejected the notion that a plaintiff can recover

28

damages when it was never at risk for the loss.  USGen maintained that the facts and mechanism by which the plaintiff in Canadian Forest Products was insulated against losses are similar to those in this case.

In support of its reply, TransCanada filed the affidavit of Yates, who contended that Canadian Forest Products did not apply because the NEB regulatory scheme differed from the scheme in Canadian Forest Products.  The basis for this opinion was, among other reasons: (1) TransCanada is not assured recovery of its costs, but only has the opportunity to recover those costs, through its rate-making process; (2) even when it has recovered costs, such as the cost of USGen's rejection of the Agreement, it is subject to a duty of prudence to pursue recovery of those costs; (3) because of that duty of prudence, it faces risk that the NEB will reverse its decision to allow the recovery of the rejection costs through its tolls; and (4) the regulatory scheme in Canadian Forest Products presented no such risks, and therefore that opinion does not apply to this case.

The parties deferred further briefing on summary judgment until they completed expert discovery.  Subsequently, TransCanada served USGen with the report of Yates, which supplemented the affidavit he submitted in connection with TransCanada's summary judgment reply brief.  USGen then served TransCanada with the expert reports of Cameron and Priddle.  Cameron's report stated that the risk that the NEB would reverse its decision is "fanciful", and Priddle's report stated that there is "no realistic likelihood" of reversal.

### 1.    Rebuttal Reports

The court disagrees that Cameron's and Priddle's reports should be stricken as improper rebuttal reports.  "Rebuttal evidence is defined as "evidence given to explain, repel, counteract, or disprove facts given in evidence by the opposing party.  That which tends to explain or contradict or disprove evidence offered by the adverse party." United States v. Stitt, 250 F.3d 878, 897 (4th Cir. 2001) (quoting Black's Law Dictionary 1267 (6th ed. 1990)).  "There must be a nexus between the purported rebuttal evidence and the evidence that the purported rebuttal evidence seeks to rebut." Stitt, 250 F.3d at 897 (citing United States v. Curry, 512 F.2d 1299 (4th Cir. 1975)).

Cameron's and Priddle's reports are clearly rebuttal reports. Yates offered the opinion that TransCanada remains at risk for the costs of the rejection of the Agreement notwithstanding the prior action of the NEB.  Cameron and Priddle acknowledge that risk, hypothetically, but contend it is "fanciful" and "not realistic," respectively.[14]  The reports are intended to counteract Yates' opinion and are therefore rebuttal in nature.

Moreover, the court will not strike the reports on the basis that the opinions should have been included in USGen's case-in-chief reports.  TransCanada's position is that USGen should have anticipated Yates' argument.  The court concludes that striking the reports of Cameron and Priddle on this basis is entirely too harsh under the circumstances.  It may be the case that USGen could have more fully addressed the risk factor in an expert submission with its cross-motion for summary judgment. Nonetheless, it is likely that USGen still would have submitted a rebuttal report not altogether different than the reports it has submitted.  Further, the court finds that it was

---

[14] Cameron also rebuts various opinions of TransCanada's witnesses on the mitigation issues.

not unreasonable for USGen to raise the Canadian Forest Products case in its cross-motion, but await TransCanada's reply before it decided on the scope of the expert opinion it needed in support of its position.

TransCanada has suffered no real prejudice.  Discovery has been extended to allow the completion of the expert reports.  The parties have not completed briefing on summary judgment.  To eliminate the potential for any prejudice to TransCanada that could result from the sequence of the delivery of the expert reports, the court will allow TransCanada to serve a surrebuttal report.

### 2.    Legal-opinion testimony.

The dispute between the parties raises, in part, the distinction between expert reports submitted pursuant to Fed. R. Civ. P. 44.1 and reports submitted under Fed. R. Evid. 702.  The distinction is important, albeit more so in jury trials: Fed. R. Civ. P. 44.1 submissions are made only to the judge to assist the court in formulating the conclusions of law, while Fed. R. Evid. 702 opinions are submitted to the factfinder as part of the evidentiary record.

The reports have elements both of foreign law reports under Fed. R. Civ. P. 44.1 and expert opinion reports under Fed. R. Evid. 702.  For example, Yates' opinion that Canadian Forest Products is inapplicable is clearly a Fed. R. Civ. P. 44.1 submission.  Yates, Priddle and Cameron, however, are all offered as experts in the field of NEB regulatory matters.  There are aspects of their opinions that can be characterized as Fed. R. Evid. 702 opinions on regulatory matters, without regard to the foreign law nature of the NEB proceeding.  Much of the discussion in the reports about what the NEB did in

31

2004 and why the NEB did it is in the nature of Fed. R. Evid. 702 opinion testimony,

relying upon facts or information they presumably obtained in accordance with Fed. R.

Evid. 703.[15]  Such matters could be appropriate for submission to the factfinder under

Fed. R. Evid. 702, assuming the other elements for admissibility are met.  The court

therefore turns to the standards for Fed. R. Evid. 702 and Fed. R. Civ. P. 44.1.

> **a.    Fed. R. Evid. 702 and 704.**

Fed. R. Evid. 702 provides:

> If scientific, technical, or other specialized knowledge will
> assist the trier of fact to understand the evidence or to
> determine a fact in issue, a witness qualified as an expert by
> knowledge, skill, experience, training, or education, may
> testify thereto in the form of an opinion or otherwise, if (1)
> the testimony is based upon sufficient facts or data, (2) the
> testimony is the product of reliable principles and methods,
> and (3) the witness has applied the principles and methods
> reliably to the facts of the case.

Fed. R. Evid. 704(a), with one exception, provides that "testimony in the form of an

opinion or inference otherwise admissible is not objectionable because it embraces an

ultimate issue to be decided by the trier of fact."  This rule, however, "does not lower the

bars so as to admit all opinions."  United States v. Barile, 286 F.3d 749, 759 (4th Cir.

2002) (quoting Advisory Committee Notes).  "Expert testimony on an ultimate issue is

therefore excludable under Rule 702 if it does not aid the jury."  Id. at 760 (citing Kopf v.

Skyrm, 993 F.2d 374, 377-78 (4th Cir. 1993)).  "Expert testimony that merely states a

legal conclusion is less likely to assist the jury in its determination."  Id.  See also,

---

[15] The court does not rule in this decision whether the Priddle and Cameron reports comply with Fed. R. Evid. 702, 703, 704.  TransCanada has stated it intends to make a Daubert challenge to Milne, Cameron and Priddle.

Weinstein's Federal Evidence § 704.04[2][a] (2d ed. 2001) ("The most common reason for excluding opinion testimony that gives legal conclusion is lack of helpfulness . . . . The testimony supplies the jury with no information other than the witness's view of how the verdict should read.")

In Adalman v. Baker, Watts & Co., 807 F.2d 359, 366 (4th Cir. 1986), the Court of Appeals for the Fourth Circuit affirmed a district court's decision prohibiting an expert from testifying "to the jury as to what the applicable law may mean, and what the applicable law does or does not require[.]"  In reaching its decision, the Adalman court stated:

> [I]t is the responsibility – and the duty – of the court to state to the jury the meaning and applicability of the appropriate law, leaving to the jury the task of determining the facts which may or may not bring the challenged conduct within the scope of the court's instruction as to the law.

Id.  Further, in cases concerning domestic law, the Court could not "…conceive [any] circumstances which would shift this burden from the court to the jury, where the jury judgment would be influenced, if not made, on the basis of expert witness testimony which would undoubtedly follow the usual pattern of conflicting expert opinions."  Id. Critically, the Adalman court expressly distinguished cases where the meaning and applicability of foreign law was at issue:

> There are cases, particularly those involving foreign law, where the court may receive and consider the opinions of experts in that foreign law, usually practitioners in that law, as to the meaning and applicability of that law to a controversy pending in one of our courts. There, however, the significant difference is that such expert witness evidence is presented to the court – not to the jury – to aid

33

> the court in formulating its charge in the relatively rare
> such cases in which a jury is involved.

Id. Without expressly stating, in addressing foreign law submissions, the Fourth Circuit

appeared to be referring to Fed. R. Civ. P. 44.1 submissions.

### b.    Fed. R. Civ. P. 44.1

Fed. R. Civ. P. 44.1 provides:

> A party who intends to raise an issue concerning the law of
> a foreign country shall give notice by pleadings or other
> reasonable written notice. The court, in determining foreign
> law, may consider any relevant material or source,
> including testimony, whether or not submitted by a party or
> admissible under the Federal Rules of Evidence. The
> court's determination shall be treated as a ruling on a
> question of law.

This rule seeks to provide a "uniform and effective procedure for raising and determining

an issue concerning the law of a foreign country."  See § 44.1App.01 (Original

Committee Note of 1966 to Fed. R. Civ. P. 44.1).

Courts may use expert testimony to determine foreign law.[16] Grupo Protexa, S.A.

v. All Am. Marine Slip, 20 F.3d 1224, 1230, n.6 (3d Cir. 1994).  Such testimony need not

be live and may be made via declarations or affidavit.  Universe Sales Co., Ltd. v. Silver

Castle, Ltd., 182 F.3d 1036, 1038 (9th Cir. 1999).  The court may give an expert opinion

whatever probative value it deems warranted under the circumstances.  Argonaut P'ship,

---

[16] The scope of what a court can consider under Fed. R. Civ. P 44.1 is very broad.  In order to arrive at legal
conclusions under foreign law, courts may consider: (1) the opinions of expert witnesses; (2) extracts from
foreign legal material; and (3) even material that would be inadmissible at trial.  Nat'l Group for Communs.
& Computers Ltd. v. Lucent Techs. Int'l Inc., 331 F. Supp. 2d 290, 294 (D. N.J. 2004).  In addition, Fed.
R. Civ. P. 44.1 "provides courts with broad authority to conduct their own independent research to determine
foreign law."  Bel-Ray Co., Inc. v. Chemrite Ltd., 181 F.3d 435, 440 (3d Cir. 1999).  Expert opinions
regarding foreign law need not be under oath.  United States v. First Nat'l Bank of Chicago, 699 F.2d 341,
343-344 (7th Cir. 1983) (relying on unsworn letters from foreign counsel).

L.P. v. Bankers Trustee Co., Ltd., No. 96 CIV. 1970 (MBM), 96 CIV 2222 (MBM), 1997
WL 45521, at *9 (S.D.N.Y. Feb. 4, 1997) (citing United States v. First Nat'l Bank of
Chicago, 699 F.2d 341, 344 (7th Cir. 1983)).  "In fact, federal judges may reject even the
uncontradicted conclusions of an expert witness and reach their own decisions on the
basis of independent examination of foreign legal authorities."  Haywin Textile Prods.,
Inc. v. Int'l Fin. Inv. & Commerce Bank Ltd., 137 F. Supp. 2d 431, 435 (S.D.N.Y. 2001)
(quoting Curtis v. Beatrice Foods Co., 481 F. Supp. 1275, 1285 (S.D.N.Y. 1980), aff'd,
633 F.2d 203 (2d Cir. 1980); see also, Zurich Capital Mks. Inc. v. Coglianese, 383 F.
Supp. 2d 1041, 1053 (N.D. Ill. 2005).  "[D]ifferences of opinion among experts on the
content, applicability, or interpretation of foreign law do not create a genuine issue as to
any material fact."  Lucent Techs. Int'l Inc., 331 F. Supp. 2d at 294; Matter of the
Arbitration Between Trans Chem. Ltd. and China Nat'l Mach. Import & Export Corp.,
978 F. Supp. 266, 275 (S.D. Tex. 1997); See also, Banco de Credito Indus., S.A. v.
Tesoreria General de la Seguridad Social de Espana, 990 F.2d 827, 838 (5th Cir. 1993)
("[E]ven differences of opinion on the content, applicability, or interpretation of the
foreign provision may not be characterized as a "genuine issue as to any material fact");
United States v. BCCI Holdings (Luxembourg), S.A., 977 F. Supp. 1, 6 (D. D.C. 1997),
aff'd, 159 F.3d 637 (D.C. Cir. 1998).

      TransCanada argues that an expert proffered under Fed. R. Civ. P. 44.1 may not
apply the law to the facts.  It is correct that there are a number of cases that hold that an
expert proffered under Fed. R. Civ. P. 44.1 may not offer to find the facts or assist the

factfinder in finding the facts.[17]  But that is a different issue than a claim that an expert proffered under Fed. R. Civ. P. 44.1 may not apply the foreign law to the facts.

The Court of Appeals for the Fourth Circuit, tacitly at least, has been tolerant of allowing Fed. R. Civ. P. 44.1 experts to offer their opinion on the applicability of the foreign law to the facts.  See Adalman, 807 F.2d at 366 (In foreign law cases, the court may receive and consider expert opinions as to the "meaning and applicability" of the foreign law.); Basch v. Westinghouse Elec. Corp., 777 F.2d 165, 170 (4th Cir. 1985).

In Basch, a widow filed suit against her husband's employer seeking damages for her husband's death.  One of the principle theories of liability was that the husband's death was caused by an Iranian physician whom the widow contended was an employee of the husband's employer.  The parties stipulated that Iranian law governed. Both parties presented expert opinions on whether the physician was in fact an employee under Iranian law.  Both experts applied Iranian law to the facts as they understood them and reached legal conclusions regarding the issue of the physician's employment status.  Id. While the experts in Basch initially agreed that Dr. Salami was not an employee of Westinghouse under Iranian law, the plaintiffs' expert subsequently changed his opinion based on additional facts.  Id. at n. 8.  In reaching its determination, the Basch court considered both expert opinions regarding the substance of Iranian law and its applicability to the facts of that case.

---

[17] See e.g., ID Sec. Sys. Can., Inc. v. Checkpoint Sys., 198 F. Supp. 2d 598, 623 (E.D. Pa. 2002) ("To the extent that Olah [the expert] seeks to find or assist the court in finding the facts of this case, Olah's testimony invades the province of the factfinder and it is not an appropriate function of expert testimony under Rule 44.1."); Lithuanian Commerce Corp., Ltd. v. Sara Lee Hosiery, 177 F.R.D. 245, 264 (D. N.J. 1997) vacated in part on other grounds, 179 F.R.D. 450 (D.N.J. 1998), ("[T]his report will subvert the jury's function in that it is the responsibility of the jury, not Mr. Pukas or the Lithuanian government, to

A case providing an example of the allowable scope of an expert opinion under Fed. R. Civ. P. 44.1 in a bench trial is <u>Vlachos v. M/V Proso</u>, 637 F.Supp. 1354 (D. Md. 1986). There, the court was called upon to determine whether a seaman plaintiff had a claim for recovery under Greek law. In determining Greek law, the court considered the deposition testimony and an affidavit of a Greek attorney, and the trial testimony of a second Greek attorney. <u>Id</u>. at 1366. The opinion is replete with examples of testimony by the Greek attorneys applying Greek law to the facts of the case. Indeed, one of the experts answered the court's specific question on the application of the law to the facts:

> [I]f the Court comes to the conclusion that the Captain [defendant] . . . would have had the knowledge that it was dangerous . . . to have a seaman go up this mast and do this kind of work without being equipped with  the proper safety device, would that be the equivalent of . . . dolus [the basis of liability under Greek law]?"

<u>Id</u>. at 1369. Further, that expert testified that he had reviewed the depositions and heard the testimony and stated "there is not room . . . for . . . a Greek Court, under Greek law to hold that there was dolus on the part of the employer . . . ." <u>Id</u>. <u>See also</u>, <u>Bostingl v. Maryland Bank, N.A.</u>, 662 F. Supp. 882, 885 (D. Md. 1987) <u>affirmed</u> 841 F.2d 1122 (4th Cir. 1988) ("The Court notes that the defendants' experts cogently state the reasons [in their Fed. R. Civ. P. 44.1 submission on Greek law] supporting their conclusion that there was no causal connection between the alleged negligence of the defendants . . . [and the plaintiff's harm].")

In each of the foregoing cases, the lower courts or the Court of Appeals reached its own conclusion on the foreign law and applied it to the facts of the case. In doing so,

---

determine what the facts are in light of the applicable law. For those reasons, Mr. Pukas' report shall not be admitted into evidence at trial and he shall be barred from testifying before the jury.").

however, the courts considered expert testimony that included the application of the law to those facts.

TransCanada also objects to the reports as containing improper legal-opinion testimony. As noted earlier, legal-opinion testimony that may well be improper to submit to the factfinder under Fed. R. Evid. 702 is entirely appropriate to submit to the court under Fed. R. Civ. P. 44.1. See Adalman, 807 F. 2d at 366 (differentiating between legal-opinion testimony offered in cases concerning domestic law and legal-opinion testimony offered in cases concerning foreign law.). The rationale for this differentiation is that, in the latter case, "such expert witness evidence is presented to the court – not to the jury – to aid the court in formulating its charge . . . ." Id.

To the extent the reports contain matters that are to be submitted to the factfinder under Fed. R. Evid. 702, the court is mindful that the Fourth Circuit has consistently held that conclusory legal-opinion testimony is not admissible because it does not help the jury and may in fact lead to confusion because the jury may decide to rely on the expert's rendition of the law rather than the instruction given by the judge. See Barile, 286 F.3d at 760; Adalman, 807 F.2d at 366 ("Permitting such testimony as to legal conclusions gives cogent meaning to the apprehensions that jurors will turn to the expert, rather than to the judge, for guidance on the applicable law.") To that end, the task of the trial court is "to distinguish opinion testimony that embraces an ultimate issue of fact from opinion testimony that states a legal conclusion. This task, however, is not an easy one." Barile, 286 F.3d at 760; see also, Adalman, 807 F.2d at 366. As the Fourth Circuit has stated:

> The proffer of expert opinion in many cases raises problems difficult
> of resolution by the trial court, where the line must be drawn between

> proper expert evidence as to facts, the inferences to be drawn from
> those facts, and the opinions of the expert, on the one hand, and
> testimony as to the meaning and applicability of the appropriate law,
> on the other hand. While sometimes difficult to discern that line,
> especially in the heat of trial, it nonetheless must be drawn.

Id. at 366.

While the court recognizes the importance of drawing the line in order to shield the factfinder from confusing and unhelpful testimony, the court need not be quite so sharp-penciled in drawing the line in this case. This matter will be resolved without a jury. If resolved on summary judgment, the court will issue its statement of undisputed material facts and conclusions of law. If resolved after trial, this court will issue findings of fact and conclusions of law. In either circumstance, the court will be required to distinguish between factual matters and legal conclusions. But that is the usual function of this court, and sorting out the difference between opinion testimony that embraces an ultimate issue of fact, on the one hand, from opinion testimony that states a legal conclusion under Fed. R. Civ. P 44.1, on the other, does not implicate the same concerns as if a jury were the factfinder. Further, because the parties will have an extensive statement of the basis for this court's decision, each party will have a full record to assess whether the court has failed to properly make these distinctions. Finally, although the reports include matters that could be submitted to the factfinder under Fed. R. Evid. 702, it appears that virtually all of the legal-opinion testimony in the reports focus on foreign law opinion and will only be pertinent to the court's conclusions of law.

Accordingly, to the extent the reports are Fed. R. Civ. P. 44.1 reports, the court will allow the experts to offer legal-opinion testimony and offer their opinions on the

39

applicability of the foreign law to the facts.  While the court independently will determine all conclusions of law, and will apply the law to the facts, allowing the experts to offer their opinions on the applicability of the law to the facts in their Fed. R. Civ. P. 44.1 submissions could be helpful to the court.  The court further concludes that this approach is consistent with the practice of the courts within the Fourth Circuit, as described in the cases identified above, especially in non-jury matters.  The court also notes that TransCanada opened this door with Yates' report, and that report includes statements in which Yates applies the foreign law to the facts of the case.[18]  Thus, the TransCanada Motion is denied to the extent they are based on the claim that experts under Fed. R. Civ. P. 44.1 cannot offer legal-opinion testimony or apply the foreign law to the facts.

The court will defer ruling on the remainder of the TransCanada Motion for several reasons.  First, the record before the court is incomplete on the significance of the expert opinions to the underlying objection to the TransCanada Claim.  The parties have not completed briefing on the summary judgment issues.  USGen has not filed its reply brief integrating the significance of its experts' contentions.  TransCanada obviously has not had a chance to respond to the Cameron and Priddle reports in the context of summary judgment.  Thus, the record is not altogether clear on the extent to which the opinions in the reports of Priddle and Cameron are pertinent to the merits of the underlying claim objections.[19]

---

[18] See e.g. Yates' report at ¶25.  (".... it is my opinion that [the Supreme Court of Canada's decision in British Columbia v. Canadian Forest Products Ltd.] is entirely inapplicable to this case.")

[19] At the hearing, TransCanada contended that the court need only determine that the risk exists that the NEB would reverse itself; USGen contended that the court must also determine that the risk is material.

To some extent, the parties argued the significance of the expert opinions to <u>Canadian Forest Products</u> at the July 26th hearing on the instant motions.  The better approach would be for the parties to complete the briefing on summary judgment.  The court will then be in a better position to determine what issues remain pending and whether the expert opinions are appropriate matters to consider with respect to those rulings.  On the record before the court, it appears that the court is presently being called upon to offer a blanket advisory opinion that may have little or no significance to the merits of the underlying claims.

With respect to whether or not Cameron and Priddle offered improper factual testimony, the court notes that the parties did not submit the extensive exhibits and supporting documents to the reports that apparently provide the basis for some or all of the factual statements made within.  Thus, the court does not have before it a complete record.  Moreover, TransCanada has stated it intends to make a <u>Daubert</u> challenge to Milne's, Cameron's and Priddle's testimony.  The court can address the remaining issues in the context of that challenge.

### III. CONCLUSION

The court will enter an order consistent with the foregoing.


cc:

Gordon A. Coffee, Esq.
Peter K. Dykema, Esq.
Winston & Strawn, LLP
1700 K Street, NW
Washington, D.C. 20005

Marc E. Richards, Esq.
Blank Rome LLP,
The Chrysler Building
405 Lexington Avenue,
New York, N.Y. 10174

David W. Elrod, Esq.
Craig Tadlock, Esq
Elrod, PLLC
500 N. Akard St., Suite 3000
Dallas, Texas 75201

Adam M. Spence, Esq.
Michael J. Lentz, Esq.
The Law Office of Adam M. Spence
P.O. Box 20369
Baltimore, MD  21284-0369

Office of the U.S. Trustee
6305 Ivy Lane, Suite 600
Greenbelt, MD 20770

**END OF MEMORANDUM**