Date signed April 01, 2010



THOMAS J. CATLIOTA
U. S. BANKRUPTCY JUDGE

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
## at GREENBELT

| | |
|---|---|
| In re: | * |
| | *    Case No.   03-30465-PM |
| USGen New England, Inc., | *    (Chapter 11) |
| | *    (Specially assigned to J. Catliota) |
| Reorganized Debtor | * |
| | * |
| ********************************* | * |
| | * |
| | * |
| USGen New England, Inc., | *    Claim No. 37 |
| | *    Docket No. 1620 |
| | *    Docket No. 1716 |
| | * |
| vs. | * |
| | * |
| TransCanada Pipelines, Ltd. | * |
| | * |
| | * |
| | * |
| | * |
| *     *     *     *     *     *     *     *     *     *     *     * | |

## MEMORANDUM OPINION

Before the Court is Debtor's Objection to Claim of TransCanada Pipelines Limited

[Claim No. 37] filed by USGen New England Inc., the reorganized debtor ("USGen"), on April

1

12, 2005 at Docket No. 1620.  On May 18, 2005, TransCanada Pipelines, Ltd. ("TransCanada")

filed a response to the objection at Docket No. 1716.  The Court held a trial on the objection and

response from March 3, 2008 through March 13, 2008.  After the close of evidence the parties

submitted post-trial briefs, including proposed findings of fact and conclusions of law.  The

Court held closing arguments on July 2, 2008.

      TransCanada's proof of claim arises from USGen's rejection of a natural gas

transportation contract in September 2003.  The claim, as amended, is in the approximate amount

of $52 million Canadian ("CAD").  The three primary issues in this claim litigation are whether:

(1) USGen is entitled to mitigation credit for three contracts TransCanada entered into with

Nexen Marketing following the rejection, or if not, for any other contracts; (2) TransCanada

failed to take reasonable steps to mitigate its damages because it did not offer to sell the capacity

under the rejected USGen contract as Short-Term Firm Transportation service in October and

November 2003, prior to the commencement of Firm Transportation contracts; and (3) the

rationale of the Canadian Supreme Court's decision in British Columbia v. Canadian Forest

Products Ltd., [2004] 2 S.C.R. 74 (Can.) bars TransCanada's rejection claim.  For the reasons set

forth herein, the Court concludes that: (1) USGen is entitled to mitigation credit for the three

Nexen Marketing contracts; (2) TransCanada did not fail to take reasonable steps to mitigate its

damages in October and November 2003 by not offering to sell the capacity as Short-Term Firm

Transportation service; and (3) the Canadian Forest Products decision does not bar

TransCanada's claim.  The parties also have raised other issues which the Court resolves herein.

Accordingly, the Court will

          (1) sustain USGen's objection to TransCanada's claim in part, and deny it in part;

(2) require USGen to submit the recalculation of the claim amount within ten (10)

days from the entry of this opinion in accordance with Section II.A.6. ("The

Calculation of TransCanada's Allowed Claim") of this Memorandum Opinion;

and

(3) require USGen to pay the claim and interest on the claim in accordance with the

provisions of USGen's confirmed Chapter 11 plan of reorganization.

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334, 157(a), and

Local Rule 402 of the United States District Court for the District of Maryland. This is a core

proceeding pursuant to 28 U.S.C. § 157(b)(2)(B). The following constitutes the Court's findings

of fact and conclusions of law.

# I.    FINDINGS OF FACT

## A.  TransCanada and Its Business

TransCanada is headquartered in Calgary, Alberta, Canada, and is engaged in the natural

gas pipeline business. Among other things, TransCanada owns and operates the Canadian

Mainline pipeline (the "Mainline"), a 14,898 kilometer natural gas transmission system that

extends from the Alberta/Saskatchewan border east to the Quebec/Vermont border and connects

with other natural gas pipelines in Canada and the United States. TransCanada's exhibit TCPL[1]

314 is a map showing the Mainline in 2006.[2]

## 1.  The Mainline

The TransCanada Mainline moves natural gas from west to east, from the gas basins of

Alberta and Saskatchewan to markets in Southern Canada. Gas is transported along the Mainline

using a series of compressors installed at various points along the pipeline's path. The Mainline

---

[1] Hereafter, all of TransCanada's exhibits will be referred to as "TCPL."
[2] One difference between the Mainline in 2006 and the Mainline in 2003 is that, in 2003, North Bay was not an approved receipt and delivery point. This point will be discussed subsequently.

reaches as far east as the major Canadian cities of Toronto, Ottawa, and Montreal, and it also connects with American pipelines in New England and New York. The Westernmost point on the Mainline is at Empress, Alberta. The Easternmost portion of the pipeline is the Eastern Delivery Area (the "EDA"), which consists of segments of interconnecting pipe that form a large triangle in Southeastern Ontario (the "Triangle"). The EDA begins at the Western edge of the Triangle and continues to the Easternmost points on the system. North Bay is at the Northwestern corner of the Triangle, and the Southwestern corner of the Triangle is near Parkway. The Mainline also includes a receipt/delivery point at Dawn which is also on the Southwestern end of the Triangle slightly Southwest of Parkway. The EDA includes a delivery point at Iroquois. Northeast of the Eastern point of the Triangle is the GMi EDA ("GMi EDA").

Just prior to the delivery point at Iroquois is compressor station 1217, also known as Stittsville (the "Stittsville Compressor"). The Stittsville Compressor provides compression that enables the gas to flow in two separate directions: (1) from the Stittsville Compressor, gas can flow through the Winchester shortcut directly to the delivery point at Iroquois; and (2) gas can continue to flow along the North Bay shortcut until it reaches the Montreal line at Morrisburg which flows eastward to the GMi EDA. The distance between the Stittsville Compressor and Iroquois is approximately 100 kilometers. The bottleneck of gas at the Stittsville Compressor is significant for the reasons addressed further in this opinion.

Generally, gas flowing from Empress to Iroquois travels on the Mainline past North Bay through the Stittsville Compressor and the Winchester shortcut to Iroquois. Gas flowing from Empress to GMi EDa travels from Empress past North Bay through the Stitsville Compressor. Capacity flowing from Dawn to Iroquois generally flows on a back haul basis over the Northern Ontario line through Parkway, North Bay, the Stittsville Compressor, the Winchester shortcut to

4

Iroquois.  Gas flowing from Dawn to the GMi EDA follows the same path except that it flows through the North Bay shortcut rather than the Winchester shortcut after it passes through the Stittsville Compressor.

### 2.  Services Offered by TransCanada on the Mainline

TransCanada transports natural gas over the Mainline to its shipper customers.  The gas itself is provided by the shipper.  TransCanada accepts the shipper's natural gas at a contracted receipt point and delivers an equal amount of gas at a contracted delivery point.  Two forms of transportation service are at issue in this case: Firm Transportation ("FT"), and Short-Term Firm Transportation ("STFT").[3]

### a.  FT Service

The most common form of service offered by TransCanada is FT.  TransCanada earns ninety percent of its revenues from FT services.  Under an FT service agreement, TransCanada accepts natural gas at a contracted receipt point and delivers natural gas at a contracted delivery point.  FT contracts must have a term of at least one year.  In a typical FT contract, an FT shipper has the right, after providing notice to TransCanada, to renew the contract indefinitely in one-year increments.  Because of this renewal right, TransCanada must ensure that capacity offered as FT is available indefinitely.

An FT shipper pays a charge, called a demand toll, for the right to ship gas up to the maximum quantity specified in its contract.  The demand toll is based primarily on the distance between the receipt and delivery points and is multiplied by the contract quantity, expressed in gigajoules per day ("GJ/d").  A shipper must pay the demand toll whether or not it actually ships any gas.  When a shipper actually ships gas—by "nominating" its contracted FT capacity for

---

[3]  TransCanada offers other forms of transportation services.  One of these other forms, Storage Transportation Service ("STS"), is sold generally through the same open season process as FT sales.  Other services will be discussed as pertinent.

use—it pays an additional commodity charge based on the quantity of gas shipped, also measured in GJ/d.

### b.  STFT Service

STFT service is similar to FT service in that it provides firm transportation service of a maximum quantity of gas each day.  However, an STFT contract is for a contract term of a minimum of seven days up to a maximum of one year less a day, and does not include a right of renewal.  Because an STFT contract has no renewal rights, TransCanada can expect STFT capacity to be available for sale as FT at the end of the STFT contract term.

TransCanada always tries to sell capacity as FT before using it for other services. Capacity that has not been contracted on a FT basis may be sold as STFT.

### 3.  TransCanada's Regulatory System

The National Energy Board of Canada (the "NEB") regulates TransCanada.  The NEB was established by the National Energy Board Act (the "NEB Act"), which sets forth the NEB's jurisdiction, powers, and general regulatory scheme.  The Mainline and most of TransCanada's operations are subject to regulation by the NEB.  The NEB approves a tariff that governs TransCanada's operations on the Mainline, including how it contracts with shippers who want to utilize the Mainline to transport gas.  The NEB also regulates TransCanada's rates, and issues orders and decisions that also govern TransCanada's operation of the Mainline.

Under the NEB Act, the NEB must establish tolls for shipping on the Mainline that are "just and reasonable."  TransCanada's tolls are approved by the NEB through a toll design process.  The NEB Act forbids the NEB and TransCanada from unjustly discriminating among shippers.

The NEB and the regulatory scheme require TransCanada to exercise a duty of prudence in its actions. The NEB's ultimate goal is to protect the public.

### a. TransCanada's Toll Design and Toll Application Procedure

TransCanada's toll design is a procedure by which its approved revenue requirement is expressed in terms of prices to be applied for the services it offers. TransCanada's tolls are calculated to generate revenue sufficient to meet TransCanada's annual revenue requirement. TransCanada's annual revenue requirement consists of all of its prudently incurred costs that the NEB finds are necessary to operate properly the business, plus a reasonable rate of return for TransCanada's investors.

TransCanada's tolls are set on an annual basis. Each year, TransCanada submits a toll application to the NEB setting forth its calculation of tolls for the following calendar year or "Test Year." The NEB, which is advised by an expert staff with decades of experience, reviews TransCanada's toll application with a "fine-toothed comb." Moreover, shippers and other parties in interest also review TransCanada's toll application with "a fine toothed comb." These parties are generally sophisticated parties well informed of the NEB process. While these parties may have differing interests, they generally all share the same interest of minimizing their costs—TransCanada's tolls—without compromising the safe operation of the Mainline and TransCanada's ability to provide adequate services to the shippers. To that end, in TransCanada's toll application process, interested parties may identify costs of a relatively small magnitude (in some cases costs of a few hundred thousand dollars) and bring those costs to the NEB's attention for adjudication. The NEB has authority to approve or deny TransCanada's toll applications.

7

After the NEB approves TransCanada's prudently incurred costs and its annual revenue requirement, the approved revenue requirement is divided by allocation units, which reflect the known GJ/d shipping units in the FT contracts at the time the application is made. From this calculation, FT tolls for all receipt and delivery points on the Mainline are derived for the Test Year. Tolls on the TransCanada system, as approved by the NEB, are primarily distance-based, that is, the longer the haul in kilometers, the higher the toll.

Changes in allocation units from year to year will affect tolls. Removing a contract that has been rejected by a shipper from the allocation units will have the effect of changing the average unit cost across the entire Mainline and, all other things being equal, raising all tolls.

Because the costs and revenues submitted in a toll application are estimates, variances between estimated and actual revenue for the Test Year may also affect future tolls. Each toll application includes deferral accounts, which reflect variances from the Test Year calculations based upon actual revenue realized. Deferral account balances may reflect deficient revenue, such as the impact of a default, and, if approved, increase tolls. Conversely, deferral account balances may reflect surplus revenue, such as recovery from litigation, and thus lower tolls.

Deferral account balances are brought forward for adjudication in subsequent years, and if approved, they are reflected in future tolls.

### b.  TransCanada's Duty of Prudence

As noted earlier, virtually all of TransCanada's actions are subject to a duty of prudence. This duty extends to TransCanada's toll application process, including the treatment of deferral accounts, and TransCanada's actions in pursuing a shipper who has defaulted on its contract.

The NEB Act requires that TransCanada charge "just and reasonable" tolls gives rise to TransCanada's duty of prudence to make every effort to minimize its tolls through various

8

means, including cost control, financial assurances, and other measures. As a result, TransCanada's regulatory scheme does not provide TransCanada with guaranteed recovery of its annual cost of service and a reasonable rate of return. Instead, TransCanada's regulatory scheme provides TransCanada with an opportunity to recover its prudently incurred costs and reasonable rate of return. As stated above, TransCanada's toll applications are reviewed by the NEB and interested parties, including TransCanada's shippers.

TransCanada's actions with respect to the deferral account balances are subject to the same duty of prudence imbued in all of TransCanada's toll design. As a result, deferral accounts do not eliminate TransCanada's risk of bearing an expense. The disposition of deferral account balances is not assured, but merely deferred until a subsequent NEB adjudication.

In the same vein, in the event of a long-term contract default where the resulting damages were not fully mitigated, TransCanada's duty of prudence obliges TransCanada to prudently pursue recovery from the defaulting shipper. TransCanada does not pass on automatically the cost of a defaulted contract to its shippers. TransCanada must include the effect of the default in its toll application, which must be approved by the NEB.

### c. Review and Variance

Interested parties may challenge any NEB decision—including the approval of a prior toll application—through an application for a review and variance pursuant to Section 21 of the NEB Act. An application for review and variance under Section 21 may be made at any time.

Anyone adversely affected by any NEB decision has an absolute right to file a Section 21 application for review and variance. The grounds include, but are not limited to, error of law, jurisdiction, new facts, and changed circumstances. Review and variance applications are governed by the NEB rules of procedure, including § 43 and § 44, and involve a two-step

9

process.  First, an applicant must raise a doubt as to the correctness of the decision.  Second, if the NEB determines that the applicant has raised a doubt as to the correctness of the decision, the NEB will hear the merits of the issue.

Thus, although tolls are said to be "final" for the year in which they are collected, they are not truly final since they may be adjusted via a review and variance proceeding.  For example, in September 2002, TransCanada filed a Section 21 application regarding the "final tolls" in the July 2002 NEB Reasons for Decision RH-4-2001.  As a result of that review and variance proceeding (RH-R-1-2002), the tolls previously resolved by RH-4-2001 were significantly altered.

Accordingly, because NEB Section 21 applications are not time constrained and the tolls are not truly final for purposes of review, TransCanada remains at risk of loss under the NEB review and variance procedures.

### d.  TransCanada's Procedures for Sale of Capacity on the Mainline

Sales of TransCanada's capacity are governed by its NEB-approved tariff, its Transportation Access Procedure ("TAP"), and the STFT Toll Schedule.  The TAP governs, among other things, all requests for FT transportation services.  The purpose of the TAP is to set forth the process by which TransCanada administers requests for service to ensure fair and equitable treatment to all shippers seeking FT and other services.

Sales of FT capacity take place through processes known as an existing capacity open season, daily open season, or new capacity open season; sales of STFT capacity take place through the posting of an STFT availability notice.  TransCanada cannot sell FT capacity to any shipper without first posting it for sale in an open season.

10

Existing Capacity Open Season:  TransCanada sells FT capacity through an auction process, termed an open season.  TransCanada typically offers FT capacity in an existing capacity open season.  An open season notice identifies the quantity of capacity available along a specified segment of the Mainline—such as Empress to Iroquois—and indicates the date by which bids must be received.  An existing capacity open season is for a period of time determined by TransCanada "which shall not be less than five banking days after the commencement of such open season."  Although TransCanada has discretion to set the length of the existing capacity open season, it cannot accept bids until the close of the existing capacity open season.  The open season process is designed to be very transparent.  In that regard, TransCanada cannot sell existing capacity as FT capacity without first posting that capacity through the open season process.

Although the TAP states that TransCanada may post "all or a portion" of available capacity in an open season, TransCanada at all times relevant to this case views itself as bound to post all available FT capacity in each open season notice.

Aspiring shippers must submit bids identifying a NEB-approved receipt and delivery point, the quantity of capacity desired, and a service start and end date.  Shippers may bid for any receipt and delivery points within the available path.  For example, in response to an open season with an Empress to Iroquois path, a shipper could bid on a receipt point downstream of Empress and a delivery point upstream of Iroquois.  Certain segments offered for sale as FT utilize common capacity along the Mainline.  Consequently, capacity sold on one segment may reduce or eliminate capacity that would have been available on another segment which has a delivery

point further downstream.  For example, FT contracts awarded to GMi EDA and Cornwall[4] remove capacity from the system that would have been available to Iroquois because the gas must pass through the Stittsville Compressor.

After the close of the open season, TransCanada must rank bids and allocate the posted capacity pursuant to bid ranking procedures (the "Bid Ranking Procedures") in the TAP.  The Bid Ranking Procedures are designed to maximize revenue over the longest term to TransCanada and is also designed to ensure that the capacity is awarded to those shippers who desire it the most.  Section 3.4(a) of the TAP states:

> (a) At the close of the Open Season, TransCanada shall rank the submitted bid forms and allocate the Posted Capacity among Service Applicants in the following descending priority.
>
> (i) demand toll multiplied by the contract term for each Bid Form or combination of Bid Forms, with the combination of bids yielding the highest overall product having the highest priority;
>
> (ii) the requested service commencement dates, with the earliest requested service commencement date having the highest priority provided that TransCanada will have no obligation to award any capacity to a Bid Form  with a service to commence two or more years from the close of the Open Season.

(TCPL Ex. 81 at 008756).  The bids are ranked in descending order with the highest bid highest having the largest mathematical product of: (1) the amount of the demand toll measured in dollars per month (which turns largely on the distance between receipt and delivery points); and (2) the duration of the contract (measured in months), and so on.  If two bids are tied based on this first criterion, then the bid with the earlier commencement date will be ranked higher.

---

[4]  Cornwall is a delivery point located in the Endbridge EDA or the Consumers EDA delivery zone.  While there are points in the Endbridge zone that are upstream from Iroquois, there is no dispute that Cornwall is downstream of Iroquois and thus utilizes the same common capacity as contracts awarded to Iroquois.

The TAP also provides the sequence by which TransCanada awards bids. Section 3.4(d) states:

> (d) TransCanada shall allocate capacity to the Bid Forms with the highest rankings until all the Bid Forms have been processed or until all available capacity has been allocated.

(TCPL Ex. 81 at 008757). Under this provision, TransCanada awards capacity first to the highest ranked bidder. The next highest ranked bidder then is awarded capacity, and the process continues until all the available capacity is exhausted or all bids are filled. TransCanada has no discretion in how it ranks or awards bids, though it is permitted to decline any bid for service that would commence more than two years after the close of the open season. Further, TransCanada may not award significantly more capacity than it posted in the existing capacity open season.

Daily Open Season: If posted capacity remains uncontracted after an existing capacity open season, TransCanada offers a portion of that capacity as FT service in a daily open season on its electronic bulletin board. Pursuant to the TAP, if the total remaining posted capacity on a segment is greater than or equal to 20,000 GJ/d, then TransCanada must post 50 percent of that capacity in a daily open season. A typical daily open season begins at 11:00 am and closes at 4:00 pm on a normal business day. At the close of the daily open season, TransCanada evaluates bids and awards capacity using the same bid-ranking methodology under TAP as it uses in an existing capacity open season. The FT capacity sought and awarded in a daily open season is identical to that sought and awarded in an existing capacity open season.

STFT Sales: If capacity is still available after an existing capacity open season and daily open season, TransCanada can offer it as STFT by publishing an STFT availability notice on its website. TransCanada's sale of STFT is governed by the STFT Toll Schedule. TransCanada is not permitted to sell capacity as STFT without first posting it through an STFT availability

notice.  TransCanada always tries to sell capacity as FT before using it for STFT sales. While the STFT Toll Schedule requires TransCanada to offer STFT at least twice a year, TransCanada has discretion to offer it more frequently.

Aspiring STFT shippers submit bids identifying a receipt and delivery point, the maximum and minimum daily quantity of capacity desired, the requested service period, and the STFT bid price as calculated pursuant to subsection 2.3(b) of the STFT Toll Schedule.  STFT bids are ranked in descending order from highest to lowest based on the STFT bid price for each system segment and service period pursuant to Section 2.3(c)(i) of the STFT Toll Schedule.

New Capacity Open Season:  When TransCanada determines that there is a reasonable expectation of a long term requirement for an expansion of TransCanada's system capacity and that it intends to prepare and to submit to the NEB an application for authorization to construct facilities or otherwise obtain additional system capacity, TransCanada is required to issue a notice on its electronic bulletin board and otherwise notify potential service applicants by fax or email that it will hold a new capacity open season.  This notice must (1) identify the minimum term of service required by TransCanada for bids in support of the facilities application; (2) identify the expected date by which such additional capacity might first be offered for service; (3) identify the dates on which the new capacity open season will commence and end; and (4) indicate the system segments which are being offered.  Further, a new capacity open season notice must request that

> Service Applicants provide to TransCanada with their Bid Form all applicable supporting documentation set out in Part 3 of the National Energy Board's Guidelines for Filing Requirements determined by TransCanada to be necessary for submission to the NEB in support of TransCanada's Facilities Application pursuant to Part III of the NEB Act and which evidence supports the Service Applicant's need for transportation service in the time frame contemplated in the Service Applicant's Bid Form.

14

(TCPL Ex. 81 at 008760-61). A new capacity open season is similar to an existing capacity open season. Likewise, new capacity is awarded based on the same TAP ranking procedure applicable for an existing capacity open season.

### 4. Re-aeroing

As noted above, TransCanada uses a series of compressors along its Mainline to move gas from one point to another by adding pressure. These compressors can be mechanically altered through a process termed re-aeroing. Re-aeroing is primarily used to fix mechanical failures in the compressor. Such re-aeroing usually involves changing the aero assemblies on compressors. TransCanada also re-aeros for operational and efficiency purposes.

TransCanada can re-aero its compressors either to increase efficiency and operating flexibility on the pipeline (with an accompanying reduction in pipeline capacity) or to increase pipeline capacity (with an accompanying reduction in efficiency and operating flexibility). TransCanada does so by reconfiguring certain compressors from "parallel" to "series" or vice versa. When the compressor station is arranged in parallel, the fuel efficiency of the compressor is increased, along with operating flexibility, but throughput or capacity is decreased. When a compressor operates in series mode, efficiency and flexibility decrease while throughput is increased.

The cost of re-aeroing a compressor back from parallel to series can vary. In some instances, where the aero must be replaced—because the existing one may be damaged beyond repair—the cost may be quite significant. In addition, the re-aeroing of a compressor back from parallel to series can take as little as three to four days provided: (1) that there are sufficient resources; (2) there are no problems encountered during the process; and (3) overtime labor is employed.

Re-aeroing a compressor from parallel to series or vice versa, does not require regulatory approval.

Between 1999 and 2007, TransCanada re-aeroed its compressors on several occasions. From 1999 to 2003, TransCanada re-aeroed 33 compressors to either reduce capacity or for maintenance purposes on the Mainline. In 2004, TransCanada re-aeroed six compressors to increase capacity on the Mainline. From 2005 through 2007, TransCanada re-aeroed nine times for repair and performance purposes.

In 2000 and 2001, TransCanada re-aeroed several compressors to increase fuel efficiency thereby reducing capacity. This was due, in part, to de-contracting on the Mainline. "De-contracting" is the term used when a shipper does not exercise its unilateral right to extend the term of a FT contract. The Stittsville Compressor, at unit 1217A, was re-aeroed from series to parallel in 2001 thereby increasing fuel efficiency and reducing capacity. This change of the Stittsville Compressor—from series to parallel—temporarily reduced or mothballed capacity available to GMi EDA and Iroquois, which are both downstream of the Stittsville Compressor.

## B. The USGen Contract and Bankruptcy

### 1. The USGen Contract

USGen (as the successor in interest to New England Power Company) was party to an FT contract (the "Contract") with TransCanada. Pursuant to the Contract, USGen reserved 53,904 GJ/d of FT capacity from a receipt point at Empress, Alberta, to a delivery point at the interconnect with the Iroquois Gas Transmission System near Waddington, New York (the "Empress to Iroquois" path). The Contract term was from January 6, 1992 through October 31, 2006, and pursuant to TransCanada's tariff, obligated USGen to pay demand tolls plus a pressure charge reflecting the cost to move gas to Iroquois. The Contract also required USGen to pay a

16

commodity charge if it actually shipped gas.  All tolls and charges were tied to the rate specified

in TransCanada's approved tariff, as adjusted from year to year.

Section 7.1 of the Contract states that TransCanada's Firm Service:

> Toll Schedule, the List of Tolls, and the General Terms and
> Conditions set out in TransCanada's Transportation Tariff as
> amended or approved from time to time by the NEB are all by
> reference made a part of this Contract and operations hereunder
> shall, in addition to the terms and conditions of this Contract, be
> subject to the provisions thereof.

(TCPL Ex. 202 at 000080).  Section 7.1 is a standard clause in all of TransCanada's contracts.

The purpose of the provision is to insure the parties to a contract understand that the contract is

governed and bound by the NEB rules and regulations.  Section 7.3 of the Contract states that it

shall be "construed and applied, and be subject to the laws of the Province of Alberta, and, when

applicable, the laws of Canada, and shall be subject to the rules, regulations and orders of any

regulatory or legislative authority having jurisdiction."

TransCanada's transportation tariff, which was incorporated by reference into the

Contract, required USGen to provide certain financial assurances of its obligations under the

Contract.  At the time USGen rejected the Contract, it provided TransCanada with $1,460,094

CAD in financial assurances.

### 2.  The USGen Bankruptcy and Contract Rejection

On July 8, 2003 (the "Petition Date"), USGen filed a voluntary petition for relief under

Chapter 11 of the U.S. Bankruptcy Code.  USGen filed a motion under 11 U.S.C. § 365 to reject

the Contract on August 12, 2003.  (Docket No. 186).  By order entered on September 12, 2003,

the Court granted USGen's motion and authorized it to reject the Contract effective as of

September 5, 2003 (the "Rejection Date").  (Docket No. 275).  Following the rejection of the

Contract, on October 20, 2003, TransCanada filed a proof of claim for $71,133,275.63 CAD for rejection damages.

On May 13, 2005, the Court entered an order confirming USGen's Second Amended Plan of Liquidation (the "USGen Plan"). Under the USGen Plan, all unsecured creditors were to be paid in full, with interest. (Docket No. 1570 at § 4.03). Section 8.01 of the USGen Plan provides that "[a] Claim for damages resulting from the rejection of an Executory Contract shall be entitled to Post-Petition Interest . . . unless otherwise agreed in writing by the parties to such Executory Contract or as ordered by the Bankruptcy Court." Id. at § 8.01C. "Executory Contract" is defined as "any executory contract . . . within the meaning of section 365 of the Bankruptcy Code in effect between the Debtor and another Entity as of the Petition Date." Id. at § 1.53. The Contract was an Executory Contract under this definition.

Under the USGen Plan, the term "Post-Petition Interest" means

> interest . . . (c) on Claims resulting from the rejection of an executory contract or unexpired lease under section 365 of the Bankruptcy Code, accruing from the effective date of rejection pursuant to the order of the Bankruptcy Court authorizing such rejection to the Distribution Date at the simple rate of four percent (4%) per annum.

Id. at § 1.101. "Distribution Date" is defined under the USGen Plan to mean "the date on which a Distribution is made pursuant to this Plan to holders of Allowed Claims . . . ." Id. at § 1.47. Under this definition, the date on which USGen pays TransCanada the amount of its rejection claim, as determined by the Court, is the Distribution Date. Accordingly, under the USGen Plan, TransCanada is entitled to interest on its claim from the Rejection Date to the Distribution Date.

On October 12, 2005, TransCanada filed an amended proof of claim reducing its claim to $45,199,721 CAD.  On November 2, 2006, TransCanada filed its second amended proof of claim which increased TransCanada's claim to $52,426,566 CAD.

## C.  TransCanada's Post-Rejection Activities

### 1.  TransCanada's Post-Rejection Toll Applications

In the fall of 2002, TransCanada filed its 2003 toll application. As calculated, TransCanada's 2003 FT tolls projected that the Contract would remain in service for the full year.  After USGen rejected the Contract, TransCanada included in an FT revenue deferral account an entry for approximately $5.8 million CAD in reservation charges that USGen would have paid for the remainder of 2003 under the Contract.  Subsequently, TransCanada included that deferral account in its 2004 FT toll application (RH-4-2004).  The NEB approved that toll application, thus allowing TransCanada to impose the entire amount of the deferral account balance on its shippers in its 2004 tolls.

### 2.  TransCanada's Post-Rejection Open Season Activities

#### a.  The July-September 2003 Open Season.

At the time USGen rejected the Contract, TransCanada was in the midst of a combined open season.  This open season was termed a "combined open season" because it was both a new capacity open season as well as an existing capacity open season.  The combined open season ran from July 17, 2003, to September 18, 2003 (the "July-September 2003 Open Season").  The July-September 2003 Open Season offered both new and existing capacity along a variety of contract paths, with an in-service date for the existing capacity of November 1, 2003.

Prior to the rejection of the Contract, TransCanada posted 100,000 GJ/d of existing capacity from Empress to Iroquois—the same path as the Contract.  Moreover, TransCanada

posted 100,000 GJ/d of existing capacity from Empress to GMi EDA, which, as noted earlier,

utilizes common capacity with Iroquois.  As explained earlier Section I.A.1. of this

Memorandum Opinion, the Stittsville Compressor provides the capacity needed to ship gas both

to GMi EDA and Iroquois.  Consequently, any capacity utilized to ship gas to GMi EDA reduces

the available capacity to Iroquois. [5]

On September 15, 2003, three days after this Court authorized the rejection of the

Contract and three days before the July-September 2003 Open Season was scheduled to close,

TransCanada amended the July-September 2003 Open Season notice (the "Amended September

2003 Open Season Notice") to increase the available capacity from Empress to Iroquois by

50,000 GJ/d.  The Amended September 2003 Open Season Notice increased the offered capacity

from Empress to Iroquois from 100,000 GJ/d to 150,000 GJ/d.  In addition, TransCanada

increased the offered capacity from Empress to Consumers EDA from 260,000 GJ/d to 310,000

GJ/d.  The in-service date for the additional existing capacity offered in the Amended September

2003 Open Season Notice remained November 1, 2003.

TransCanada issued the Amended September 2003 Open Season Notice to include

50,000 GJ/d of the capacity turned back by USGen as a result of the Contract rejection (the

"USGen Turnback Capacity").  TransCanada rounded USGen's 53,904 GJ/d to 50,000 GJ/d,

because it was standard practice to offer round numbers in an open season notice.

---

[5]  Moreover, TransCanada offered 260,000 GJ/d from Empress to Consumers EDA.  The Consumers EDA, which is also known as the Endbridge EDA, is a delivery zone that has delivery points both upstream and downstream of Iroquois.  An open season offer to deliver 260,000 GJ/d to the Consumers/Endbridge EDA means that TransCanada is able to deliver 260,000 GJ/d in the aggregate within the Consumers/Endbridge EDA.  It does not mean, however, that TransCanada can deliver 260,000 GJ/d to each and every delivery point within the Consumers/Endbridge EDA.  Thus, in the July-September 2003 Open Season, TransCanada could not accept a bid to a delivery point in the Consumers EDA which is downstream of Iroquois for greater than 100,000 GJ/d, even though it was offering 260,000 GJ/d to the Consumers EDA because it was limited by the capacity that was available to Iroquois, in that case, 100,000 GJ/d.

Six days after the July-September 2003 Open Season closed, TransCanada issued a Non-Critical Notice titled "TransCanada Open Season a Success."  This notice described the results of the July-September 2003 Open Season as follows:

> TransCanada recently held a Combined Open Season of Existing and New Capacity for Firm Transportation Service and Storage Transportation Service on its Canadian Mainline System. The Combined Open Season commenced July 17, 2003 and closed on Thursday, September 18, 2003.
>
> Given market interest in the Open Season, we are pleased to share some of the preliminary results.  Although specific details cannot be revealed until final contracts are signed, there was considerable interest expressed for space on the Mainline, and in some areas, available capacity was oversubscribed.
>
> "We are pleased with the overall level of interest expressed by customers for Mainline capacity during the Open Season", says Craig Frew, Vice President, Gas Transmissions East.  "Although there was some de-contracting earlier this year for long-haul capacity on parts of the Mainline System, the preliminary Open Season results reflect the ongoing shift to short-haul contracts within the market areas.  <u>There is no question that we are connected to strong and growing markets in the Eastern Canada and the U.S. Northeast, which we anticipate will drive requirements for additional capacity.</u>

(TCPL Ex. 114(K) at 016401 (emphasis added)).

At the close of the July-September 2003 Open Season on September 18, 2003, USGen received the following bids, totaling 118,400 GJ/d, that utilized capacity on the Empress to Iroquois path:[6]

---

[6]  The information in this chart was presented by TransCanada in its proposed findings of fact and conclusions of law.  (Docket No. 2369 at 33).  The chart presented by TransCanada in its proposed findings of fact and conclusions of law, however, includes an additional contract for 114,000 GJ/d of capacity with a receipt point of Dawn and a delivery point of Consumers EDA (also known as the Endbridge EDA) which was awarded to Enbridge Gas Distribution.  This contract is not included in the chart provided herein because it does not exhaust capacity available to Iroquois.  (Tr. Transcript, March 6, 2008, 1005:14-20 (Milne)).

| Shipper | Receipt Pt. | Delivery Pt. | Haul | Volume | Start Date | End Date |
|---------|-------------|--------------|------|--------|------------|----------|
| Gaz Metropolitan | Parkway | GMi EDA | Short | 20,000 | 11/01/2005 | 10/31/2015 |
| Gaz Metropolitan | Dawn | GMi EDA | Short | 40,000 | 11/01/2005 | 10/31/2015 |
| NJR Energy Services | Dawn | Iroquois | Short | 40,000 | 11/01/2003 | 03/31/2011 |
| Nexen Marketing | Herbert | GMi EDA | Long | 12,500 | 11/01/2003 | 03/31/2005 |
| Nexen Marketing | Bayhurst | GMi EDA | Long | 2,500 | 11/01/2003 | 03/31/2005 |
| St. Lawrence Gas | Empress | Cornwall | Long | 3,400 | 11/01/2003 | 10/31/2008 |

(Tr. Transcript, March 7, 2008, 1456:10-1458:2 (Ferguson)).

Pursuant to the bid-ranking methodology in the TAP, TransCanada ranked the bids and awarded

contracts as follows:

| Shipper | Receipt Pt. | Delivery Pt. | Haul | Volume | Start Date | End Date | Demand | Term | Evaluation |
|---------|-------------|--------------|------|--------|------------|----------|--------|------|------------|
| St. Lawrence Gas | Empress | Cornwall | Long | 3,400 | 11/01/2003 | 10/31/2008 | 35.7295 | 50 | $2143.78 |
| Gaz Metropolitan | Dawn | GMi EDA | Short | 40,000 | 11/01/2005 | 10/31/2015 | 10.52889 | 120 | $1275.47 |
| Gaz Metropolitan | Parkway | GMi EDA | Short | 20,000 | 11/01/2005 | 10/31/2015 | 8.33 | 120 | $999.60 |
| NJR Energy Services | Dawn | Iroquois | Short | 40,000 | 11/01/2003 | 03/31/2011 | 8.52612 | 89 | $759.00 |
| Nexen Marketing | Bayhurst | GMi EDA | Long | 2,500 | 11/01/2003 | 03/31/2005 | 34.51034 | 17 | $582.71 |
| Nexen Marketing | Herbert | GMi EDA | Long | 12,500 | 11/01/2003 | 03/31/2005 | 32.79867 | 17 | $582.71 |

(Tr. Transcript, March 5, 2008, 806:9-810:18 (Milne)).  Under the TAP, TransCanada allocated

and awarded capacity to these contracts in the order in which they were ranked.

The contracts awarded as a result of the July-September 2003 Open Season included both

short-haul and long-haul contracts.  On the Mainline, long-haul contracts are generally those

contracts with receipt points in or near Saskatchewan.  Short-haul contracts are typically

contracts with receipt points around Dawn.

As shown in the above table, the two Gaz Metro bids (the "Gaz Metro Bids") were considered short-haul contract bids. The two contracts to Nexen Marketing (the "September 2003 Nexen Contracts") were considered long-haul.

As pertinent to this case, the September 2003 Nexen Contracts realized $15,891,255.50 CAD in revenue.

### b.  October 2003 Daily Open Season

When the July-September 2003 Open Season closed on September 18, 2003, TransCanada still had available capacity to Iroquois. As a result, TransCanada commenced a daily open season on October 15, 2003 (the "October 2003 Daily Open Season"). As described above, pursuant to the TAP, if the total remaining posted capacity on a segment is greater than or equal to 20,000 GJ/d, then TransCanada must post fifty percent of that capacity in a daily open season. Accordingly, TransCanada posted what it understood to be one-half of the remaining capacity available from Empress to Iroquois. Because of a miscalculation, TransCanada believed it had 77,600 GJ/d of capacity available (when it really had much less, as described below). TransCanada therefore posted 38,800 GJ/d from Empress to Iroquois in the October 2003 Daily Open Season.

On the first day of the October 2003 Daily Open Season, Nexen Marketing purchased all 38,800 GJ/d that TransCanada posted (the "October 2003 Nexen Contract") (when referred to collectively, the September 2003 Nexen Contracts and the October 2003 Nexen Contract will be referred to herein as the "Three Nexen Contracts"). The October 2003 Nexen Contract ran from December 1, 2003 through March 31, 2005. The October 2003 Nexen Contract was subsequently renewed extending it out to a date after October 31, 2006.

23

On October 16, 2003, TransCanada issued a Non-Critical Notice stating that "the [October 2003] Daily Open Season closed at 3:00 P.M. Calgary time, and one of the system segments, Empress to Iroquois, sold out!"  (TCPL Ex. 114(M) at 000042).  The notice further stated that "because one of the system segments [Empress to Iroquois] sold out yesterday, TransCanada will now close the [October 2003] Daily Open Season process and hold another Existing Capacity Open Season."  Id.

It was unusual for TransCanada to sell out of a daily open season in one day.  As pertinent to this case, the October 2003 Nexen Contract realized $42,939,882.20 CAD in revenue.

### c.   October 2003 Existing Capacity Open Season

The fall of 2003 was an extraordinary time for TransCanada.  The July-September 2003 Open Season and the October 2003 Daily Open Season were very successful.  As a result, of this success, TransCanada chose to hold another existing capacity open season, posting all available capacity in order to determine what further contracts it could obtain.

As stated above, at the time it issued the notice for the October 2003 Daily Open Season, TransCanada made a miscalculation of the FT capacity available from Empress to Iroquois.  TransCanada believed it had 77,600 GJ/d available, and therefore posted 38,800 GJ/d of FT capacity available (one-half of that amount, in accordance with the TAP) in the October 2003 Daily Open Season.  In fact, TransCanada only had 38,800 GJ/d of FT capacity available at that time, all of which Nexen Marketing acquired in the October 2003 Nexen Contract.

Because of the mistaken belief that it had an additional 38,800 GJ/d of FT capacity available, TransCanada held an existing capacity open season commencing on October 20, 2003 (the "October 2003 Existing Capacity Open Season").  TransCanada posted in the October 2003

Existing Capacity Open Season that it had 38,800 GJ/d of FT capacity available from Empress to Iroquois.

The 38,800 GJ/d of capacity available from Empress to Iroquois was the last available FT capacity for the period in time that was the outlined in the notice for the October 2003 Existing Capacity Open Season.

On October 23, 2003, three days after issuing the notice for the October 2003 Existing Capacity Open Season, TransCanada realized its error and amended the October 2003 Existing Capacity Open Season notice to show zero capacity available to Iroquois. As the notice amending the October 2003 Existing Capacity Open Season explained:

> Upon further assessment and analysis, it has been concluded that there is no more capacity available to Iroquois. The posted capacity from Empress to Iroquois has been amended to zero. We apologize for any inconvenience this may have caused.

(TCPL Ex. 114(O)).

As of the date it posted the above notice, TransCanada had no further FT capacity from Empress to Iroquois. The last FT capacity from Empress to Iroquois was sold in the October 2003 Nexen Contract through the October 2003 Daily Open Season.

### d.  The October 2003 STFT Availability Notice

On October 23, 2003 TransCanada issued a Non-Critical Notice titled Mainline Winter 2003/2004 Availability (the "October 2003 STFT Availability Notice"). In the October 2003 STFT Availability Notice, TransCanada posted 60,000 GJ/d of capacity available for STFT service from November 1, 2003 through March 31, 2004. This 60,000 GJ/d was the same capacity sold to Gaz Metro as FT service in the July-September 2003 Open Season Notice. The entire 60,000 GJ/d was sold as STFT service for the entire period from November 1, 2003 through mid March 2004.

### e.   Subsequent Open Season Notices posting zero capacity from Empress to Iroquois or not offering capacity from Empress to Iroquois

From November 2003 through the pertinent period in 2006, TransCanada issued numerous FT open season notices.  In none of these FT open season notices did TransCanada offer existing capacity to Iroquois.  In two open season offerings, however, TransCanada offered capacity to Iroquois that was, in one case, new capacity, and in the other case, capacity that was committed to be put into existence in the future as new capacity.  The Court addresses below the existing and daily capacity FT open seasons; the Court addresses the two new FT capacity offerings in the immediately following section.

On November 26, 2003, TransCanada issued a daily open season offering capacity with in-service dates of April 1, 2004 or earlier, if available.  The notice posted zero capacity available from Empress to Iroquois.

On January 13, 2004, TransCanada issued an existing capacity open season notice.  The notice did not offer any capacity from Empress to Iroquois.

On January 23, 2004, TransCanada issued a daily open season notice.  The notice did not offer any capacity for sale from Empress to Iroquois.

On April 5, 2004, TransCanada issued an existing capacity open season notice posting capacity with an in service date of November 1, 2004.  The notice posted zero capacity from Empress to Iroquois.

On May 7, 2004, TransCanada issued a daily open season notice.  The notice posted zero capacity available from Empress to Iroquois.

On October 4, 2004, TransCanada issued an existing capacity open season notice.  That open season notice was amended by an existing capacity open season notice dated October 14, 2004.  Both notices did not offer any capacity from Empress to Iroquois.

26

On November 15, 2004, TransCanada issued a daily open season notice. The notice did not offer any capacity from Empress to Iroquois.

On March 30, 2005, TransCanada issued an existing capacity open season notice offering capacity with an in service date of November 1, 2005. The notice posted zero capacity available from Empress to Iroquois.

On June 8, 2005, TransCanada issued an existing capacity open season notice offering capacity with an in service date of November 1, 2005. The notice posted zero capacity available from Empress to Iroquois.

On July 7, 2005, TransCanada issued a daily open season notice offering capacity with an in-service date of November 1, 2005. The notice posted zero capacity available from Empress to Iroquois.

On September 6, 2005, TransCanada issued an existing capacity open season notice offering capacity with an in-service date of November 1, 2005. The notice posted zero capacity available from Empress to Iroquois.

On September 16, 2005, TransCanada issued a daily capacity open season notice offering capacity with an in-service date of November 1, 2005. The notice posted zero capacity from Empress to Iroquois.

On September 29, 2005, TransCanada issued an existing capacity open season notice offering capacity with an in-service date of November 1, 2005. The notice posted zero capacity available from Empress to Iroquois.

On November 17, 2005, TransCanada issued an existing capacity open season notice offering capacity with an in-service date of December 1, 2005. The notice posted zero capacity available from Empress to Iroquois.

27

On December 6, 2005, TransCanada issued a daily open season notice. The notice posted zero capacity available from Empress to Iroquois.

On January 10, 2006, TransCanada issued a combined new capacity and existing capacity open season notice. The notice did not offer any capacity from Empress to Iroquois.

On March 2, 2006, TransCanada issued a daily open season notice offering capacity with an in-service date of April 1, 2006. The notice posted zero capacity available from Empress to Iroquois.

### f.   Modification of the TransCanada Mainline at the Stittsville Compressor.

In late 2003, TransCanada was facing an increasing demand for capacity to the Eastern part of the Mainline. In December 2003, TransCanada initiated a New Capacity Open Season and Request for Turnback Capacity, offering new capacity to commence on November 1, 2004, November 1, 2005 and November 1, 2006 (the "December 2003 New Capacity Open Season"). The new capacity was to be made available through the construction of new facilities. In accordance with the notice, bidders for the new capacity were required to commit to a minimum contract term of ten years.

TransCanada Power, an affiliate of TransCanada, bid for 100,000 GJ/d of the new capacity (from Dawn to the GMi EDA) with a commencement date of November 1, 2006. The TransCanada Power contract was for a term of ten years, which was the minimum term required in order for TransCanada to construct new facilities. TransCanada planned to provide the new capacity by building new pipe, or "loop", near the Stittsville Compressor.

In early 2004, TransCanada recognized that it was committed under the TransCanada Power contract to provide new capacity beginning in November 2006 through the construction of the Stittsville loop. TransCanada considered accelerating the construction of the Stittsville loop

facility so that it could make the new capacity available before the November 2006

commencement date in the TransCanada Power contract in order to capture any incremental

revenue and some incremental market.

To evaluate shipper interest, TransCanada commenced an open season on February 11,

2004 (the "February 2004 Open Season"). The February 2004 Open Season notice included two

different offerings. First, it offered an existing capacity open season with service

commencement dates starting April 1, 2004 or later. TransCanada offered no capacity to

Iroquois under this offering. (TCPL Ex. 114T at 017600).

Second, the notice for the February 2004 Open Season offered an "Additional FT

Capacity Opportunity." Id. at 017601. TransCanada stated in the notice

- In addition to the capacity being offered above, TransCanada is also posting in this open season, expansion capacity that may, subject to customer interest, be available December 1, 2004 or as soon after that as possible and also subject to the stipulation respecting receipts at Dawn, referred to below.

- This expansion capacity will be required to meet new long term firm requirements commencing November 1, 2006. These new requirements underpinned a successful FT bid in the recently closed New Capacity Open Season.

- A number of shippers have advised TransCanada that they have identified market opportunities over the two year period starting with the winter of 2004-05. These markets could be served via the facilities that TransCanada must construct to meet the long term firm requirements referred to above if such additional capacity were available by the end of this year.

- In response to such requests, TransCanada will offer the segments posted below provided that for any bids with Dawn as a receipt point, shippers must stipulate that the daily contract quantity being requested is reduced to 0 GJ/day on or before October 31, 2006.

Id. (emphasis added; emphasis in original deleted).

The foregoing makes clear that, in the Additional FT Capacity Opportunity in the

February 2004 Open Season, TransCanada offered the capacity that was anticipated to become

available as a result of the construction of the Stittsville loop. This was the capacity

TransCanada needed to satisfy the TransCanada Power contract. Because of the November 1, 2006 in-service date of the TransCanada Power contract, TransCanada included the unusual requirement that any bidders had to agree to zero renewal rights beginning on October 31, 2006.

In the offering of the Additional FT Capacity Opportunity, TransCanada offered 100,000 GJ/d per day from Empress to Iroquois and from Dawn to Iroquois, the same amount as it was committed to provide under the TransCanada Power contract.

The February 2004 Open Season closed on February 20, 2004, and TransCanada received a variety of bids for the Additional FT Capacity Opportunity. In fact, TransCanada received bids in excess of the capacity posted. In fact, it appears that TransCanada initially determined to award in excess of 160,000 GJ/d, but later reduced that to 100,000 GJ/d.

TransCanada awarded contracts under the February 2004 Open Season on March 22, 2004. As a result of the Additional Opportunity for FT Capacity offering in the February 2004 Open Season, TransCanada awarded the following contracts for delivery to Iroquois:

| Shipper | Receipt Pt. | Delivery Pt. | Haul | Volume | Start Date | End Date |
|---------|-------------|--------------|------|--------|------------|----------|
| Oneok Energy Mktg | Empress | Iroquois | Long | 19,500 | 12/01/2004 | 03/31/2006 |
| Oneok Energy Mktg | Dawn | Iroquois | Short | 39,000 | 12/01/2004 | 03/31/2006 |
| UBS Energy Canada | Empress | Iroquois | Long | 10,000 | 12/01/2004 | 03/31/2005 |
| UBS Energy Canada | Empress | Iroquois | Long | 2,500 | 04/01/2005 | 03/31/2006 |
| Coral Energy Canada | Empress | Iroquois | Long | 26,377 | 12/01/2004 | 03/31/2006 |

(Tr. Transcript, March 7, 2008, 1475:19-1476:20 (Ferguson)).

While TransCanada originally planned to service the above contracts by accelerating construction of the Stittsville loop, it concluded on March 15, 2004, that it would not complete the construction of the loop and would instead satisfy the bids by re-aeroing station 1217 at the Stittsville Compressor. TransCanada decided to re-aero rather than complete the Stittsville loop

30

at that time because it could meet the delivery requirements of the bids by re-aeroing and re-aeroing was less expensive than completing the construction of the Stittsville loop.

TransCanada re-aeroed the Stittsville Compressor from parallel to series between September 13, and October 20, 2004.  The re-aeroing corresponded with other maintenance performed on the Stittsville Compressor.  The most significant portions of the re-aeroing were completed in approximately six days.  The re-aeroing cost $135,000 CAD.

## II.    CONCLUSIONS OF LAW

### A.  Damages and Mitigation

The parties do not dispute that the Contract was an executory contract under 11 U.S.C.§ 365 of the Bankruptcy Code.  As applicable to this case, that section provides that a debtor's rejection of an executory contract "constitutes a breach of such contract . . . immediately before the date of the filing of the petition . . . ."  11 U.S.C. § 365(g)(1).  Consequently in determining the amount of TransCanada's rejection claim, the Court must look to applicable nonbankruptcy law principles of damages for breach of contract.  The parties agree that, pursuant to the Contract, the applicable nonbankruptcy law is Canadian law.

In seeking to establish the scope of Canadian law on various issues in the case, the parties cited numerous Canadian and English court decisions and Canadian law treatises.  The leading treatise on Canadian law of damages, the parties agreed, is by Professor Waddams, S. M. Waddams, The Law of Damages (4th ed. 2004) (hereafter "Waddams"). [7]  In addition, the

---

[7]  Both parties and their expert witnesses cited Waddams as the leading authority on the law of damages in Canada. For example, TransCanada's legal expert affirmed the high regard Waddams enjoys in Canadian juris prudence:

    Q.    Are you familiar with Professor Waddams' treatise, The Law of Damages?
    A.    I am.
    Q.    Is that considered to be a recognized treatise in Canada on the law of damages?
    A.    Yes. It would be the -- the leading academic treatise on damages, if I can put it that

31

parties offered expert witnesses on foreign law under Fed. R. Civ. P. 44.1, made applicable to this proceeding by Fed. R. Bank P. 9017.  In a prior memorandum opinion addressing pre-trial disputes, the Court ruled that it would allow the experts to opine on the ultimate issues in the case, for the reasons stated therein.  *See* Memorandum Opinion (Docket No. 2216) at 31-40. Having heard the testimony and read the expert reports, the Court relies primarily on the specific language and rationale of the cited cases as well as Waddams in rendering its decision.

The following discussion is based on Canadian law unless otherwise noted.

### 1.  Applicable Legal Standards

While broad principles are applicable to the calculation of damages, discrepancies often arise in their applicability to particular cases.  Judges who preside over damages cases "have necessarily to look at their special character, and to mould, for the purposes of different kinds of claim, the expression of the general principles which apply to them."  British Westinghouse Electric & Manufacturing Co., Ltd. v. Underground Electric Rys. Co. of London, Ltd. (Westinghouse), [1912] A.C. 673 (H.L.) (U.K.) (pincite unavailable).  Ultimately, "[t]he quantum of damage is a question of fact, and the only guidance the law can give is to lay down general principles which afford at times but scanty assistance in dealing with particular cases." Id.  Keeping the foregoing in mind, it is nonetheless necessary to outline the general principles governing the calculation of contractual damages.

---

way. There are other practitioner books, but his is a very highly regarded treatise on the law of damages.

(Tr. Transcript, March 11, 2008, 1963:22-1964:9 (McCamus)).  Moreover, both parties attempted to highlight their experts' relationship to Professor Waddams.  Further, the Waddams treatise is routinely cited by Canadian courts. *See e.g.,* Canadian Forest Products Ltd., [2004] 2 S.C.R. at ¶¶ 107, 108, 123, 176, 198; West Edmonton Mall Ltd. v. McDonald's Restaurants of Canada Limited, [1994] 144 A.R. 331, ¶ 44 (Alberta Court of Queen's Bench) aff'd on appeal; Tangye v. Calmonton Investments Ltd., [1998] 87 A.R. 22,  ¶¶ 30, 36 (Alberta Court of Queen's Bench).

It is axiomatic that "the person who has suffered from such a wrong is entitled, so far as money can do it, to be placed in as good a position as if the contract had been performed." Karas v. Rowlett, [1944] S.C.R. 1, ¶ 8 (Can.); Westinghouse (pincite unavailable) ("as far as possible, he who has proved a breach of a bargain to supply what he contracted to get is to be placed, as far as money can do it, in as good a situation as if the contract had been performed."). The injured party, however has a duty "to take all reasonable measures to mitigate the loss consequent upon the breach." Rowlett at ¶ 8; Westinghouse (pincite unavailable) (there is a duty imposed on an injured party ". . . of taking all reasonable steps to mitigate the loss consequent on the breach, and debars him from claiming any part of the damage which is due to his neglect to take such steps."). This obligation stems from the general proposition "that a plaintiff cannot recover from the defendant damages which he himself could have avoided by the taking of reasonable steps." Janiak v. Ippolito, [1985] 1 S.C.R. 146, ¶ 36 (Can.).[8] The burden of showing that the injured party mitigated his damages or unreasonably failed to do so is borne by the breaching party. Michaels v. Red Deer College, [1975] 2 S.C.R. 324, ¶ 11 (Can.).

a.  Transactions Constituting Mitigation

Generally, a transaction is considered in the calculation of mitigation (or, as is sometimes said, "taken into account") if it arises out of the consequences of the breach and is made in the ordinary course of business. Westinghouse (pincite unavailable) ("when in the course of his business [the non-breaching party] has taken action arising out of the transaction, which action has diminished his loss, the effect in actual diminution of the loss he has suffered may be taken into account even though there was no duty on him to act."). In Westinghouse, the plaintiff sought damages for the sale, by the defendant, of defective machinery. Westinghouse (pincite

---

[8] As the Janiak Court pointed out, the duty to mitigate is not a "duty" in the strict sense. Id. at ¶36. However, since a number of cases refer to the obligation of a plantiff to take reasonable steps to avoid damages as a duty to mitigate, it will be referred here either as the duty to mitigate or the obligation to take reasonable steps to mitigate damages.

unavailable). Specifically, the plaintiff sought the recovery of the cost of purchasing and

installing replacement machines that were vastly superior to the machines that the defendant

sold. The court disagreed, finding that the plaintiff's purchase of the replacement machines

arose as a consequence of the breach and the plaintiff had mitigated all of his damages as a result

of the more profitable machines. The court stated:

> I think the principle which applies here is that which makes it right
> for the jury or arbitrator to look at what actually happened, and to
> balance loss and gain. The transaction was not res inter alios acta,
> but one in which the person whose contract was broken took a
> reasonable and prudent course quite naturally arising out of the
> circumstances in which he was placed by the breach.

Id. "If the interest acquired by the damaged person is something he could not have been able to

obtain if the contract had been carried out, it must be brought into the account; if it could have

been acquired consistently with his performance of the contract, it is not available as mitigation."

Dawson v. Helicopter Exploration Co., [1958] 12 D.L.R. (2d) 1, 10 (Can.); *See also* Canadian

Forest Products Ltd., at ¶ 107 ("a test often applied, that is, whether the plaintiff could, even in

the absence of the wrong, have made the disputed profit. If so, it is treated as collateral. If not, it

goes to reduce the plaintiff's loss." (*quoting* Waddams at ¶ 15.800)).

In Apeco of Canada, Ltd. v. Windmill Place, [1978] 2 S.C.R. 385, ¶ 8 (Can.) the plaintiff

sought to recover damages from the defendant for the breach of a commercial lease. The

defendant argued that the plaintiff had successfully mitigated his damages by re-letting the space

to a third party. The court disagreed. The court held that because the plaintiff had more than

half the building vacant, the re-letting of the defendant's space was not a consequence of the

breach. The court stated:

> 5.  . . . the vacancy created by the appellant's breach did not have
> any bearing on the new tenant's decision to rent 17,000 square feet
> of accommodation in the new building. If the premises formerly

reserved for Apeco had been the only available space suitable to
the new tenant's needs, different considerations would have
applied, but the building was more than half empty and the
Goodboy's company was at first not interested in renting the Apeco
space at all and it was only after some persuasion on the part of the
respondent that it was induced to do so.

6. It follows, in my view, that the February 1976 transaction could
have been concluded even if the appellant had not breached the
original agreement and that it was an independent transaction
which in no way arose out of the consequences of the breach by
the appellant.

                ***

9.   . . . I am satisfied that the Goodboy's lease entered into in
February 1976 at a time when the building was still more than one-
half vacant was not a transaction arising out of the consequences of
the respondent's breach in October of the previous year, and the
rental received from Goodboy's is not to be deducted in mitigation
of the damage suffered by the respondent.

Id. at ¶¶ 5, 6, and 9.  This principle—that transactions are considered "collateral" and not

mitigation, if the non-breaching party "could have" concluded the transaction absent the

breach—is also referred to as the "lost sale scenario."

### b.  Failure to Mitigate

As noted earlier, Canadian law imposes a duty on the non-breaching party to take all

reasonable steps to mitigate losses caused by the breach.  "The person who has broken the

contract is not to be exposed to additional cost by reason of the plaintiffs not doing what they

ought to have done as reasonable men, and the plaintiffs not being under any obligation to do

anything otherwise than in the ordinary course of business." Westinghouse (pincite unavailable)

(quoting Dunkirk Collery Co. v. Lever, [1878] 9 Ch. D. 20, 25 (U.K.)).  This "principle does not

impose on the [non-breaching party] an obligation to take any step which a reasonable and

prudent man would not ordinarily take in the course of his business."  Id.

The fact that the expenditure of time or money required to avoid a
larger loss will not excuse the plaintiff from making the

> expenditure if the expenditure is reasonably small and the chances of avoiding the greater loss favourable. What is reasonable has been called a question of fact depending on the particular circumstances of the case. In case of doubt, the plaintiff will usually receive the benefit because it does not lie in the mouth of the defendant to be over-critical of good faith attempts by the plaintiff to avoid difficulty caused by the defendant's wrong.

Waddams at ¶ 15.150 (citations omitted). Waddams goes on to quote the following passage

from the holding in Banco de Portugal v. Waterlow & Sons, Ltd., [1932] A.C. 452 (H.L.)

(U.K.):

> Where the sufferer from a breach of contract finds himself in consequence of that breach placed in a position of embarrassment the measures which he may be driven to adopt in order to extricate himself ought not to be weighed in nice scales at the instance of the party whose breach of contract has occasioned the difficulty. It is often easy after an emergency has passed to criticize the steps which have been taken to meet it, but such criticism does not come well from those who have themselves created the emergency. The law is satisfied if the party placed in a difficult situation by reason of the breach of a duty owed to him has acted reasonably in the adoption of remedial measures, and he will not be held disentitled to recover the cost of such measures merely because the party in breach can suggest that other measures less burdensome to him might have been taken.

Id. at ¶ 15.140. When finding that an injured party unreasonably failed to mitigate its damages,

the inquiry then revolves around what steps the injured party should have taken to mitigate

damages. Further there is authority in Canadian law, at least in tort law, that the inquiry then

requires the court to assess the damages reasonably avoidable by the injured party. Janiak, 1

S.C.R. 146 (denying a plaintiff 70 percent of his damages because the court found that the

plaintiff had reasonably failed to take mitigative steps).

   In Janiak, the Canadian Supreme Court addressed the assessment of damages for

personal injury where the victim of an accident unreasonably refused to undergo recommended

surgery. Id. at ¶ 1. The evidence at the trial court revealed that the injured party suffered from a

36

great fear of surgery even when the recommended surgery had a 70 percent chance of success.

Id. The trial court found that the injured party acted unreasonably in refusing the recommended

surgery. The trial court assessed damages against the tortfeasor for the period between the time

of the accident and the time that the injured party could have returned to work had he accepted

the recommended surgery.

The Canadian Supreme Court agreed with the trial court's finding that the victim

unreasonably failed to mitigate damages by refusing surgery that had a 70 percent chance of

success. However, the Canadian Supreme Court disagreed with the trial court's calculation of

damages and found that the court of appeals outlined the proper methodology when an injured

party fails to mitigate. Unlike the trial court, the court of appeals took into account that the

recommended surgery had a 70 percent chance of success and adjusted the damage award to

include the probability that full recovery was not guaranteed.

In agreeing with the court of appeals calculation of damages, the Canadian Supreme

Court stated that the court of appeal's approach is consistent with the principles of mitigation:

> The role of the court in making an assessment of damages which depends upon its view as to what will be and what would have been is to be contrasted with its ordinary function in civil actions of determining what was. In determining what did happen in the past a court decides on the balance of probabilities. Anything that is more probable than not it treats as certain. But in assessing damages which depend upon its view as to what will happen in the future or would have happened in the future if something had not happened in the past, the court must make an estimate as to what are the chances that a particular thing will or would have happened and reflect those chances, whether they are more or less than even, in the amount of damages which it awards.

Janiak at ¶ 43 (quoting Mallett v. McMonagle, [1970] A.C. 166, 176 (H.L.) (U.K.)). The

Canadian Supreme Court held that "[i]n assessing damages the Court determines not only what

will happen but what *would have* happened by estimating the chance of the relevant event occurring, which chance is then to be directly reflected in the amount of damages." Id.

### 2.  Applicability of Legal Standards to the Facts of this Case

TransCanada's contractual damages (prior to the application of any mitigation credit) arising from USGen's rejection of the Contract are fairly simple to calculate and are not generally disputed by USGen.  TransCanada's Second Amended Proof of Claim, which was admitted into evidence, establishes TransCanada's contractual damages (prior to the application of any mitigation credit or reduction for financial assurances) to be $65,068,045 CAD.  (TCPL Ex. 205 at 026851).[9]  This is the amount of the revenue stream that TransCanada would have received under the Contract from the Rejection Date to October 31, 2006, the termination date under the Contract, by reference to the actual tolls in effect during the relevant years.

The parties' primary dispute centers on whether TransCanada mitigated, or failed to mitigate, its damages.  Specifically, the parties dispute whether TransCanada (1) failed to take reasonable steps to mitigate its damages by failing to offer the USGen Turnback Capacity as STFT for the period beginning on October 1, 2003[10] through November 30, 2003; and (2) was successful in mitigating all, or merely some, of its damages by re-selling as FT the USGen Turnback Capacity from November 30, 2003 through October 31, 2006.  The Court will address these issues in turn.

### a.  Mitigation of TransCanada's Damages as STFT Prior to the Commencement of the FT Contracts

---

[9]  USGen's calculation of TransCanada's contractual damages (prior to the application of any mitigation credit or reduction for collateral security) is not materially different: $65,068,129 CAD. USGen Ex. 109

[10]  Originally, USGen contended that TransCanada should have offered the USGenTurnback Capacity as STFT sales beginning the day after the Rejection Date.  At trial, however, USGen withdrew its contention that TransCanada failed to take reasonable steps to sell the USGenTurnback Capacity from the Rejection Date through September 30, 2003.

USGen maintains that TransCanada unreasonably failed to mitigate its damages by not offering the USGen Turnback Capacity as STFT service. Specifically, USGen contends—and the Court will address in the following section—that the Three Nexen Contracts serve as mitigation of TransCanada's claim. The September 2003 Nexen Contracts, with a capacity of 15,000 GJ/d, had a start date of November 1, 2003; therefore TransCanada had available to sell as STFT the 15,000 GJ/d capacity that was reserved for the September 2003 Nexen Contracts from October 1, 2003 to October 31, 2003. The October 2003 Nexen Contract, with a capacity of 38,800 GJ/d, had a start date of December 1, 2003; therefore TransCanada had 38,800 GJ/d capacity reserved for the  October 2003 Nexen Contract available from the October 1, 2003 to November 30, 2003. Thus, according to USGen, TransCanada should have offered as STFT 53,800 GJ/d for the month of October, 2003 (the 15,000 GJ/d capacity reserved for the September 2003 Nexen Contracts plus the 38,800 GJ/d capacity reserved for the October 2003 Nexen Contract) and 38,800 GJ/d for November 2003 (the 38,800 GJ/d capacity reserved for the October 2003 Nexen Contract). USGen concedes that it has the burden of establishing that TransCanada failed to take reasonable steps to mitigate its damages. USGen contends that TransCanada failed to do so because it did not offer these amounts of the USGen Turnback Capacity as STFT service during these periods. This Court disagrees.

As stated in Section I.A.2.b., it was TransCanada's usual practice to attempt to sell capacity first as FT and only then as STFT. There may well be several reasons for this practice, but the most significant reason is that FT revenues are treated differently and are more beneficial to TransCanada in its toll design process than STFT revenues. Consistent with its usual practice, four days after this Court approved the rejection of the Contract, TransCanada offered the USGen Turnback Capacity as FT by adding 50,000 GJ/d to the July-September 2003

39

Open Season in the Amended July-September 2003 Open Season Notice. *See* I.C.2.a.-c. The in-service date offered in the July-September 2003 Open Season was November 1, 2003, and the in-service date offered for the USGen Turnback Capacity in the Amended July-September 2003 Open Season Notice remained November 1, 2003. When the July-September 2003 Open Season closed on September 18, 2003, TransCanada had capacity that was not sold (albeit under the mistaken belief that it was 77,600 GJ/d rather than 38,800 GJ/d, *see supra* at Section I.C.2.b.-c.). Again consistent with its usual practice, TransCanada offered 38,800 GJ/d as FT capacity in the October 2003 Daily Open Season on October 15, 2003. When that capacity sold on the first day, TransCanada, under the mistaken belief that 38,800 GJ/d FT capacity remained available, offered that capacity on October 20, 2003 in the October 2003 Existing Capacity Open Season. TransCanada realized the error on October 23, 2003 and amended the October 2003 Existing Capacity Open Season to eliminate the 38,800 GJ/d capacity.

Based on the foregoing, the Court finds and concludes that TransCanada acted prudently and reasonably and consistent with its usual practices in offering the USGen Turnback Capacity from the Rejection Date through the close of the October 2003 Existing Capacity Open Season on October 23, 2003. TransCanada quickly offered the USGen Turnback Capacity four days after the rejection was approved by the Court as FT capacity. This action was timely and appropriate. TransCanada offered the USGen Turnback Capacity as FT capacity through three open seasons (although in the last open season the capacity was not available, as it soon discovered, and was withdrawn). It was TransCanada's usual practice to offer capacity first as FT capacity. It was not until October 23, 2003 that TransCanada even knew the results of the FT open seasons, and therefore knew whether any remaining capacity was available. The Court will not deprive TransCanada of a damage recovery during the time it awaited the results of the

40

FT open seasons, because it was TransCanada's usual practice to sell capacity through FT before selling it as STFT. A plaintiff is not "under any obligation to do anything otherwise than in the ordinary course of business." Westinghouse (pincite unavailable). Thus, the Court concludes that from October 1, 2003 through October 23, 2003, at least, TransCanada did not fail to take reasonable steps to mitigate its loss from the Contract rejection by not offering to sell the USGen Turnback Capacity as STFT.

This leaves the period from October 24, 2003, the date after TransCanada closed the October 2003 Existing Capacity Open Season, until December 1, 2003. Because the September 2003 Nexen Contracts commenced on November 1, 2003, the capacity attributable to those contracts must be excluded from the analysis. STFT sales are for a minimum of seven days, Section I.A.2.b., [11] and therefore TransCanada could not have sold the capacity reserved for the September 2003 Nexen Contracts as STFT within that time period. The October 2003 Nexen Contract commenced on December 1, 2003. Thus the remaining question is whether TransCanada failed to take reasonable steps to mitigate its loss by not offering as STFT the 38,800 GJ/d capacity reserved for the October 2003 Nexen Contract from October 24, 2003 through November 30, 2003.

USGen contends that nothing prevented TransCanada from offering this capacity as STFT once the results of the October 2003 Existing Capacity Open Season were known on October 23, 2003. That may be true. But, as will be shown in the next section, by that time TransCanada had quickly and successfully marketed the USGen Turnback Capacity, thus generating millions of dollars of mitigation credit for USGen. Moreover, USGen's expert was not aware of any instance where TransCanada offered STFT for a month or less (Tr. Transcript

---

[11] USGen's expert testified that, in 2003, STFT sales were for a minimum of fourteen days. In either case, the capacity available for the September 2003 Nexen Contracts was not available as STFT sales after the close of the October 2003 Existing Capacity Open Season.

March 5, 2008 867:2-19 (Milne)), and this time period is not much more than that.   And there was evidence in the record that during this time, TransCanada offered open capacity on a daily basis as Interruptible Transportation ("IT") service capacity.[12]  While the question is not free from doubt, the burden is on USGen to establish that TransCanada failed to take reasonable steps to mitigate its loss from October 24, 2003 through November 30, 2003.  As Professor Waddams put is, "In case of doubt, the plaintiff will usually receive the benefit because it does not lie in the mouth of the defendant to be over-critical of good faith attempts by the plaintiff to avoid difficulty caused by the defendant's wrong."  Waddams at ¶ 15.140.  Further

> Where the sufferer from a breach of contract finds himself in consequence of that breach placed in a position of embarrassment the measures which he may be driven to adopt in order to extricate himself ought not to be weighed in nice scales at the instance of the party whose breach of contract has occasioned the difficulty. It is often easy after an emergency has passed to criticize the steps which have been taken to meet it, but such criticism does not come well from those who have themselves created the emergency.  The law is satisfied if the party placed in a difficult situation by reason of the breach of a duty owed to him has acted reasonably in the adoption of remedial measures, and he will not be held disentitled to recover the cost of such measures merely because the party in breach can suggest that other measures less burdensome to him might have been taken.

Id. (quoting Banco de Portugal).

Accordingly, the Court concludes that USGen did not carry its burden of proving that TransCanada failed to take reasonable steps to mitigate its damages by not offering as STFT the 38,800 GJ/d capacity reserved for the October 2003 Nexen Contract from October 24, 2003 through November 30, 2003.[13]

---

[12]  IT allows a shipper to transport natural gas only when and if capacity is available.

[13]  Because the Court find that TransCanada did not breach its duty to mitigate in this regard, the Court need not address TransCanada's contention that USGen should not receive dollar-for-dollar mitigation credit for STFT revenues because of the way those revenues are treated under the toll design process.

### b.  The Mitigation of TransCanada's Damages Through the Three Nexen Contracts

The determination of whether TransCanada mitigated its damages by selling the USGen Turnback Capacity as FT capacity in the Three Nexen Contracts requires a two-step analysis: First, whether TransCanada sold the USGen Turnback Capacity in the fall of 2003.  Second, if so, which of the contracts for capacity sold in 2003 on the Empress to Iroquois path should be applied to mitigate TransCanada's losses.[14]

Based on the standards set forth previously, the Court finds and concludes that TransCanada mitigated much of its damages by re-selling the USGen Turnback Capacity.  The Court further finds and concludes that the USGen Turnback Capacity is properly allocable to the Three Nexen Contracts and that these contracts were transactions arising out of the consequence of USGen's breach.  The Court further finds and concludes that TransCanada could not have entered into these contracts absent the USGen Turnback Capacity.  Therefore, the Three Nexen Contracts serve as mitigation for TransCanada's loss.  These findings and conclusions are supported by TransCanada's open season offerings and postings, witness testimony, and TransCanada's Bid Ranking Procedures.  The Court will now address these findings and conclusions in greater detail.

It is beyond question to this Court that, as a matter of fact, the USGen Turnback Capacity was resold by TransCanada in the fall of 2003 via the July-September 2003 Open Season and the October 2003 Daily Open Season.  As set forth in Section I.C.2.a. of the Findings of Fact, TransCanada initially offered 100,000 GJ/d to Iroquois in the July-September 2003 Open Season.  On September 15, 2003, three days after the Court authorized USGen's rejection of the Contract and three days before the July-September 2003 Open Season was scheduled to close,

---

[14]  The Court will address in a subsequent section TransCanada's arguments concerning actions it could have taken to service the Three Nexen Contracts in the absence of the USGen Turnback Capacity.

TransCanada amended the available capacity in the July-September 2003 Open Season by issuing the Amended September 2003 Open Season Notice.  In it, TransCanada increased the available capacity to Iroquois to 150,000 GJ/d.  TransCanada's own witnesses concede that the increase of available capacity offered to Iroquois in the Amended September 2003 Open Season Notice was attributable to the USGen Turnback Capacity.  The Court finds and concludes that TransCanada would not have offered the additional 50,000 GJ/d of capacity to Iroquois in the July-September 2003 Open Season absent USGen's rejection of the Contract.

Once the July-September 2003 Open Season closed on September 18, 2003, TransCanada awarded contracts on the Empress to Iroquois path totaling 118,400 GJ/d.  These contracts are listed in the first chart in the Findings of Fact, Section I.C.2.a.  Subsequently, in the October 2003 Daily Open Season, TransCanada posted 38,800 GJ/d from Empress to Iroquois.  That capacity was sold in the October 2003 Nexen Contract on the first day of the October 2003 Daily Open Season.

As set forth in the Findings of Fact, TransCanada made a miscalculation and believed it had an additional capacity of 38,800 GJ/d available from Empress to Iroquois after Nexen purchased the 38,800 GJ/d in the October 2003 Nexen Contract on October 16, 2003.  *See* Section I.C.2.c.  TransCanada then issued the October 2003 Existing Capacity Open Season mistakenly offering the 38,800 GJ/d from Empress to Iroquois.  Shortly thereafter, TransCanada realized its error and issued the Amended October 2003 Existing Capacity Open Season.  In it, TransCanada stated that "[u]pon further assessment, it has been concluded that there is no more capacity available to Iroquois.  The posted capacity from Empress to Iroquois has been amended to zero."  TCPL Ex. 114(O).

Accordingly, the facts that TransCanada (1) amended the July-September 2003 Open Season to include the USGen Turnback Capacity by increasing the available capacity from Empress to Iroquois to 150,000 GJ/d; (2) awarded contracts on the Empress to Iroquois path totaling 118,400 GJ/d at the close of the July-September 2003 Open Season; (3) posted and sold 38,800 GJ/d on the Empress to Iroquois path in the October 2003 Daily Open Season; and (4) subsequently announced that "there is no more capacity available to Iroquois" in the Amended October 2003 Existing Capacity Open Season, lead to the inescapable conclusion that TransCanada resold the USGen Turnback Capacity. This conclusion is further bolstered by TransCanada's own employee, Tim Stringer, who in an email produced by TransCanada, stated "I thought I'd point out that USGen New England is no longer a shipper on the system. They went belly up and their capacity came back to us, and we then resold it in an open season." (USGen Ex. 67).

Next, the Court must determine which of the contracts utilizing capacity on the Empress to Iroquois path that were awarded by TransCanada in the July-September 2003 Open Season and the October 2003 Daily Open Season should be considered in the calculation of mitigation. As discussed in Section II.A.2., the only interest considered in the calculation of mitigation is that interest that could not have been obtained absent the breach. *See* <u>Dawson</u> at 10, *supra*. Stated otherwise, the contracts that should be applied to the calculation of mitigation are those contracts that TransCanada could not have entered into absent the USGen Turnback Capacity.

In order to make this determination, the Court must determine which contracts on the Empress to Iroquois path constituted the last capacity sold and thus could not have been entered into absent the USGen Turnback Capacity. Because the USGen Turnback Capacity was resold by TransCanada in both the July-September 2003 Open Season and the October 2003 Daily

45

Open Season, it is necessary to evaluate those open seasons separately to determine the last capacity sold.

The Court will first analyze the July-September 2003 Open Season. As explained in Section I.C.2.a. of the Findings of Fact, three days before the July-September 2003 Open Season was set to close, TransCanada increased its posting of capacity to Iroquois, from 100,000 GJ/d to 150,000 GJ/d to reflect the 50,000 GJ/d of the USGen Turnback Capacity. The contracts that TransCanada awarded as a result of the July-September 2003 Open Season exhausted 118,400 GJ/d of this 150,000 GJ/d available capacity. Consequently, at the conclusion of the July-September 2003 Open Season, TransCanada had exhausted all of the 100,000 GJ/d capacity it had available to Iroquois before the USGen Turnback Capcity and had sold 18,400 GJ/d of the USGen Turnback Capacity.

The Court must determine which of the contracts awarded in the July-September 2003 Open Season should be considered as mitigation of TransCanada's damages. Because TransCanada awarded multiple contracts in the July-September 2003 Open Season on the Empress to Iroquois path, the Court will look to the procedure TransCanada used to rank bids and allocate posted capacity when it awarded the contracts.

The Bid Ranking Procedures in the TAP used by TransCanada to rank bids and allocate posted capacity, described in Section I.A.3.d., provide a reasonable and objective method to determine which of the contracts awarded by TransCanada in the July-September 2003 Open Season could not have been entered into by TransCanada absent the USGen Turnback Capacity, and thus, should constitute mitigation. As explained in Section I.A.3.d. of the Findings of Fact, the Bid Ranking Procedures are mandated by the TAP and are designed to maximize revenue over the long term to TransCanada. Further, TransCanada utilizes the Bid Ranking Procedures

46

in the ordinary course of business to evaluate bids, allocate capacity, and award contracts.

Finally, utilizing the Bid Ranking Procedures gives mitigation credit to those contracts that are

the least valuable to TransCanada under the TAP mandated analysis, and therefore is consistent

with mitigation principles.

The Bid Ranking Procedures require TransCanada to rank all the bids it receives based on

a formula set forth in the TAP.  Id.  Pursuant to this ranking, TransCanada awards capacity first

to the highest ranked bidder.  The next highest ranked bidder then is awarded capacity, and the

process continues until all the available capacity is exhausted or all bids are filled.  The Bid

Ranking Procedures are critical to the analysis herein because they show that TransCanada

awards its bids and allocates capacity in sequence.  Consequently, this feature provides a clear

picture of which contracts were awarded last and thus could not have been entered into by

TransCanada absent the USGen Turnback Capacity.[15]

Applying the Bid Ranking Procedures to the July-September 2003 Open Season, it is

straightforward to identify which contracts were awarded last and therefore utilized the USGen

Turnback Capacity.  As set forth in the second chart in Section I.C.2.a. of the Findings of Fact,

the lowest ranked contracts that were awarded by TransCanada in the July-September 2003 Open

Season were the September 2003 Nexen Contracts.  Thus under the Bid Ranking Procedures, the

---

[15]  TransCanada also argues that even if the Court were to employ the Bid Ranking Procedures to determine the last capacity sold in the July-September 2003 Open Season, the Gaz Metro contracts should be deemed to be the last capacity sold because TransCanada had full discretion under the TAP to accept or decline the Gaz Metro Bids.  But as described above, Section 3.4(a) of the TAP requires TransCanada to rank the submitted bid forms and allocate the posted capacity among bidders based on an enumerated descending priority.  Section 3.4(d) requires TransCanada to allocate capacity to the bids with the highest rankings until all the bids have been processed or until all available capacity has been allocated.  Thus, under the plain language of the TAP, once TransCanada chose to accept the Gaz Metro Bids, it had to allocate the capacity for those contracts in accordance with the order in which those contracts were ranked under Section 3.4(a) of the TAP.  See Section 3.4(d) of the TAP.  Consequently, the fact that TransCanada could have rejected the Gaz Metro Bids is irrelevant to the allocation of capacity under the TAP once the bids were accepted.  And in any event, the Court finds TransCanada's claim that it would have rejected the Gaz Metro Bids to be unsupported and lacking merit. If the Contract had not been rejected, and TransCanada had only offered the 100,000 GJ/d in the July-September 2003 Open Season, it is inconceivable that TransCanada would have rejected the GAZ Metro Bids.

capacity allocated to Nexen in the September 2003 Nexen Contracts was the last capacity allocated to any of the relevant contracting parties in the July-September 2003 Open Season.[16] Accordingly, the Court finds and concludes that (1) TransCanada could not have obtained the September 2003 Nexen Contracts absent the USGen Turnback Capacity; and (2) the September 2003 Nexen Contracts were transactions arising out of the consequences of the USGen breach. Therefore, the September 2003 Nexen Contracts will be considered as mitigation of TransCanada's damages.

The Court will next analyze the October 2003 Daily Open Season. Based on the record herein and as stated above, it is clear that in the July-September 2003 Open Season TransCanada awarded all of the 100,000 GJ/d available capacity it had prior to the rejection of the Contract and sold a portion of the USGen Turnback Capacity as well. Therefore, any available capacity that TransCanada offered and awarded in the October 2003 Daily Open Season must have utilized the USGen Turnback Capacity.[17] As noted earlier in Section I.C.2.c. of the Findings of Fact, TransCanada awarded all 38,800 GJ/d of the capacity offered in the October 2003 Daily Open Season to Nexen in the October 2003 Nexen Contract. Therefore, the October 2003 Nexen Contract utilized the remainder of the USGen Turnback Capacity. Accordingly, the Court finds and concludes that (1) TransCanada could not have obtained the October 2003 Nexen Contract absent the USGen Turnback Capacity; and (2) the October 2003 Nexen Contract was a

---

[16] In a related argument, TransCanada contends that USGen, as the defaulting party, is not entitled to select which contracts entered into by TransCanada subsequent to the breach should be allowed as a mitigation credit against the losses suffered by TransCanada. TransCanada asserts that Canadian law does not allow USGen to "cherry pick" which contracts constitute mitigation. But USGen is not doing so. The Court is applying the Bid Ranking Procedure under the TAP as the appropriate and fair methodology to determine the last capacity sold.

[17] It is important to emphasize that, under the TAP, TransCanada must post, in a Daily Open Season, 50 percent of all uncontracted capacity that had been previously posted in the most recent Existing Capacity Open Season if that uncontracted capacity exceeds 20,000 GJ/d. *See*, Section I.A.3.d.of the Findings of Fact. Thus, the 38,800 GJ/d to Iroquois posted by TransCanada in the October 2003 Daily Open Season necessarily constituted the uncontracted capacity that was posted in the July-September 2003 Open Season.

transaction arising out of the consequences of the USGen breach. The October 2003 Nexen Contract will be considered as mitigation of TransCanada's damages.

### 3.  TransCanada's Other Arguments

TransCanada asserts several arguments in an attempt to show that USGen should not receive mitigation credit for the Three Nexen Contracts because:  (1) USGen failed to meet its burden, as characterized by TransCanada, of showing that TransCanada could not have entered into and performed under the Three Nexen Contracts absent the USGen Turnback Capacity; (2) TransCanada could have accepted the Three Nexen Contracts absent the USGen Turnback Capacity by re-aeroing the Stittsville Compressor; (3) TransCanada could have accepted the Three Nexen Contracts absent the USGen Turnback Capacity by treating the Gaz Metro Bids as bids for new capacity; and (4) TransCanada had excess capacity in the west end of the Mainline that was available without the USGen Turnback Capacity, and the Court should not give mitigation credit where that excess capacity existed.  Each argument will be addressed in a separate section below.

### a.  The Burden of Proof

Both parties generally agree that the burden of proving mitigation is on USGen.  The parties differ, however, on the scope of that burden. The dispute centers on the extent to which USGen must show that TransCanada could not have entered into and performed under the Three Nexen Contracts absent the USGen Turnback Capacity.  This dispute is significant in two respects.

First, TransCanada contends that, independent of any arguments it makes concerning how it could have performed the Three Nexen Contracts in the absence of the USGen Turnback Capacity (such as by re-aeroing the Stittsville Compressor), the burden is on USGen to prove

that TransCanada could not have entered into the Three Nexen Contracts absent the USGen Turnback Capacity under any circumstance.   Second, TransCanada argues that, with respect to those specific, hypothetical actions it contends it could have taken that would have enabled it to perform the Three Nexen Contracts in the absence of the USGen Turnback Capacity (such as by reaeroing the Stittsville Compressor or treating the Gaz Metro Bids differently), the burden is on USGen to prove that TransCanada could not have taken those specific actions, and is not on TransCanada to prove that it could have taken the actions.

In TransCanada's view, USGen did not prove that TransCanada could not have entered into the Three Nexen Contracts by showing, as described above, that TransCanada posted and sold the UsGen Turnback Capacity and announced it had zero remaining capacity to Iroquois. TransCanada contends that this showing only speaks to what TransCanada actually did rather than what TransCanada "could have" done.  Accordingly, under TransCanada's interpretation of the "could have" test articulated by <u>Dawson</u>, USGen is required to prove that TransCanada, could not have, under any circumstance, entered into the Three Nexen Contracts absent the USGen Turnback Capacity.

USGen disputes this position.  It concedes that Canadian law imposes on USGen the burden to prove that TransCanada could not have entered into the Three Nexen Contracts absent the USGen Turnback Capacity.  It contends, however, that it met this burden by establishing that TransCanada did, in fact, resell the USGen Turnback Capacity in the July-September 2003 Open Season and the October 2003 Open Season, and that it had no more capacity available for sale, all as described above.  USGen argues that, to the extent TransCanada argues that it could have taken some hypothetical actions to increase its capacity (such as through re-aeroing the Stittsville Compressor or by treating the Gaz Metro Bids differently) in order to perform under the Three

50

Nexen Contracts absent the USGen Turnback Capacity, the burden is on TransCanada to prove it could have done so.

Each party relies on various Canadian authorities for its position.  TransCanada points to several cases: Crestvalley Homes Ltd. v Krklinski, [1996] 50 R.P.R. (2d) 283 (Ont. Ct.); Mason & Risch Ltd. v. Christner, [1920] 54 D.L.R. 653 (Ont. S.C.); Candlepin Machine Parts Ltd. v. Britten, [1991] 107 N.S.R. (2d) 366 (Nova Scotia S.C.); Schaible Electric Ltd. v. Melloul-Blamey Construction Inc., [2004] 35 C.L.R. (3d) 141 (Ont. S.C.); In re Vic Mill Ltd. (Vic Mill), [1913] 1 Ch. 465 (Ch.A.C.) (U.K.).   The authorities USGen relies on include the following: Waddams at ¶ 13.120; First Avenue Market Place (1986) v. Manthos, [1994] 100 B.C.L.R. (2d) 76 (B.C. C.A.); Redpath Industries Ltd. v. Cisco, [1994] 2 F.C. 279, ¶ 45 (Fed. Ct.).

The Court concludes that the burden of proof that TransCanada attempts to cast on USGen is too broad and not supported either by the Canadian cases that TransCanada relies upon or the well-established principles governing burden of proof in claim adjudication proceedings under U.S. bankruptcy law.  Under TransCanada's broad reading of the test, USGen would have the daunting task of exploring every conceivable action that TransCanada could have taken, no matter how remote, and then proving that TransCanada could not have taken it.  The task with which TransCanada attempts to saddle USGen is insurmountable by any litigant trying to prove that a non-breaching party has mitigated its damages.

Recognizing the herculean undertaking that it seeks to impose on USGen, TransCanada suggests two possible actions that it could have taken in October of 2003, namely re-aeroing the Stittsville Compressor or treating the Gaz Metro Bids differently, in order to enter into the Three Nexen Contracts absent the USGen Turnback Capacity.  TransCanada then argues that USGen failed to prove that TransCanada could not have taken any of these alternate actions.  Thus,

51

under TransCanada's reading of the "could have" test articulated in <u>Dawson</u>, TransCanada can sit back and propose hypothetical actions that it could have taken almost 5 years earlier which, theoretically, may (or for that matter may not – depending on USGen's ability to rebut them) have enabled it to accept the Three Nexen Contracts absent the USGen Turnback Capacity. Under this view, USGen's claim for mitigation credit would fail if USGen could not both anticipate these arguments and prove that TransCanada could not have taken these actions. TransCanada's position is not supported by applicable law.

This task is all the more difficult because TransCanada did not disclose prior to trial the theories it contends USGen has the burden of disproving, namely that TransCanada could have re-aeroed the Stittsville Compressor or treated the Gaz Metro Bids differently. These theories were not discussed by TransCanada's witnesses proffered under Fed. R. Civ. P. 30(b)(6) (except perhaps in only the most obscure way). They were not included in TransCanada's experts' reports or mentioned in TransCanada's pretrial statement. *See* Docket No. 2292. According to TransCanada, it had no duty to disclose these matters because, during extensive fact and expert discovery, USGen never asked the correct questions that would lead to the discovery of these theories. And, according to TransCanada's view of the burden of proof, even though these theories were a central part of TransCanada's case, it had no obligation to raise them in its expert reports or pre-trial statement because the burden is on USGen to disprove the theories, not on TransCanada to prove them.[18] Thus, TransCanada's view of the burden of proof has the effect of reinvigorating the much denounced "trial by ambush." The Court finds no familiarity with this burden doctrine under the law of any jurisdiction.

---

[18] The re-aeroing and Gaz Metro theories are the subject of USGen's motions to strike evidence. Docket Nos. 2313 and 2345. Although USGen's motion to strike raises serious concerns, in light of the Court's ruling herein, the Court will deny the motions to strike as moot.

The Court concludes that USGen's position of the scope of the mitigation burden is consistent with applicable law and provides a more reasonable and just outcome. The mitigation burden is on USGen to establish that TransCanada, in fact, resold all of the USGen Turnback Capacity to Nexen, and that, in doing so, TransCanada sold all of its available capacity. As described above, USGen met this burden. The burden then is on TransCanada to show that it suffered a loss—by losing a sale—because it could have accommodated the Three Nexen Contracts absent the USGen Turnback Capacity by re-aeroing or otherwise. This interpretation is supported both by the applicable Canadian law and the usual burden jurisprudence in claim adjudication proceedings in U.S. bankruptcy law.

The Court will first address the burden analysis in claim adjudication proceedings under U.S. bankruptcy law. Section 502(a) of the Bankruptcy Code provides that a "claim . . . proof of which is filed under §501 . . . is deemed allowed, unless a party in interest . . . objects." 11 U.S.C. § 502(a). Section 502(b) provides that if an objection is made, the Court shall allow the claim except to the extent it is disallowable under one of the nine enumerated grounds for disallowing the claim contained therein. *See* § 502(b)(1)-(9). One of those grounds is that the claim is unenforceable under applicable law. Id. Further, under Bankruptcy Rule 3001, a "proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim." Fed. R. Bankr. P. 3001(f). A properly executed and filed proof of claim "is sufficient to shift the burden of producing evidence and to entitle the claimant to share in the distribution of the bankrupt's estate unless an objector comes forward with evidence contradicting the claim." In re Gates, 214 B.R. 467, 472 (Bankr. D.Md 1997). The burden is on the objecting party to produce evidence, which if uncontroverted, would defeat the claim asserted. Id. Once the objecting party comes forward with sufficient evidence to rebut

the claim in whole or in part, the burden of going forward shifts back to the claimant to prove the validity of the claim by a preponderance of the evidence.  Id.

As set forth in the Applicability of Legal Standards to the Facts of this Case, USGen has put forth evidence which, if uncontroverted, would plainly establish that it is entitled to mitigation credit for the Three Nexen Contracts.  The burden of going forward then shifts to TransCanada to prove that the Three Nexen Contracts should not serve as mitigation.

The Court reaches the same conclusion under Canadian law.  In Waddams, this issue was given significant treatment:

> a seller, on the buyer's default, although reselling the particular goods at the contract price, claims the profits lost on one transaction.  If the defendant's argument is characterized as one based on mitigation, that is, that the seller has mitigated the loss by reselling, it might seem that the buyer would bear the onus of proving that the seller had fully mitigated the loss.  But this would require the buyer to prove that the seller had inadequate stocks of identical goods to supply both customers and as the critical facts in such a dispute are peculiarly within the knowledge of the seller, it would seem that the seller could reasonably be expected to adduce the necessary evidence.  Alternatively, it might be said that, though the defendant bears the onus of proving mitigation, the onus is discharged by showing that the plaintiff has sold the goods at the contract price unless the plaintiff can show that, after all, there is a loss of profit.  Where the *Sale of Goods Act* applies, it seems that the onus will be on the plaintiff to establish a loss of profits for, by what is said to be the *prima facie* measure of damages, the plaintiff will have suffered no loss.  The same conclusion seems desirable in cases such as sales of shares or rental of equipment or apartments where the Act does not apply.

Waddams at ¶ 13.120.  Thus, Waddams plainly supports USGen's view of the burden of proof.

The English case of Charter v. Sullivan, [1957] 2 Q.B. 117, 125 (C.A.) (U.K.) is instructive.  In that case, a buyer-defendant breached a contract to purchase a Hillman Minx automobile.  Id. at 118.  The seller-plaintiff resold the automobile to a third party a week later for

the same purchase price as defendant's contract.  Id.  The seller claimed damages for the lost profit on the sale arguing that he could have and would have made the subsequent sale regardless of the defendant's breach because he could obtain an additional Hillman Minx from the manufacturer within 10 days of requesting it.  Id.  The court rejected the seller's position holding that the seller had failed to meet its burden of showing that it lost the additional profit by losing an additional sale.  Id. at 134.  The court stated:

> He [the seller] claims that he could have sold a "Hillman Minx" to the defendant and another to the new purchaser and made two profits, whereas he has made only one and lost irreplaceably the profit on the defendant's transaction (or at least on one of the two transactions).
>
> If a seller can prove that a profit has been irretrievably lost on a sale of goods by the buyer's default it would in my opinion be recoverable as damages in accordance with section 50 (2) [of the Sale of Goods Act]. But where there has in fact been a resale of the goods, the seller has the burden of proving a loss of profit beyond that which on the face of it has been recouped in whole or in part by the resale.

Id.  TransCanada argues that this decision is contrary to Canadian case law and is not controlling in the instant case.  However, this English law decision is referred to with approval in two of the very cases that TransCanada relies on in support of its position that it suffered a loss because it could have performed the Three Nexen Contracts as well as the USGen Contract.  See Canadian Union College v. Camsteel Indus. Ltd., [1979] 17 A.R. 98, ¶¶ 37-38 (Alberta Dist. Ct.); Victory Motors Ltd. v. Bayda, [1973] 3 W.W.R. 747, ¶¶ 15-19 (Saskatchewan Dist. Ct.).  In Victory Motors, the court quoted this same pertinent passage from Charter v. Sullivan, which indisputably places the burden of proving a lost sale on the non-breaching party.  Victory Motors at ¶ 19.

Further, the cases relied on by TransCanada do not support its broad reading of the mitigation burden.  TransCanada points to <u>Mason & Risch</u> and <u>Candlepin Machine</u>, both cited *supra*, for the proposition that USGen bears the burden of proving that TransCanada could not have performed under the Three Nexen Contracts absent the USGen Turnback Capacity, and therefore did not suffer the loss of an additional sale.  In <u>Mason & Risch</u>, the defendant breached a contract to purchase an upright piano.  <u>Id.</u> at 654.  The defendant argued that the plaintiff was only entitled to nominal damages because there was no difference between the market price and the contract price.  <u>Id.</u> at 655.  The court agreed that "[i]t is well established that when a buyer wrongfully refuses to accept purchased goods, the damages for which he is liable are, if there be a market for them at the place of delivery, the difference between the contract-price and the market or current price . . . ."  <u>Id.</u> at 655.  This is because it is presumed that the plaintiff will, consistent with its duty of mitigation, resell the goods at issue in the marketplace.  <u>Id.</u> at 656.  The court held that this general rule has no application to cases in which there is not an open market for the goods, and that the onus of proving there was an open market for the piano was on the defendant.  <u>Id.</u>  The court went on to award damages for the amount of profit lost by the plaintiff as a result of the defendant's breach but did not award the full contract price.  <u>Id.</u>

This case does not place the burden on the defendant to prove that the plaintiff did not suffer a lost sale.  Initially, it is important to emphasize that nothing in the facts articulated in <u>Mason & Risch</u> indicates that the piano was actually resold to a third party.  Thus, the issue of whether the plaintiff could have realized an additional profit by selling two pianos never arose.  The case simply stands for the proposition that it is the defendant's burden to show that there is an open market to apply the presumption that a seller will resell the goods in the open market,

and therefore damages will normally be quantified as the difference between the contract price and the market price.  The case is not helpful to the analysis before this Court.

The holding in <u>Candlepin Machines</u> is similar to that in <u>Mason & Risch</u>.  In <u>Candlepin Machines</u>, the defendant breached a contract to purchase bowling equipment, and the plaintiff resold the equipment to another buyer.  The defendant argued that section 51(3) of the Sale of Goods Act should apply, which states "[w]here there is an available market for the goods in question, the measure of damages is *prima facie* to be ascertained by the difference between the contract price and the market or current price . . . ."  <u>Id.</u> at ¶¶ 70-71.  The plaintiff countered that section 51(2) applied, under which the appropriate measure of damages was the loss "directly and naturally resulting" from the breach.  <u>Id.</u>  The court stated that onus is on the defendant to show that there is an available market.  <u>Id.</u> at ¶ 75.  The court went on to assess damages pursuant to Section 51(2).  <u>Id.</u> at ¶¶ 84-100.  It found that the damages consisted of the profits lost as a result of the defendant's repudiation of the contract.  <u>Id.</u> at ¶¶ 80-81.

The same reasoning that distinguishes <u>Mason & Risch</u> distinguishes <u>Candlepin Machines</u> from the case at bar.  Nowhere in the <u>Candlepin Machines</u> decision does the court place the burden on the defendant of showing that the plaintiff did not lose a profit as a result of the defendant's breach.  The holding in <u>Candlepin Machines</u> simply states that the burden is on the defendant to prove the availability of a market in order to successfully claim that the appropriate measure of damages is the difference between the contract price and the market price.  <u>Id.</u> at ¶ 75.  The holding in <u>Candlepin Machines</u> does not support TransCanada's overly broad burden position.

It is also important to mention that <u>Candlepin Machines</u> addressed a sale of goods statute nearly identical to that at issue in <u>Charter v. Sullivan</u>.  In <u>Sullivan</u>, the defendant made the same

arguments as the defendants in <u>Mason & Risch</u> and <u>Candlepin Machines</u>, namely, that the measure of the plaintiff's damages was only the difference between the contract price and the market price—in that case nominal because the contract price was the same as the market price—because there was an available market for the Hillman Minx automobile. <u>Id.</u> at 133. After a discussion of the meaning of the term "available market", the court determined that there was no available market in that case and thus proceeded to apply the measure of damages set forth in Section 50(2) of the Sale of Goods Act (the section synonymous to that applied by the court in <u>Candlepin Machines</u>). <u>Id.</u> at 134. The court stated that the appropriate measure of damages was the lost profits resulting from the lost sale. <u>Id.</u> The court went on to hold however, that the burden is on the plaintiff to show that it lost the profits of an additional sale as a result of the defendant's breach. <u>Id.</u>

The holding in <u>Candlepin Machines</u> does not contradict the holding in <u>Sullivan</u>. Just like in <u>Sullivan</u>, the court in <u>Candlepin Machines</u> did not apply the difference between the contract price and the market price as the appropriate measure of damages (as set forth in Section 50(3) of the Sale of Goods Act; a provision nearly identical to that addressed in <u>Sullivan</u>) because the defendant failed to prove that there was an available market. Also, just like the court in <u>Sullivan</u>, the court in <u>Candlepin Machines</u> went on to assess damages under Section 50(2) of the Sale of Goods Act (also nearly identical to the provision applied in <u>Sullivan</u>), which included damages arising from a lost sale. Unlike <u>Sullivan</u>, however, the <u>Candlepin Machines</u> decision did not address which party the burden was on to prove a lost sale.

TransCanada also relies on <u>Schaible Electric Ltd.</u> to support its position. In <u>Schaible Electric Ltd.</u>, the plaintiff, an electrical subcontractor, claimed damages for breach of contract against the defendant under a subcontract to perform electrical work on a project. <u>Id.</u> at ¶ 2. The

58

defendant argued that the plaintiff successfully mitigated all of its damages because it was successful in obtaining alternative contracts for the period in question. Id. at ¶ 111. The court disagreed and awarded the plaintiff damages for the lost profits on the contract as a result of defendant's breach. Id. at ¶¶ 126, 131.

The Schaible Electric Ltd. decision also does not support TransCanada's broad interpretation of USGen's burden on mitigation. While the Schaible Electric Ltd. court did state the general legal principle that once plaintiff presented a *prima facie* case for damages, it was incumbent on the defendant to demonstrate that the claim for mitigation should either reduce or nullify the damages claimed. Id. at ¶ 126. However, the court did not require the defendant to disprove every possible action that the plaintiff could have taken to increase its capacity to perform contracts. The court in Schaible Electric Ltd., relied on the testimony of the plaintiff and his associates establishing that plaintiff had an electrical supervisor and apprentice ready and committed to work on the project; once the defendant breached the contract, the electrical supervisor left the employ of the plaintiff. Id. at ¶ 115. Further, the court relied on the plaintiff's own financial records which showed that it experienced nearly a 50 percent decline in revenue in the year that the contract with the defendant was to be performed. Id. at ¶ 116. Based on this evidence, the court found that the plaintiff had established a *prima facie* case for damages and that it was then incumbent on the defendant to prove mitigation. Id. at ¶ 126. In substance, the court found as a matter of fact that the plaintiff had the capacity at the time to perform under the defendant's contract as well as all of its other contracts. Id. at 108. Nowhere does the Schaible Electric Limited court hold that the defendant may receive mitigation credit if the defendant is able to prove (1) that the plaintiff was working at 100% capacity on other projects at the time the

59

defendant's contract demanded performance; and (2) that the plaintiff could not possibly increase its workforce to fulfill its contractual obligations.

TransCanada also relies on <u>Crestvalley Homes</u> to support its position.  In <u>Crestvalley</u>, the plaintiff, as vendor, sought damages from the defendant, as purchaser, for breach of a contract of purchase and sale under which the plaintiff was to supply a building lot and build a new home for the defendant at a price of $475,000.  <u>Id.</u> at ¶ 1.  The house was built, but the deal did not close and the plaintiff resold the property for $264,900 to the Guerrieros.  <u>Id.</u> at ¶ 16.  The sale was part of the settlement of an unrelated litigation.  <u>Id.</u>  At the time that the plaintiff sold the property to the Guerrieros, it had at least seven homes in the same subdivision ready to be sold.  <u>Id.</u> at ¶ 30.  The plaintiff contended that the appropriate measure of damages was the difference between the contract price ($475,000) and the fair market value of the home ($304,000).  <u>Id.</u> at ¶¶ 28-29.  The plaintiff used the fair market value rather than the actual price charged to the Guerrieros, which was lower, because the sale to them was part of a settlement of litigation and thus reflected additional value not applicable to the defendant.  <u>Id.</u> at ¶ 28.

The defendant countered that the plaintiff had failed to show the amount of its loss, or indeed any loss.  <u>Id.</u> at ¶¶ 31-33.  Specifically, the defendant stated that the resale was part of a settlement of litigation and the true value of the settlement could not be calculated.  <u>Id.</u> at ¶ 33 ("The true benefit to the plaintiff of the use of the land in the settlement, allegedly available to it only because of the breach, was not shown to be less than the original sale price of $475,000; thus, no loss was shown.").  Further, the defendant contended that there was no evidence that the Guerrieros would have been willing to make the settlement by accepting any of the other homes that the plaintiff had in its inventory.  <u>Id.</u> at ¶ 33.

In response, "the plaintiff submitted that the settlement with the Guerrieros could have been effected without the use of the property at issue since the plaintiff had a large completed and unsold inventory of the same model in the same phase of the subdivision."  Id. at ¶ 35.  The plaintiff contended that if the defendant had performed on the contract "the plaintiff would simply have offered the Guerrieros another location and so effected the settlement."  Id. at ¶ 35.

The Crestvalley court held that the burden was on the defendant, who was seeking credit for the value of the sale of the property to the Guerrieros, to bring evidence proving that the transaction with the Guerrieros could not have proceeded without the lot subject to the defendant's contract, and the defendant did not do so.  Id. at ¶ 37.  The Crestvalley decision does not support TransCanada's broad interpretation of USGen's burden on mitigation.  In Crestvalley, there was no question that the plaintiff had seven similar properties available for sale.  The Crestvalley court placed the burden on the defendant to show that the Guerrieros would not have accepted any of these available properties.

This burden is a far cry from the burden that TransCanada seeks to impose on USGen. TransCanada repeatedly informed the market that it sold out capacity to Iroquois and it had zero capacity available.  It is one thing for a defendant seeking mitigation credit for a particular sale of real estate—where it is well established that there is additional capacity available—to investigate and attempt to prove that the purchaser would not have accepted another immediately available piece of property.  It is quite another to require a defendant, after showing that the plaintiff has sold all available capacity, including the capacity turned back as a result of the breach, to also prove that the plaintiff could not have undertaken one or more hypothetical actions in order to increase its capacity to perform under the contracts for which the defendant seeks mitigation credit.  Stated otherwise, for the Crestvalley decision to be pertinent here, the

facts would have had to have shown that the plaintiff sold all seven properties, but the court nevertheless required the defendant to prove that the plaintiff could not have bought another lot and built a house on it to sell to the Guerrieros.

TransCanada also relies on the English case of <u>Vic Mill</u>, to further support its position. In <u>Vic Mill</u>, the plaintiff sought damages for the defendant's breach of a contract to purchase spinning machines for its mill. <u>Id.</u> at 470. The damages sought under the contract related to two categories of machines. The first category consisted of machines that the plaintiff had completed and had on hand. <u>Id.</u> The second category pertained to machines that the plaintiff had not yet manufactured but had purchased the necessary materials. <u>Id.</u> The plaintiff sought damages for lost profits under the contract for both categories of machines. <u>Id.</u> at 470-471.

The defendant contended that the plaintiff should not be entitled to damages for the second category of goods because the plaintiff had used the materials that it had purchased to perform other contracts. <u>Id.</u> at 471. The defendant argued that the plaintiff should not be entitled to claim damages for lost profits because it had earned a profit on the contract where the materials were used and thus the plaintiff, if awarded damages, would receive two profits. <u>Id.</u> at 471. The court disagreed with the defendant and held:

> The evidence on the affidavits fairly taken is evidence that the claimants' works were sufficiently large and their equipment sufficiently ample to have enabled them to perform this contract in addition to all the others that they did perform….No authority has been cited for the contention that it rests upon the maker who is claiming damages by way of lost profit, not only to prove that he was ready and willing to perform, but that he was able to utilize his time, as he did, and in addition to have taken on and carried through these particular appellants' contract. As the evidence stands, there was a prima facie case that the makers could have made this profit as well as the profits on all the other contracts that they had. There was not only no evidence to rebut that, but no suggestion to the contrary was made in cross-examination

<u>Vic Mill</u> at 472.

The holding in <u>Vic Mill</u> does not support TransCanada's broad interpretation of USGen's burden on mitigation.  The court in <u>Vic Mill</u>, relied on uncontroverted evidence presented by the plaintiff which showed that the plaintiff had sufficient capacity to perform both contracts.  <u>Id.</u> ("The evidence on the affidavits fairly taken is evidence that the claimants' works were sufficiently large and their equipment sufficiently ample to have enabled them to perform this contract in addition to all the others that they did perform.").  The court held that "[a]s the evidence stands, there was a prima facie case that the makers could have made this profit as well as the profits on all the other contracts that they had."  <u>Id.</u>  The court went on to hold that the defendant failed to present any evidence to rebut the showing made by the plaintiff.  <u>Id.</u> Accordingly, the court did not hold that the burden was on the defendant to show that the plaintiff did not have, or could not create, the capacity to perform both contracts.  Rather, it simply held that the plaintiff established a prima facie case that he had the capacity to perform both contracts and that the defendant failed to present any evidence to rebut that showing.

TransCanada makes much of the following statement from the <u>Vic Mill</u> decision:

> No authority has been cited for the contention that it rests upon the maker who is claiming damages by way of lost profit, not only to prove that he was ready and willing to perform, but that he was able to utilize his time, as he did, and in addition to have taken on and carried through these particular appellants' contract.

<u>Id.</u> TransCanada contends that this statement supports its position that USGen is required to prove that TransCanada could not have, under any circumstances, performed under the Three Nexen Contracts absent the USGen Turnback Capacity.  The above quoted statement does not support TransCanada's assertions.  Read in context with the paragraph where it lies, the statement stands for the proposition that a plaintiff need not prove that he is able to perform both

contracts if he shows that he generally had the capacity to perform them. Moreover, the statement by its own terms only provides that the plaintiff does not have to show that he is able to perform. It does not say that the defendant is required to prove that the plaintiff was unable under any circumstances, to perform.

Further, the Canadian Supreme Court in <u>Rowlett</u>, relying on the same statement, did not place the burden on the defendant to prove that the plaintiff could not have, under any circumstances, performed under both contracts. In <u>Rowlett</u>, the plaintiff, tenant, sued the defendant, landlord, for defrauding him out of a lease of property that the plaintiff used to operate a confectionary business. <u>Id.</u> at ¶¶ 1-4. Shortly, after receiving the notice to vacate the property, the plaintiff purchased a new confectionary business. <u>Id.</u> at ¶ 3. The plaintiff also purchased a third confectionary business earlier that year. <u>Id.</u> After receiving the notice of termination, the plaintiff attempted to purchase the property from the defendant. <u>Id.</u> at ¶¶ 2-3. At the time the defendant vacated the property, he was successfully operating all three businesses and still attempting to purchase the property from the defendant. <u>Id.</u> at ¶ 3.

The plaintiff sought damages for the lost profits of the confectionary business as a result of the fraudulent termination of the lease. The defendant countered that the profits of the new business that the plaintiff purchased after he received notice of the termination should be considered as mitigation. The court disagreed and stated:

> the question is whether or not the business commenced in October can be looked upon as incompatible with that closed by the fraud: or, in the other sense, whether the capacity to be released to the respondent by the result of the fraud was necessary to the continuance of the business so commenced. The unquestioned facts do not admit of any such conclusion. At the time of surrendering the lease, three businesses were being carried on profitably and the respondent was doing his utmost to purchase the premises of the "Oasis" [the surrendered business] in order to continue that scale of operations. There is, therefore, before the

> Court, no evidence on the basis of which a jury should have been
> instructed to take account of the earnings from the "White Cross"
> [new business] actually or potentially arising from a capacity set
> free to the respondent by the fraudulent action of the appellants.

Id. at 12.  The court relied on the statement in Vic Mill, which TransCanada contends supports

its position to hold that "[o]nce a *prima facie* case for damages is presented, the onus at least for

proceeding with the evidence is then cast upon the party who asserts a claim for mitigation."  Id.

This burden is far removed from that which TransCanada attempts to impose.

In the instant case, USGen has met its burden on mitigation by showing that: (1) the

USGen Turnback Capacity was offered for sale; (2) the USGen Turnback Capacity was in fact

resold to Nexen in the Three Nexen Contracts; (3) TransCanada had a policy of posting all

available capacity as the system is configured at the time; (4) under the TAP, TransCanada

could only sell capacity it had posted in an open season (leaving aside STFT and other

discretionary services); (5) TransCanada issued a non-critical notice at the conclusion of the

October 2003 Daily Open Season exclaiming that it was sold out of capacity from Empress to

Iroquois; (6) TransCanada withdrew the October 2003 Existing Capacity Open Season notice

because it realized it did not have any capacity available to Iroquois and apologized to its

shippers; and (7) TransCanada issued multiple open season notices after the October 2003

Existing Capacity Open Season, none of which posted any capacity to Iroquois that would be

available prior to November 1, 2004.

This is not to say, that TransCanada cannot come forward with evidence showing that it

in fact lost an additional sale because it could have performed under the Three Nexen Contracts

absent the USGen Turnback Capacity by taking actions such as re-aeroing the Stittsville

Compressor to increase capacity or treating the Gaz Metro bids differently.  But in doing so, the

burden is on TransCanada to prove that it could have successfully taken any such actions.

### b.  Re-aeroing the Stittsville Compressor

TransCanada contends that USGen should not receive mitigation credit for the Three Nexen Contracts because it could have and would have increased its available capacity to Iroquois by re-aeroing the Stittsville Compressor in the fall of 2003 in order to perform them absent the USGen Turnback Capacity.  In support of this position, TransCanada relies on the testimony of its witnesses who stated that TransCanada could and would have re-aeroed the Stittsville Compressor in the fall of 2003 in order to accommodate the Three Nexen Contracts absent the USGen Turnback Capacity.  Further, TransCanada's witnesses testified that the re-aeroing of the Stittsville Compressor could have been completed in time to meet the in-service dates of all the contracts awarded in the July-September 2003 Open Season absent the USGen Turnback Capacity.  To bolster these assertions, TransCanada presented the following facts: (1) TransCanada has re-aeroed compressors on the Mainline; (2) re-aeroing could conceivably be accomplished in three or four days; (3) the capacity available through the re-aeroing of the Stittsville Compressor could be sold as FT capacity with full renewal rights; (4) TransCanada re-aeroed the Stittsville Compressor in November of 2004 to increase capacity to Iroquois; (5) the re-aeroing of the Stittsville Compressor in the fall of 2004 was completed in six to seven days at a cost of approximately $135,000.[19]

Based on the facts presented, the Court concludes, for three independent reasons, that TransCanada's contention regarding the re-aeroing of the Stittsville Compressor does not defeat USGen's claim for mitigation.  First, TransCanada's claim that it "could have" and "would have" re-aeroed the Stittsville Compressor is not credible, and is belied by its own actions in the fall of

---

[19] TransCanada did not introduce evidence that re-aeroing the Stittsville Compressor was part of its decision-making at the time of the Contract's rejection.  TransCanada's contention that it could have re-aeroed the Stittsville Compressor to service the Three Nexen Contracts in the absence of the USGen Turnback Capacity is a theory it developed for purposes of litigating the adjudication of the Contract rejection claim.  As stated earlier, *see* Section II.A.3.a., the re-aeroing and Gaz Metro theories are the subject of USGen's motion to strike evidence.

2003.  Second, under the TAP, TransCanada could only sell capacity that was properly posted and offered for sale. TransCanada never offered for sale the capacity that was hypothetically available through re-aeroing the Stittsville Compressor, and by failing to do so, TransCanada cannot now claim it "could have" accommodated the Three Nexen Contracts with such capacity. Third, assuming that TransCanada "could have" and "would have" re-aeroed Stittsville in order to accommodate the Three Nexen Contracts in the absence of the USGen Turnback Capacity, by failing to offer for sale the capacity that was hypothetically available through re-aeroing, TransCanada did not meet its duty to mitigate its damages.  These points will be addressed further below.

First, TransCanada's contention that it "could have" and "would have" re-aeroed Stittsville in order to accommodate the Nexen Contracts in the absence of the USGen Turnback Capacity is belied by its own actions, and is not credible.  As set forth in Section I.C.2.a. of the Findings of Fact, TransCanada received bids for 118,000 GJ/d of capacity in the July-September 2003 Open Season.  That open season had offered 100,000 GJ/d of capacity from July 17 to September 15, 2003, and 150,000 GJ/d for only three days.  TransCanada then sold out of capacity on the Empress to Iroquois segment on the first day of the October 2003 Daily Open Season.  TransCanada then initiated the October 2003 Existing Capacity Open Season offering 38,800 GJ/d of capacity from Empress to Iroquois on the mistaken belief that it had such capacity available.  When TransCanada realized that it did not have the capacity available at the time, it announced that it had no further capacity to Iroquois and chose to rescind the Empress to Iroquois offering in the October 2003 Existing Capacity Open Season.  TransCanada did not decide to leave open the October 2003 Existing Capacity Open Season and satisfy any bids for Empress to Iroquois on the first day of the October 2003 Daily Open Season.  It did not decide to

issue a new open season notice offering the capacity that was hypothetically available through re-aeroing.  TransCanada did not do so despite robust bidding in July-September 2003 Open Season and the October 2003 Daily Open Season.  As a factual matter, the Court rejects TransCanada's contention that it "would have" re-aeroed Stittsville in order to accommodate the Nexen Contracts in the absence of the USGen Turnback capacity.  When faced with the opportunity to take that very action at the time of the Contract rejection and the sale of the USGen Turnback Capacity, as a matter of fact, TransCanada did not choose to offer for sale the capacity that was hypothetically available through re-aeroing.

Second, there is no doubt that TransCanada did not offer for sale the capacity that was hypothetically available through re-aeroing.  As pertinent here, TransCanada can only sell capacity on its Mainline by offering it for sale through its open season process or by posting it via an STFT availability notice.  TransCanada is barred from selling capacity that is not offered for sale in accordance with the procedures in TAP.  Thus, insofar as its re-aeroing theory is concerned, by failing to offer for sale the capacity that was hypothetically available through re-aeroing, TransCanada cannot now claim it "could have" sold that capacity.

To illustrate, in the absence of the USGen Turnback Capacity, TransCanada would not have increased the capacity in the July-September 2003 Open Season. Therefore, it could not have accepted the September 2003 Nexen Contracts, since those contracts would have exceeded the posted capacity in the July-September 2003 Open Season.

Third, TransCanada's failure to offer for sale the capacity that was available through re-aeroing is fatal to its re-aeroing theory for an additional, independent reason.  Assuming that TransCanada "could have" and "would have" re-aeroed Stittsville in order to accommodate the Three Nexen Contracts in the absence of the USGen Turnback Capacity, by failing to offer for

68

sale the capacity that was hypothetically available through re-aeroing, TransCanada did not meet its duty to mitigate its damages.  Stated otherwise, TransCanada cannot recover from USGen under its re-aeroing theory because TransCanada failed to take reasonable steps to avoid the damage, namely, offering the re-aeroing capacity for sale. [20]

As articulated above, Canadian law imposes a duty on the non-breaching party to take all reasonable steps to mitigate losses caused by the breach.  *See* Section II.A.1.b.   Here, TransCanada did not offer for sale the capacity available through re-aeroing.  Conducting an open season for that capacity would have been routine and not expensive.   Indeed, as discussed above, TransCanada simply could have left open the October 2003 Existing Capacity Open Season and would have received (or not received as the case may be) bids for 38,800 GJ/d of capacity that "could have" been filled by the hypothetically available capacity resulting from re-aeroing.  Even aside from leaving open the October 2003 Existing Capacity Open Season, at any time TransCanada could have offered for sale the hypothetically available capacity resulting from re-aeroing through an open season.  It did not do so.  Instead, when TransCanada pulled the capacity to Iroquois from the October 2003 Existing Capacity Open Season, it announced

> Upon further assessment and analysis, it has been concluded that there is no more capacity available to Iroquois. The posted capacity from Empress to Iroquois has been amended to zero. We apologize for any inconvenience this may have caused.

(TCPL Ex. 114(O)); *See* I.C.2.c.  Further, as set forth in Section I.C.2.e. of the Findings of Fact, TransCanada issued numerous open season notices between November of 2003 and March of

---

[20] An important distinction needs to be made here. The Court has already found that TransCanada acted reasonably and prudently in selling the USGen Turnback Capacity after the rejection of the Contract, through its efforts in the July-September 2003 Open Season, the October 2003 Daily Open Season, the October 2003 Existing Capacity Open Season, among other actions.  It is only in response to TransCanada's after-the-fact litigation theory that the Court finds TransCanada failed to mitigate it damages because it did not offer for sale the available capacity resulting from re-aeroing the Stittsville Compressor.

2006 that did not post any available capacity for sale to Iroquois, or specifically posted zero available capacity to Iroquois, in every notice.

When a court finds that the non-breaching party unreasonably failed to take steps to mitigate its damages, under Canadian law, the court should determine whether the steps that reasonably could have been taken would have resulted in the mitigation of damages. *See* Section II.A.1.b. (discussion of <u>Janiak</u>). Thus, having concluded that TransCanada's failed to offer for sale the capacity that was available through re-aeroing, pursuant to the holding in <u>Janiak</u> and other Canadian cases, this Court will determine the probability that TransCanada would have sold that capacity if it had posted that capacity for sale.

This inquiry requires the Court to weigh all the facts, and attempt to predict the probability that TransCanada would have sold the capacity hypothetically available through re-aeroing in the winter of 2003 had it posted it for sale. Based on the evidence presented including but not limited to: (1) TransCanada's expedient sale of capacity to the Eastern end of the Mainline; and (2) TransCanada's non-critical notices, the Court finds and concludes that TransCanada would have sold the capacity available through re-aeroing in the winter of 2003 for the entire time period at issue had TransCanada posted said capacity for sale.

The high demand for capacity on the Eastern end of the Mainline and the U.S. Northeast is evidenced by TransCanada's expedient sale of capacity in the winter of 2003 after the July-September 2003 Open Season closed. As described in Section I.C.2. of the Findings of Fact, TransCanada held unsold capacity to Iroquois when the July-September 2003 Open Season closed. But TransCanada had added the 50,000 GJ/d of USGen Turnback Capacity to that open season on September 15, 2003, only three days before that open season closed. TransCanada then posted 38,800 GJ/d of capacity on the Empress to Iroquois path in the October 2003 Daily

Open Season.  Nexen Marketing purchased the entire 38,800 GJ/d *on the same day that it was posted*.  It was unusual for TransCanada to sell out of a daily open season in one day, (Dep. Transcript, November 3, 2006, 154:2-6 (Coad)), lending further evidence that there was increasing demand for capacity on the Eastern end of the Mainline.  Further, as noted in the Findings of Fact, TransCanada issued the October 2003 STFT Availability Notice offering 60,000 GJ/d on the Empress to Iroquois path.  The entire 60,000 GJ/d was sold.  Plus, in February of 2004, TransCanada posted 100,000 GJ/d of capacity on the Empress to Iroquois path via the Additional FT Opportunity as part of the February 2004 Open Season, with a start date in late 2004.  Again, TransCanada was successful in selling that capacity, even though that capacity had zero renewal rights as of October 31, 2006.  *See* Section I.C.2.f.  FT capacity with zero renewal rights was very unusual, and is not as attractive to shippers as the usual FT capacity. Nevertheless, that FT capacity sold.  Accordingly, it is clear from TransCanada's expedient sale of capacity on the Empress to Iroquois path following the closure of the July-September 2003 Open Season that there was high demand on the Eastern end of the Mainline as well as the U.S. Northeast.

TransCanada's own non-critical notices and open season notices show that TransCanada recognized this surging demand for capacity on the Eastern end of the Mainline and the U.S. Northeast.  After the conclusion of the July-September 2003 Open Season, there was considerable interest in capacity on the Eastern end of the Mainline, including the U.S. Northeast, and TransCanada anticipated it would drive requirements for additional capacity.  As detailed in Section I.C.2.a. of the Findings of Fact, on September 24, 2003, six days after the conclusion of the July-September 2003 Open Season, TransCanada issued a non-critical notice announcing the "considerable interest for space on the Mainline."  The non-critical notice further

71

provided the following statement by Craig Frew, TransCanada's Vice President, Gas

Transmissions East:

> Although there was some de-contracting earlier this year for long-haul capacity on parts of the Mainline System, the preliminary Open Season results reflect the ongoing shift to short-haul contracts within the market areas. <u>There is no question that we are connected to strong and growing markets in the Eastern Canada and the U.S. Northeast, which we anticipate will drive requirements for additional capacity.</u>

(TCPL Ex. 114(K) at 016401 (emphasis added)).  Thus, in late September 2003, TransCanada

believed that it had rising demand for capacity on the Eastern end of the Mainline as well as the

U.S. Northeast.  Not only were the market conditions "strong and growing," but they were

leading to the need for "additional capacity."  Id.

Further, TransCanada's witness at trial testified that in late 2003, TransCanada was

facing an increasing demand for capacity to the Eastern part of the Mainline.  *See* (Tr. Transcript,

March 10, 2008, 1648:18-1649:1 (Robinson))

TransCanada's recognition of the surging demand on the Eastern end of the Mainline and

the U.S. Northeast is also evidenced by the noncritical notice TransCanada issued on October 16,

2003 following the close of the October 2003 Daily Open Season.  *See* Section I.C.2.b.  In that

non-critical notice, TransCanada exclaimed that the Empress to Iroquois segment had "sold out!"

As a result of this sell-out of the Empress to Iroquois segment, TransCanada decided to

discontinue the October 2003 Daily Open Season and it initiated the October 2003  Existing

Capacity Open Season.  This conduct further evidences TransCanada's recognition that there

was high demand for capacity on the Eastern end of the Mainline and the U.S. Northeast.

Based on the foregoing, the Court finds and concludes that if TransCanada had offered

for sale the capacity that was available through re-aeroing the Stittsville Compressor,

TransCanada would have sold that capacity after the July-September 2003 Open Season closed. Thus, the Court finds and concludes that TransCanada cannot recover under its re-aeroing theory because it did not take a reasonable step to avoid the loss, namely, offering the re-aeroing capacity for sale.

Further, the Court finds and concludes that TransCanada did not offer the capacity available through re-aeroing the Stittsville Compressor in the Additional FT Opportunity in the February 2004 Open Season. Therefore, the Additional FT Opportunity did not discharge TransCanada's duty to take reasonable steps to avoid the loss. The factual findings underpinning these findings and conclusions are set forth in Findings of Fact, Section I.C.2.f.

The Additional FT Capacity Opportunity offering FT capacity to Iroquois in the February 2004 Open Season did not offer the capacity available through the re-aeroing of the Stittsville Compressor even though the contracts awarded under that offering were ultimately serviced by re-aeroing Stittsville. TransCanada intended to satisfy the contracts awarded as a result of the Additional FT Capacity Opportunity by accelerating the construction of the Stittsville loop. Thus, as a matter of fact, the capacity offered in the Additional FT Capacity Opportunity was not the capacity available through the re-aeroing of the Stittsville compressor. It was the capacity that was to become available from the new construction of the Stittsville loop. Ultimately, TransCanada may have served the contracts by re-aeroing the Stittsville Compressor, but that does not mean that TransCanada offered the capacity available from re-aeroing the Stittsville Compressor.

Further, the capacity offered in the Additional FT Capacity Opportunity was the capacity that was committed to TransCanada power as of November 1, 2006. *See* Section I.C.2.f. As stated above, TransCanada did not offer it with the customary renewal rights. Instead, the

73

posting offered FT Capacity available to Iroquois with zero renewal rights as of October 31, 2006. This point is critical because this offering is significantly less attractive to shippers than a standard FT offering and is different in kind that the capacity that would have been available from re-aeroing. Thus, TransCanada did not satisfy its duty to mitigate its damages by posting the Additional FT Capacity Opportunity.

Finally, the Court notes that in order for a party to be awarded damages for lost sale profits, it is axiomatic that the supply of the good or service that is the subject of the breach must be greater than the demand for that good or service. TransCanada's position turns this principle on its head. In essence, TransCanada argues that the supply of capacity exceeded demand in the fall of 2003 and thus USGen is not entitled to mitigation credit for the Three Nexen Contracts. The problem with this position is that the reason that supply of capacity in the fall of 2003 may have exceeded "demand" (as reflected in bids) is because TransCanada failed to offer that capacity for sale. Thus, TransCanada cannot seek to collect damages for a breach of contract contending that it lost a sale because it had additional capacity available, when it never attempted to sell that capacity by the only method permitted by its regulatory system.

### c.  Gaz Metro

In the July-September 2003 Open Season, Gaz Metro submitted Gaz Metro Bids that led to the Gaz Metro contracts. *See* Chart in Section I.C.2.a. TransCanada argues that USGen should not receive mitigation credit for the Three Nexen Contracts because it could have treated the Gaz Metro bids as bids for new capacity. TransCanada further argues that treating the Gaz Metro Bids as new capacity would have freed up the 60,000 GJ/d of existing FT capacity that was allocated to the Gaz Metro contracts. Therefore, TransCanada contends it could have serviced the Three Nexen Contracts absent the USGen Turnback Capacity. The record fails to

74

establish, however, that TransCanada could have treated the Gaz Metro Bids as bids for new capacity. In fact, the record establishes, by a preponderance of the evidence, that the Gaz Metro Bids did not qualify as bids for new capacity. The Court therefore finds and concludes that neither of the Gaz Metro Bids qualified as new capacity bids and that TransCanada could not have treated them as bids for new capacity. Accordingly, this contention fails.

In support of its argument, TransCanada's witness relied on the following facts to testify that the Gaz Metro Bids were suitable for "expansion" capacity:

- the Gaz Metro Bids were received in the July-September 2003 Open Season, which was a combined open season that offered both new and existing capacity;

- the requested start date under the Gaz Metro Bids was November 1, 2005, which is consistent with the start date posted for new capacity in the July-September 2003 Open Season;

- the Gaz Metro Contracts were for ten year terms which was the minimum term that was required for bids for new capacity in the July-September 2003 Open Season.

(Tr. Transcript, March 7, 2008, 1458:12-1459:10 (Ferguson)). Based on these facts, TransCanada's witness concluded that there was sufficient time to add capacity and sufficient contract underpinning to support an expansion with the Gaz Metro Contracts. (Tr. Transcript, March 7, 2008, 1459:1-4 (Ferguson)).

These facts taken as true, do not support the finding and conclusion that TransCanada could have treated the Gaz Metro Bids as bids for new capacity. The November 1, 2005 start date and the ten year term were two of the requirements of the July-September 2003 Open Season for a new capacity bid. But they were by no means the only requirements. As highlighted in Section I.A.3.d. of the Findings of Fact, Section 4.1(a) of the TAP requires bidders for new capacity to submit to TransCanada with their bid form

all applicable supporting documentation set out in Part 3 of the
National energy Board Guidelines for Filing Requirements
determined by TransCanada to be necessary for submission to the
NEB in support of TransCanada's Facilities Application and which
evidence supports the Service Applicants [bidders] need for
transportation service in the time frame contemplated in the
Service Applicant's Bid Form

(TCPL Ex. 81 at 008760-61).  Further, the July-September 2003 Open Season notice and its

subsequent amendments, provided that "all bids submitted for New Capacity in this Open Season

will be required to submit supporting documentation as set out in Part III of the National Energy

Board's Guidelines for Filing Requirements."  (TCPL Ex. 114(I) at 016407; USGen Ex. 21 at

000014).  The July-September 2003 Open Season Notice also provided that "the documentation

required [was] to include long term supply evidence and long term market evidence."  (TCPL

Ex. 114(I) at 016407).  These mandates are only applicable to bidders for new capacity and do

not apply to bids by shippers for existing capacity.

     The facts simply show that the Gaz Metro Bids possessed two of the attributes of bids for

new capacity, namely the start date and the ten year term.  The evidence does not establish, as a

matter of fact, that TransCanada could have treated the Gaz Metro Bids as bids for new capacity

in the July-September 2003 Open Season.  Indeed, TransCanada's witness never testified that

TransCanada believed it could have treated the Gaz Metro Bids as bids for new capacity at the

time of the July-September 2003 Open Season, nor did any witness testify that the Gaz Metro

Bids qualified as new capacity bids.  No witness testified that Gaz Metro submitted the necessary

detailed information in support of a new capacity bid as required by the  July-September 2003

Open Season notice or the TAP.  TransCanada did not introduce as evidence the Gaz Metro Bid

documents, which would have removed all doubt one way or the other.

Moreover, Kay Coad, the TransCanada employee who "administered and ran" the July-September 2003 Open Season, as well as all FT open seasons from around 2000 for four or five years, was asked specifically whether the Gaz Metro Bids were for new or existing capacity. She could not recall what the Gaz Metro Bid forms stated, and testified she "can't tell you exactly what they were bidding for." (Tr. Transcript, March 11, 2008, 1814:1-18; 1860:9-21(Coad). Instead, TransCanada's witness, Dean Ferguson, testified that, in hindsight, TransCanada could have treated the Gaz Metro Bids as new capacity bids. But Ms. Coad had been TransCanada's corporate designee under Fed. R. Civ. P. 30(b)(6) on the topic of open seasons and she "administered and ran all [the] open season processes." Id. It was her responsibility to administer the July-September 2003 Open Season, and Mr. Ferguson had little, if anything, to do with it.

TransCanada requests this Court to infer that TransCanada could have treated the Gaz Metro Bids as bids for new capacity in the July-September 2003 Open Season. The Court concludes that such an inference is not warranted based on the record in this case. In light of the patently different requirements between bids for existing capacity and bids for new capacity, TransCanada's failure to present credible testimony or evidence (including the bid documents) that would establish that the Gaz Metro Bids qualified as bids for new capacity or that they could have been treated as bids for new capacity leads this Court to reject the inference TransCanada asks the Court to adopt.

Further, the evidence in the record established affirmatively that the Gaz Metro Bids did not qualify as bids for new capacity and in fact were not bids for new capacity. USGen's expert testified that, in his opinion, the Gaz Metro Bids were bids for existing capacity and not bids for new capacity, and his testimony was credible. (Tr. Transcript, March 6, 2008, 1002:2-9

77

(Milne)).  Further, in a summary of the July-September 2003 Open Season, TransCanada stated

that it had received a bid for new capacity, and it is clear that the bid was neither of the Gaz

Metro Bids:

> TransCanada received numerous bids for existing capacity from
> Dawn which exceeded the available capacity, resulting in capacity
> from Dawn being fully subscribed.  <u>TransCanada also received a
> bid for new capacity from Dawn to Chippawa in this open season.</u>
> After further discussions regarding the requirements needed to be
> fulfilled prior to the provision of the service request, the bidder's
> deposit was returned and the original bid is no longer active.

(TCPL Ex. 43 at 023392) (emphasis added).  Neither of the Gaz Metro Bids had a delivery point

in Chippawa.  Accordingly, this publicly-issued statement by TransCanada leads to the

conclusion that TransCanada itself determined that  neither of the Gaz Metro Bids met the

requirements for a new capacity bid.

 For the forgoing reasons, this Court finds and concludes that the Gaz Metro Bids did not

qualify as bids for new capacity and that TransCanada could not have treated the Gaz Metro Bids

as bids for new capacity in the July-September 2003 Open Season.  The Court further finds and

concludes that TransCanada could not have performed the Three Nexen Contracts absent the

USGen Turnback Capacity by treating the Gaz Metro Bids as bids for new capacity.

### d.  North Bay

 TransCanada points out that the Mainline is a system consisting of approximately 15,000

kilometers and runs from Empress, Alberta in the West to the Quebec/Vermont border in the

East.  TransCanada posits that it had, at the time of USGen's breach and throughout the

remainder of the Contract term, substantial unused capacity in the Western segments of the

Mainline from Empress to the Triangle.[21]  TransCanada further avers that (1) the bottleneck on

---

[21] For a description of the Triangle, *see* at Section I.A.1.

the Mainline occurred just before the Stittsville Compressor, which is a short distance from Iroquois; and (2) tolls on the TransCanada Mainline are primarily distance-based. TransCanada therefore argues that USGen should not receive a mitigation credit for the value of the Three Nexen Contracts that is attributed to the distance on the Mainline where TransCanada had excess available capacity.

Specifically, TransCanada contends that the distance from "inside the Triangle" to Iroquois can be measured either from North Bay (which is at the Northwestern corner of the Triangle) or from Parkway (which is near the Southwestern corner of the Triangle). Id. Thus, in TransCanada's view, USGen should be allowed a mitigation credit based on the constrained section of the Mainline from North Bay or Parkway to Iroquois, and not for the unconstrained section from Empress to North Bay or Parkway. TransCanada avers that this mitigation credit can be calculated by utilizing the toll from Parkway to Iroquois (the toll value from Parkway to Iroquois on the Three Nexen Contracts is referred to herein as the "Partial Mitigation Credit")

Nothing in the record supports the notion that Nexen Marketing would have accepted a contract in September or October 2003 only from Empress to North Bay or Parkway. Indeed, the record establishes that such a notion is factually unsupportable. Thus, under the applicable mitigation principles of Canadian law, USGen is entitled to mitigation credit for the full value of the Three Nexen Contracts. But TransCanada argues that the unique circumstances of the case allow the Court to ignore the usual mitigation principles and craft an equitable remedy. The Court concludes, however that it should not craft an equitable remedy here because such a remedy would place TransCanada in the position of being better off by the Contract rejection, and therefore is inconsistent with Canadian law.

Before turning to the discussion of the equitable principles, the Court will discuss the North Bay/Parkway distinction. Prior to trial, TransCanada's focus on the partial mitigation theory was North Bay (i.e., that USGen should only receive mitigation credit from North Bay to Iroquois for the Three Nexen Contracts). *See* TransCanada's Pre-Trial Statement, Docket No. 2292 at 8-9 (where there is no mention of Parkway). But as stated in the Findings of Fact of this Memorandum Opinion, North Bay was not an approved receipt or delivery point in 2003. It is therefore beyond question that TransCanada could not have sold capacity to any shipper seeking a receipt of delivery point at North Bay. Thus, TransCanada's "North Bay theory" fails insofar as it seeks any equitable adjustment based on North Bay.

Apparently recognizing this infirmity, after trial TransCanada argued that the value of the Partial Mitigation Credit should be based on the distance between Parkway (an approved receipt and delivery point) and Iroquois, because the distance between North Bay and Iroquois is roughly similar to the distance between Parkway and Iroquois.

In the Court's view, the theory is not plausible on its face. Parkway has no connection to the Three Nexen Contracts or the issues presented. Plus, there is no plausible evidence in the record to support the notion that Nexen Marketing would have submitted a bid to Parkway or another area west or south of North Bay, and not to the GMi EDA (past Iroquois). Nevertheless, because Parkway is an NEB approved receipt and delivery point, the Court will address the merits of the theory.

The Court rejects TransCanada's contention that USGen should receive only the Partial Mitigation Credit for the Three Nexen Contracts. The award of only Partial Mitigation Credit is inconsistent with Canadian law because it would enable TransCanada to reap a windfall from USGen's breach. This outcome is contrary to the basic legal tenant applicable to the measure of

contractual damages namely, that "the person who has suffered from such a wrong is entitled, so far as money can do it, to be placed in as good a position as if the contract had been performed." Rowlett at 8 (emphasis added).

The windfall that TransCanada would receive if USGen was awarded only the Partial Mitigation Credit for the Three Nexen Contracts can be illustrated by reviewing the contracts TransCanada awarded in the July-September 2003 Open Season pursuant to the Bid Ranking Procedures. As explained in Section I.C.2. of the Findings of Fact of this Memorandum Opinion, the September 2003 Nexen Contracts were the lowest ranked contracts that TransCanada awarded under the Bid Ranking Procedures in the July-September 2003 Open Season. As the Court previously concluded, if the Contract had not been rejected, TransCanada would not have had capacity available to enter into the September 2003 Nexen Contracts. Thus, if the Contract had not been rejected, TransCanada would not have realized any revenue from the September 2003 Nexen Contracts and would have received revenue from USGen under the Contract. By awarding USGen only the Partial Mitigation Credit, TransCanada would obtain the entire benefit of the revenues from USGen under the Contract (in the rejection claim) as well as the value of the September 2003 Nexen Contracts (minus only the Partial Mitigation Credit). Thus, even though the Court concludes that TransCanada could not have entered into the September 2003 Nexen Contract in the absence of the USGen rejection, TransCanada would obtain both the revenue from the Contract and a very substantial portion of the revenue from the September 2003 Nexen Contracts (the value of the September 2003 Nexen Contracts minus the small Partial Mitigation Credit from Parkway to Iroquois). The same reasoning applies to the

October 2003 Nexen Contract.[22]  Rather than being put in the same position as if the Contract had not been rejected, TransCanada would be substantially better off.

TransCanada relies on the expert testimony of John McCamus ("McCamus"), which was presented to the Court pursuant to Fed. R. Civ. P. 44.1.  As pertinent here, McCamus testified about certain improper employment dismissal cases in which an employee remains unemployed for a period of time after a wrongful dismissal, but then obtains employment at a higher rate of pay.  McCamus stated that the issue in those cases is whether to apply the increased pay as mitigation to offset previous months' benefits paid while the person was still unemployed, thereby reducing the terminated employee's damages.  According to McCamus, the Canadian courts are split on the issue.  Waddams opines that the excess earnings should not be brought into account to reduce the terminated employee's damages.  He also testified because TransCanada is constrained by its regulatory environment to the manner in which it solicits bids for capacity, and as a result is not at liberty to decline or explore modification of an offer in order to act in a manner that is most advantageous to its own business interests, a Canadian court would not rigidly apply the Dawson mitigation test to the facts of this case.

The Court gives no weight to the McCamus opinion to the extent it relies on the employment cases.  McCamus addressed these employment cases, generally.  TransCanada failed to provide citations or copies of the cases and McCamus's expert report failed to mention the cases.  Instead, TransCanada merely refers to them as a general category of cases.  Based on this record, the Court cannot hold that the legal principles on which those cases rely apply to the facts of this case and certainly cannot conclude that the principles in those cases override the

---

[22]  It appeared to the Court that TransCanada's expert, John McCamus, acknowledged the windfall that TransCanada would receive by awarding USGen only the Partial Mitigation Credit.  *See* Tr. Transcript, March 12, 2008, 2123:2-2124:22 (McCamus).  TransCanada disputes this interpretation of the testimony.  In any event, the Court reaches its conclusion whether or not it was acknowledged by Mr. McCamus.

mitigation principles under Canadian law addressed earlier. Accordingly, TransCanada's reliance upon them will be disregarded.

McCamus also pointed to another passage from <u>Waddams</u> to support TransCanada's position which passage provides:

> [T]here are many cases where the plaintiff has been held entitled to recover damages from the defendant in respect of a loss despite an offsetting transaction that might appear to reduce or remove the loss. Many such cases have been discussed in earlier chapters.

<u>Waddams</u> ¶ 15.740. But this passage only provides a general statement and does not refer to any specific type of case where this rule is applied.

Finally, the Court does not agree that it should ignore the usual Canadian law on mitigation and craft a unique equitable remedy merely because TransCanada operates in a regulatory environment. The regulatory scheme in which TransCanada operates is sophisticated and well-developed. The authorities cited by McCamus do not support the contention that the existence of the regulatory scheme creates any hardship on TransCanada that requires a unique equitable remedy to correct.

Accordingly, the Court concludes that the neither the facts of this case nor the authorities cited by McCamus establish a need for the Court to craft a unique equitable remedy.

### 4. TransCanada's Claim Must Be Discounted to the Petition Date.

TransCanada contends that the Court should not discount to present value as of the Petition Date the future payments that TransCanada would have received under the Contract had it not been rejected. The plain language of the U.S. Bankruptcy Code dictates otherwise.

Section 365(g) of the U.S. Bankruptcy Code provides that "the rejection of an executory contract or unexpired lease of the debtor constitutes a breach of such contract or lease . . .

immediately before the date of the filing of the petition" if such contract or lease has not been

otherwise assumed.  11 U.S.C. § 365(g).  Section 502(g) states that

> a claim arising from the rejection under Section 365 of this title . . .
> of an executory contract or unexpired lease of the debtor that has
> not been assumed shall be determined, and shall be allowed under
> subsection (a), (b), or (c) of this section or disallowed under
> subsection (d) or (e) of this section, the same as if such claim had
> arisen before the date of the filing of the petition.

11 U.S.C. § 502(g).  Pursuant to § 502(b), a bankruptcy court shall, upon objection to a claim,

"determine the amount of such claim in lawful currency of the United States as of the date of the

filing of the petition and shall allow such claim in such amount . . . ."  11 U.S.C. § 502(b).

"Therefore, the bankruptcy court must value present claims and reduce claims for future payment

to present value while also keeping in mind that a fundamental objective of the Bankruptcy Code

is to treat similarly situated creditors equally."  Pension Benefit Guar. Corp. v. Belfance (In re

CSC Indus., Inc.), 232 F.3d 505, 508 (6th Cir. 2000); In re CF&I Fabricators, 150 F.3d 1293,

1300 (10th Cir. 1998) ("To insure the relative equality of payment between claims that mature in

the future and claims that can be paid on the date of bankruptcy, the Bankruptcy Code mandates

that all claims for future payment must be reduced to present value."); See also, In re Mirant

Corp., 332 B.R. 139, 156 (Bankr. N.D.Tex. 2005); In re Loewen Group Int'l, Inc., 274 B.R. 427

(Bankr. D.Del. 2002); In re Leasing Services, Inc., 79 B.R. 161, 167 (S.D.N.Y. 1987).  "There is,

however, no mandated method in federal law for the determination of discount rates so as to

reduce a claim to its present value."  In re Mirant Corp., 332 B.R. at 156 (citing St. Louis Sw.

Ry. Co. v. Dickerson, 470 U.S. 409, 412 (1985)).

  The Court concludes that the appropriate discount rate to be applied is a "risk free rate"

for the reasoning in Kusin v. Devan, 251 B.R. 269 (D. Md. 2000).  Moreover, here USGen is a

solvent bankruptcy estate and TransCanada's claim, like all claims, will be paid in full with

interest according to USGen's confirmed plan.  While that analysis provides some backwards-looking rationalization, it is equally true that there is no evidence before the Court that USGen ever missed a payment under the Contract before it was rejected.  Of course, while the Court will discount the payments that TransCanada would have received under the Contract had it not been rejected, it will also discount the payments that Nexen made to TransCanada during the same period on the Three Nexen Contracts that serve as mitigation.

While neither party introduced evidence of a risk free rate, TransCanada consents to the use of four percent as an appropriate discount rate if the Court finds that the discounting of its claim is appropriate.  *See* Docket No. 2374 at 66,78.  Therefore, the Court will apply a four percent discount rate to discount TransCanada's claim back to the Petition Date.

TransCanada argues that discounting its claim to the petition date is inappropriate because: (1) TransCanada's claim does not involve any future damages; and (2) discounting is not appropriate when the debtor is solvent.  Further, TransCanada points to In re Oakwood Homes Corp., 449 F.3d 588 (3rd Cir. 2006) for the proposition that 11 U.S.C. § 502(b) does not mandate the discounting of its claim.  These arguments are not convincing.

TransCanada makes much of the fact that the payments under the Contract were scheduled to terminate on October 31, 2006 prior to the date of the hearing on USGen's claim objection.  Thus, TransCanada argues that its claim should not be discounted because there are no future damages, *i.e.*, no payments remaining under the Contract.  But 11 U.S.C. § 502(b) provides that a bankruptcy court "determine the amount [of a claim]…as of the date of the filing of the petition."  At the time that USGen filed its bankruptcy petition on July 8, 2003, future payments remained due under the Contract.  Thus, discounting to the Petition Date is required. The fact that the litigation over the amount of the claim spanned beyond the term of the Contract

is irrelevant.  Adopting TransCanada's position would require the Court to treat unsecured claims of creditors differently depending on the date that their claim was finally adjudicated. This outcome violates a fundamental objective of bankruptcy, namely, to treat similarly situated creditors equally.  In re CSC Indus., Inc., 232 F.3d at 508.

TransCanada also argues that the discounting of a claim back to the Petition Date is inappropriate where a debtor is solvent.  In support of this contention, TransCanada relies on a statement from Kusin v. Devan, where the court stated that not calculating the present value of a claim as of the petition date "would have the impermissible effect of paying interest on an unsecured claim."  Id. at 273.  Based on this statement, TransCanada argues that discounting its claim to the Petition Date is not warranted because USGen is a solvent debtor and thus any such discounting would violate 11 U.S.C. §§ 726 and 1129(b)(2).  This argument fails.  Under the Bankruptcy Code, claims are determined as of the petition date.  It is true that claims may be entitled to interest in a solvent bankruptcy estate, and indeed, TransCanada will be paid interest on its claim under the USGen confirmed plan.  But that does not change the basic principle that under § 502, claims are determined as of the petition date.

Further, TransCanada will receive interest on its claim from the Rejection Date (September 5, 2003) through the date of payment.  Thus failing to discount the payments due under the Contract—at least those from September 5, 2003 through October, 2006—would result in TransCanada being paid interest from and after the Rejection Date on undiscounted future payments.  That result is at odds with usual present value concepts.

TransCanada also relies on In re Oakwood Homes Corp., 449 F3d 588, 598 (3rd Cir. 2006), for the proposition that 11 U.S.C. § 502(b) does not necessarily mandate that a claim be discounted back to the petition date.  In that case, the Court of Appeals for the Third Circuit

declined to discount a claim for the principal amount of debt securities when the interest on those securities had been already disallowed pursuant to 11 U.S.C. § 502(b)(2). The court was clear to limit its holding to cases where interest on a claim was already disallowed pursuant to 11 U.S.C. § 502(b)(2). The court stated:

> We do not hold here that 11 U.S.C. § 502(b) *never* authorizes discounting a claim to present value, but instead that the statute does not clearly and unambiguously *require* it for all claims evaluated under § 502. In general, we of course acknowledge that money received today is more valuable than money negotiated to be received in the future, and reduction in recognition of that basic economic fact may sometimes be appropriate. The subsections of § 502(b) encompass various financial circumstances, however, as our colleague in dissent points out; therefore we must look at the interplay between the subsection at issue here, § 502(b)(2), and § 502(b) as a whole.

In re Oakwood Homes Corp., 449 F3d 588, 598 (3rd Cir. 2006). TransCanada's claim arose as a result of the rejection of the Contract pursuant to 11 U.S.C. §§ 365(g) and 502(g) and does not have an interest component that will be disallowed pursuant to 11 U.S.C. § 502(b)(2). Indeed, the facts here are the very opposite of those in Oakwood Homes Corp, because here TransCanada will receive post-petition interest on its claim. The Court concludes that the holding in Oakwood Homes Corp. does not warrant a determination that the Contract payments should not be discounted to the Petition Date.

The Court concludes that it must discount the payments that TransCanada would have received under the Contract had it not been rejected. The Court also concludes that it will also discount the payments that Nexen made to TransCanada during the same period that the Three Nexen Contracts serve as mitigation.

### 5. TransCanada's Claim will be Converted to U.S. Dollars as of the Petition Date.

Because the Contract was in Canadian dollars, TransCanada's claim must be converted to United States dollars. The parties dispute the applicable currency exchange rate that the Court should use to convert TransCanada's claim from Canadian dollars to U.S. dollars. USGen contends that TransCanada's claim should be converted to U.S. dollars by utilizing the exchange rate in effect on the Petition Date. TransCanada contends that its claim should be converted to U.S. dollars utilizing the exchange rate in place at the time the Court enters final judgment in this claim objection proceeding. The Court concludes that, under the plain meaning of 11 U.S.C. § 502(b), the Court shall use the exchange rate in effect on the Petition Date to convert the claim to U.S. dollars.

As noted earlier, 11 U.S.C. § 502(g) mandates that a claim for rejection damages "shall be determined and shall be allowed under subsection (a),(b), or (c) of this section . . . ." Section 502(b) provides *inter alia*

> Except as provided in subsections (e)(2), (f), (g), (h) and (i) of this section, if such objection to a claim is made, the court, after notice and a hearing, <u>shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount.</u>

11 U.S.C. § 502(b) (emphasis added). "Section 502(b) prevents the value of a claim from fluctuating by freezing the claim as of the petition date and converting it to United States dollars." <u>In re Aaura, Inc.</u>, 2006 WL 2568048, *4, n.5 (Bankr. N.D. Ill. Sept. 1, 2006); *See also* <u>United States v. Ron Pair Enters.</u>, 489 U.S. 235, 241 (1989) ("[W]here…the statutes language is plain, 'the sole function of the courts is to enforce it according to its terms'" (*quoting* <u>Caminetti v. United States</u>, 242 U.S. 470, 485 (1917))).

The plain meaning of 11 U.S.C. § 502(b) requires the court to determine the amount of TransCanada's claim in lawful currency of the United States "as of the date of the filing of the petition" and to allow the claim in that amount.  At least one court has used the exchange rate in effect as of the petition date to determine the value of a claim denominated in forign currency based on the plain meaning of 11 U.S.C. § 502(b).  In re Global Power Equipment Group, Inc., 2008 WL 435197, *4 (Bankr. D. Del. Feb. 14, 2008) ("Its [11 U.S.C. § 502(b)] plain language requires the Court to determine the allowed amount of a claim, which is denominated in foreign currency, in United States currency by using the exchange rate that prevails on the petition date."); See also, Finanz AG Zurich v. Banco Economico S.A, 192 F.3d 240, 250 (2d. Cir.1999) (noting that under United States bankruptcy law claims in a foreign currency are determined by converting them to U.S. dollars as of the date of filing of the petition).

TransCanada relies on Zimmerman v. Sutherland, 274 U.S. 253 (1927), and its progeny for the proposition that if a transaction is governed by foreign law, then the judgment day is fixed as the date for calculating damages when converting the foreign currency to U.S. dollars.  Id. at 255.  These cases are inapposite to the case at bar because they do not deal with the allowance of claims in bankruptcy under 11 U.S.C. § 502(b).

TransCanada also relies on In re Good Hope Chem. Corp., 747 F.2d 806, 811-12 (1st Cir. 1984) for the proposition that the United States Supreme Court's decision in Zimmerman applies in determining the amount of a claim in bankruptcy.  The Good Hope decision is not controlling because it was decided under the Bankruptcy Act of 1898.  Section 502(b) was enacted as part of the Bankruptcy Code in 1978.  Further, the specific language at issue here—"in lawful currency of the United States"— was added by the Bankruptcy Amendments and Federal Judgeship Act of 1984.  P.L. 98-353.  Accordingly, the Good Hope decision is not applicable to the instant case.

89

Next, the Court must determine the value of the currency exchange rate between U.S. dollars and Canadian dollars in effect on the Petition Date. While neither party presented evidence of the value of the exchange rate on the Petition Date, the Court may take judicial notice of it.

Federal Rule of Evidence 201 governs judicial notice of adjudicative facts. Fed. R. Evid. 201(a). Furthermore, a "judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Judicial notice may be taken at any time during the proceeding. Fed. R. Evid. 201(f).

Federal and state courts take judicial notice of exchange rates as a common practice. Royatex, Ltd. V. Daughan, 551 A.2d 454, 455 (Me. 1988) ("A foreign currency rate of exchange is a proper subject of judicial notice. A rate of exchange is not subject to reasonable dispute because its accuracy can be determined readily by resort to an authoritative source such as a published rate of exchange."); Aini v. Sun Taiyang Co., 1997 U.S. Dist. LEXIS 9793, at *3 (S.D.N.Y. July 7, 1997) ("The Court takes judicial notice that the franc-dollar exchange rate as of that date was 5.3368 to one.").

The source of the exchange rate can be various; an official table is proper, as in Kalinowski v. U.S., 151 Ct. Cl. 172 (Ct. Cl. 1960), where the court took notice that the German Reichsmark-United States Dollar exchange rate "averaged 23.9154 cents in April 1928, 23.8143 cents in November 1928, and 23.8234 cents in October 1931." Id. at 197. The court received these rates from "Table 173 on page 671 of an official publication of the United States Board of Governors of The Federal Reserve System entitled Banking and Monetary Statistics published in

90

1943." Id.  The monthly averages noted by the court were based on daily currency quotations on

the New York market as gathered by The Federal Reserve Bank of New York and reported to the

Secretary of the Treasury, "who published them weekly as Treasury Decisions." Id.  Similarly, a

non-governmental publication source is also allowed, such as the Journal of Commerce, the Wall

Street Journal or any newspaper that publishes daily quotations for exchange rates.  Official

Comm. of Unsecured Creditors ex rel. R.M.L., Inc. v. Conceria Sabrina S.P.A., 195 B.R. 602,

623 (M.D. Pa. 1996) (the Court took judicial notice of the exchange rates "from Italian lira into

United States dollars as published in the Journal of Commerce or the Wall Street Journal . . . .");

Air Canada v. Golowaty, 536 N.Y.S.2d 962, 963 (N.Y. Dist. Ct. 1989) ("The court takes judicial

notice of said exchange rates as reported in the New York Times . . ."); Royatex at 455-56

("Numerous publications, including major newspapers that carry daily quotations, publish

exchange rates.").  However, any information from the parties not introduced into evidence and

not based on a publication, is not appropriate.  See MacDonald v. International Chemalloy Corp.,

473 So.2d 760, 761 (Fla. Ct. App. 1985) (a letter from counsel is not a "sufficiently authoritative

source upon which to base [judicial] notice.").

      The exchange rate as of the Petition Date was $1.3702 CAD to $1.00 USD.  Federal

Reserve Statistical Release: H.10 Foreign Exchange Rates,

http://www.federalreserve.gov/RELEASES/H10/Hist/dat00_ca.htm.  The Court will utilize this

rate in the claim determination.

### 6.  The Calculation of TransCanada's Allowed Claim

      The Court must calculate the amount of TransCanada's allowed claim in light of the

rulings herein.  USGen's Exhibit 109 contains its calculation of TransCanada's claim under

USGen's theories of the case.  The model utilized in the calculation applies the Three Nexen

Contracts as mitigation and discounts the payments under the Contract and the payments under the Three Nexen Contracts, consistent with this Court's ruling.

However, the model uses a discount rate of 6.9%, while this Court has ruled that the discount rate should be 4.0%. Further USGen contends that TransCanada failed to mitigate its damages by failing to offer as STFT service 53,800 GJ/d of the USGen Turnback Capacity for October 2003 and 38,800 GJ/d of the USGen Turnback Capacity for November 2003, as addressed in Section II.A.2.a. In Exhibit 109, USGen reduced TransCanada's claim by the STFT value of 53,800 GJ/d for October 2003 and 38,800 GJ/d for November 2003. The Court rejects this contention.

USGen shall file under cover of a praecipe within 10 days of the entry of this opinion a revised calculation in the same form as Exhibit 109 that (1) utilizes a discount rate of 4.0% and (2) gives TransCanada full claim credit (i.e. no STFT value reduction) for the Contract value of 53,800 GJ/d for October 2003 and 38,800 GJ/d for November 2003. The other assumptions in Exhibit 109 shall remain the same.

**B. The Rationale of Canadian Forest Products Does Not Bar TransCanada's Recovery.**

USGen asserts that, leaving aside any recoveries TransCanada may have realized from its mitigation of damages, TransCanada is not entitled to any recovery on its Contract rejection claim because TransCanada's regulatory scheme prevented it from suffering a loss. Specifically, USGen maintains that TransCanada's regulatory scheme controls TransCanada's toll revenues and operates to ensure that TransCanada recovers its costs plus a predetermined rate of return. Additionally, USGen contends that pursuant to that scheme, the NEB has, in fact, allowed TransCanada to impose the entire cost of the Contract rejection on its customers in the form of higher tolls. In support of these positions, USGen relies on the Canadian Supreme Court's

decision in <u>British Columbia v. Canadian Forest Products Ltd.</u>, [2004] 2 S.C.R. 74 (Can.) and its progeny.  This Court disagrees.

In <u>Canadian Forest Products</u>, a forest fire swept through the Stone Creek logging area of the interior region of British Columbia in 1992.  <u>Id.</u> at ¶ 1.  Approximately 1,491 hectares were burned over, including areas where Canadian Forest Products Ltd. ("Canfor") was licensed to log.  <u>Id.</u>  Canfor's negligence was largely responsible for the fire.  <u>Id.</u> at ¶ 2.

The Province of British Columbia (the "Province") brought suit against Canfor seeking, as pertinent here, recovery of loss of stumpage revenue from trees that would have been harvested in the ordinary course (harvestable trees).  Canfor argued that the Province did not suffer a compensable loss because its stumpage system insolated it from any revenue shortfall.  The Canadian Supreme Court agreed and held that the Province suffered no loss as a result of the fire due to the revenue-neutral regulatory scheme which it put in place.

Central to the court's holding were the lower court's factual findings describing the effect of the regulatory scheme which governed the Province's revenue stream from logging.  Canfor was authorized to conduct its logging operations under a forest license from the Province, which was issued pursuant to the statutory authority of the *Forest Act*.  In relevant part, this license allowed Canfor to cut timber in its specified area in exchange for its payment of "stumpage" to the Province.  Stumpage is "a fee charged on each cubic metre of harvested timber."  <u>Id.</u> at ¶ 15.

This stumpage system was, at least in part, the Province's legislative response to its softwood lumber dispute with the United States in the 1980's.  Under the regulatory scheme, the Province "established a target rate for each region which, when multiplied by anticipated timber production, yielded a target revenue."  <u>Id.</u> at ¶ 22.  To guarantee that it would actually collect that target rate, the Province also adopted, as part of the overall stumpage system, a Comparative

Value Pricing ("CVP") system.  This system was designed to accommodate, among other things, the Province's ultimate goal of ensuring regular, adequate revenue from logging operations. "The stumpage system, including the CVP, was and is the only source of revenue for the Province under the Forest Act pursuant to which the Province was entitled to recover revenues." Id. at ¶ 26.

The precise mechanism of the stumpage system operated as follows:  the actual stumpage rate that license holders (such as Canfor) were charged varied from license area to license area (also referred to as "cutting area"), depending on local timber yields.  The more productive areas were charged higher stumpage fees than those areas of poor yield, which resulted in the Province's realization of higher stumpage revenues from some areas than others.  The actual amount of revenue received from each area depended on the comparative value of the wood harvested in that area relative to the costs of production in that area.  Based on these differences, then, a so-called "value index" ("VI") was established for each cutting area.  Id. at ¶ 23.

Next, a benchmark for each region was established by pooling the VI from all cutting areas in the region into a "mean value index" ("MVI").  The actual stumpage paid by each logging operation was determined by the relation of the VI in its cutting area to the MVI for the region; those with a higher VI would pay more than the base rate, while those with a lower VI would pay less.  This system was designed "to achiev[e] a constant and predictable revenue for the Province."  Id. at ¶¶ 24-25.  In order to facilitate the system's commitment to cost sensitivity to local conditions, the VI and MVI were adjusted each quarter.  Id. at ¶ 27.  The situation presented in the Canadian Forest Products case is illustrative of the specific mechanism of this system:  When the value of the timber in the Stone Creek area was reduced because of the fire, the VI for that area was reduced relative to the MVI.  Correspondingly, the stumpage rate for that

area was also reduced and, pursuant to the deliberate design of the stumpage system, the rates

paid by licensees in other areas was adjusted in the following quarter to compensate for the

reduced revenue from the Stone Creek area.  Id.

Put another way, this interdependent stumpage rate system produced what was referred to

as the "waterbed effect": reduced stumpage rates for some licensees result in increased stumpage

rates for other licensees.  Id. (citing a finding of the trial judge).  This waterbed effect, which was

deliberately "built into the regulatory regime[,] was a loss-spreading system that distributed local

VI gains and VI losses amongst the forest licensees throughout the region in such a way that the

Province did not, and could not, suffer a revenue loss as a result of a drop in productivity in any

one area, such as Stone Creek."  Id. at ¶ 28.

As an initial matter, the Canadian Supreme Court held that the determination of whether

a compensable loss occurred depended on the regulatory scheme that the Province, itself,

implemented.

> The assessment of compensable loss is therefore heavily
> influenced by the regulatory structure which the Province itself
> designed and implemented.

Id. at ¶ 103.

The court held that the Province's stumpage system, including the CVP,

was designed, to be, and in fact was, revenue neutral; always ensuring that the

Province recovered its target revenue.  The court stated:

> revenue neutrality was not only asserted by Canfor, and accepted
> by the trial judge, but was accepted as correct on the facts of this
> case by both the Crown's factual witness, Mr. Tigchelaar ("The
> comparative value pricing system, in effect, makes the harvested
> portion of timber damaged by a forest fire revenue neutral"…), and
> by the Crown's expert accounting witness (the CVP system
> "ensures that provincial revenues are not affected by low timber
> values"…). Revenue neutrality was not merely "presumed". It was

> established in evidence as a fact to the satisfaction of the trial
> judge.

Id. at ¶ 99 (emphasis deleted).

Based on the factual finding that the stumpage system was revenue neutral, the Canadian

Supreme Court went on to hold that no loss had occurred because the regulatory system was

designed to ensure that a loss would never be incurred.

> The necessary inference from the trial judge's analysis of the
> Crown's revenue entitlement under the regulatory system in place
> in 1992, and his acceptance of Mr. Gairns' testimony, is that no
> loss arose in the first place . . . cases of "no loss" are excluded
> from consideration under mitigation principles: "it may be that the
> benefit provided by the act of the third party prevents the loss from
> arising in the first place rather than reduces or eliminates a loss
> already incurred." . . . In this case, of course, it was the action of
> the Province itself, in putting in place a regulatory scheme to help
> resolve the softwood lumber dispute with the U.S. that assured that
> its revenue was protected against updrafts as well as downdrafts.
>
> * * *
>
> the CVP stumpage system was designed to ensure that the loss was
> never incurred. . . . A variant of the idea that the Crown never wins
> and the Crown never loses was incorporated into the regulatory
> system itself.
>
> * * *
>
> the regulatory scheme was "revenue neutral". There was no loss
> expected and none arose. The Crown cannot ignore the actual
> operation of the regulatory scheme when the selfsame regulatory
> scheme defines the Crown's claim to lost stumpage . . . .
>
> * * *
>
> The principle embodied in the CVP that the Crown neither wins
> nor loses works, of course, in both directions. If the fire had not
> occurred, the higher stumpage rates that would have been received
> in the burn area would not have enured to the benefit of the Crown.
> They would have inured to other forest operators (including
> Canfor's other logging operations) in the B.C. Interior Region. The
> Crown's revenue entitlement stood above the fray in both good
> times and bad. Irrespective of the CVP swaps of VI advantages and
> VI disadvantages amongst forest licensees, the Crown would still
> have received from the B.C. Interior Region no more and no less

96

> than the "target rate" multiplied by the volume of timber logged in
> the region.

Id. at ¶ 116, ¶ 109, ¶ 112, ¶ 114 (internal citations omitted).

The regulatory scheme implemented by the Province in Canadian Forest Products markedly differs from the regulatory system under which TransCanada operates. The Canadian Forest Products scheme was designed to be revenue neutral by ensuring that the Province received its target rate of revenue. Conversely, TransCanada's regulatory system is not revenue neutral and does not ensure that TransCanada receives a target revenue amount. Further, TransCanada's duty of prudence obliges TransCanada to pursue any defaulting shipper rather than simply spreading the resulting loss on its remaining shippers, while there was no indication in Canadian Forest Products that the Province was under any similar duty or that such a duty was pertinent to the case. Based on these material differences, described further below, the court concludes that this is not a "no loss" case. Accordingly, the holding in Canadian Forest Products is not applicable to this case.

### 1. The NEB Toll Regulatory System is not Revenue Neutral as was the Regulatory Scheme in Canadian Forest Products.

The regulatory scheme governing TransCanada does not ensure that TransCanada recover a target revenue. Rather, it affords TransCanada *the opportunity* to recover its annual revenue requirement through the process of submitting toll applications to the NEB for review and approval. As described in detail in Section I.A.3.a. TransCanada submits detailed, extensive annual toll applications to the NEB seeking a determination that the tolls are "just and reasonable." The toll applications are subject to a "fine-toothed comb" review by the NEB and its expert staff, as well as numerous shippers, shipper organizations, and others who are interested in minimizing the cost to ship gas on the Mainline. Interested parties often challenge costs of a relatively small amount, and TransCanada is obligated to make every effort to

minimize its tolls through various means, including cost controls, financial assurances, and other measures. Consequently, TransCanada is not ensured any predetermined revenue amount, and only TransCanada's prudently incurred costs will be approved by the NEB.

Conversely, in Canadian Forest Products, the CVP system automatically adjusted local stumpage rates on harvested timber to ensure that "the Crown never wins and the Crown never loses." Id. at ¶ 114. As the court stated, "[t]he Crown's revenue entitlement stands above the fray in good times and bad." Id. There, the CVP controlled prices and revenues, by making adjustments to ensure that targeted revenues are achieved. The adjustment came in the form of a quarterly mathematical calculation which resulted in the Province's receipt of the targeted revenue amount. There was no duty of prudence, no review and challenge by interested parties, no review and oversight by a regulatory agency such as the NEB, and no adjudication of challenged costs. In their place was essentially a mathematical calculation.

The NEB system and TransCanada's duty of prudence does not put TransCanada "above the fray in good times and in bad" such that TransCanada "never wins and . . . never loses." TransCanada's duty of prudence puts it in the middle of the fray. Should the NEB determine that TransCanada failed to meet its duty of prudence with respect to any cost within the toll application, that cost could be rejected and would not be included in the toll calculation. TransCanada most certainly would "lose" in that case by bearing a cost which its revenue stream is not approved to recover, thereby reducing or eliminating its rate of return. Therefore, the NEB regulatory scheme is not "revenue neutral" as that term was used in Canadian Forest Products.

Apparently, recognizing the substantial differences between the regulatory scheme under which TransCanada operates and the legislative scheme at issue in CFP, USGen requests the Court to consider the scheme as applied in this case. It contends that, as applied, TransCanada

suffered "no loss" because it recovered the lost revenue from the rejection of the Contract through its toll application process.

Here, however, TransCanada did in fact suffer a loss as a result of USGen's rejection of the Contract. Immediately upon rejection, USGen ceased making its payments under the Contract and TransCanada was denied the revenue stream from the Contract. For example, in TransCanada's 2004 toll application showed that TransCanada, after the Contract rejection, suffered a quantifiable loss of approximately $5 million CAD for 2003, which it placed in a negative deferral account. The total revenues TransCanada would have received under the remaining term of the Contract were approximately $62 million CAD, by reference to actual tolls in service during the applicable periods. There is simply no denying that the substantial revenue stream that USGen was obligated to pay under the rejected Contract was lost. Through its toll process, TransCanada was provided the opportunity to increase its revenues from shippers to account for the lost revenue stream, and it may have been successful in doing so, but that does not mean TransCanada did not suffer a loss of revenue upon the Contract's rejection.

This differs from Canadian Forest Products. There, although the fire resulted in "lost" timber, the regulatory scheme spread the value of the lost timber across the other segments. Thus, there was no loss in value at all.

Rather, although USGen disputes this characterization, its position is really that the loss has been "passed on" to the shippers as a result of the toll application process. The "passing on" defense has been rejected by the Canadian Supreme Court. See Kingstreet Investments, Inc. v New Brunswick, [2007] 1 S.C.R.3 at ¶¶ 42 -51 (Can.).

### 2. TransCanada's Duty of Prudence Obligates it to Pursue Defaulting Shippers Such as USGen

TransCanada's duty of prudence requires it prudently to pursue recovery from a defaulting shipper.  This requirement typifies the underlying purposes of the NEB and its regulatory system to protect the public, ensure that tolls are just and reasonable and mandate that TransCanada to make every reasonable effort to minimize tolls.  TransCanada's failure to pursue recovery from a defaulting shipper could well result in consequences before the NEB.

The potential risk that TransCanada's recovery of the lost revenue from the Contract rejection could be reversed is underscored by the existence of the Section 21 review and variance proceeding available under the NEB Act.  As described in Section I.A.3.c., this process permits a party in interest, at any time, to challenge any prior NEB decision, including the prior approval of a toll application.  Thus, although tolls are said to be "final" for the year in which they are collected, they are not truly final since they may be adjusted via a review and variance proceeding.  If TransCanada were to ignore a substantial, viable claim against a defaulting shipper without justification, it would be well within the rights of a party in interest to seek NEB review of that action.  This is not to suggest that TransCanada's duty of prudence obligates it to pursue every defaulting shipper, notwithstanding any potential cost of pursuit or likelihood of a successful recovery.  It does mean, however, that under the regulatory scheme as described at trial, TransCanada could not simply ignore a valid and viable recovery claim based strictly on the notion that it recovered the amount of the claim from nondefaulting shippers through its toll application process.

Under USGen's view, once TransCanada recovered in the toll application process the lost revenue from the Contract rejection, it lost the right to pursue USGen for whatever remedies would otherwise be available to it.  This argument runs completely contrary to the policy embodied in the NEB regulatory scheme and the NEB Act, a policy which presumably a

Canadian court would take into account, that Mainline tolls must be "just and reasonable." Under this view, a defaulting shipper acts with impunity while nondefaulting shippers bear the cost of the default through higher tolls. This view lacks economic rationality. It is neither just nor reasonable.[23]

USGen points out that TransCanada's regulatory scheme permitted TransCanada to treat the USGen default differently than it did. USGen could have parked any annual lost revenue from the Contract's rejection in a long-term deferral account each year while TransCanada pursued USGen for damages, and then sought adjudication in the toll application in the year the claim against USGen is finally resolved and determined. USGen argues that treating the Contract rejection in this manner ensures that TransCanada bears its own losses while the amount of those losses is uncertain, rather than immediately bringing those losses before the NEB and imposing them on its shippers in the form of higher tolls. Under this view, TransCanada made an election (knowingly or not) when it sought to recover the deferral account in its 2004 toll application and subsequently not including the Contract revenue in deferral accounts. According to USGen, by doing so, TransCanada elected not to (or at least waived its right to) pursue recovery for the Contract rejection from USGen. This contention has no merit.

The regulatory scheme under which TransCanada operates allowed it to act as it did, by first recovering the losses resulting from the Contract rejection through its toll application process and then pursuing USGen for damages, with any damage recovery being factored into the toll process when received. [24] Alternatively, it permitted TransCanada to place the annual

---

[23] Nikol Shultz, Vice President of CAPP, the Canadian Association of Petroleum Producers, testified that CAPP members were "frankly shocked at the position that's being taken here by USGen." CAPP membership has 95% of Canada's oil and natural gas shippers, and is the most active intervenor in TransCanada's NEB proceedings.

[24] Although the regulatory scheme may not technically require TransCanada to add any Contract rejection claim recovery into its toll application, TransCanada readily admitted that it believed it would be requires to do so under its duty of prudence. This admission is entirely consistent with the NEB's overall regulatory scheme and TransCanada's duty of prudence.

lost Contract revenues in a deferral account each year to be finally adjudicated in a future toll

application when the Contract damage action is resolved.  Given the time value of money,

TransCanada sought as a prudent business to recover the Contract losses in its toll process sooner

rather than await the results of the claim adjudication.  Nothing in the NEB policies or scheme

supports the notion that TransCanada lost the right to pursue USGen by doing so.  Indeed,

USGen's argument runs completely contrary to the policies behind the NEB regulatory scheme

described above and in the Findings of Fact.

　　　　USGen contends that its view—that TransCanada should have placed in a deferral

account each year the lost revenue from the rejected Contract and then brought that into the toll

process when the Contract rejection claim was finally adjudicated—is more efficient in that the

loss ultimately will be borne by shippers when it is known what the exact loss will be.  USGen

contends that passing on the loss in the toll application process before TransCanada recovers on

the Contract rejection claim results in an "intergenerational" inefficiency among shippers in

various years.  That, however, is a matter for the NEB, not this Court.  The fact remains that

TransCanada pursued one of two NEB-approved avenues to recover the losses and bring the

Contract rejection into the toll application process.  Whether USGen contends that one of those

avenues is better for shippers is not relevant to this Court.

　　　　USGen's argument, in essence, is that the Canadian Forest Products holding overrides the

well-structured policy and procedures of the NEB, and allows a breaching party to escape all

liability simply because the non-breaching party proceeded in one of two NEB-approved ways,

as opposed to the other.  The Court finds no merit to the contention that the Canadian Supreme

Court would view the policies and procedures of the NEB—which plainly allowed TransCanada

to address the Contract rejection in the toll application process immediately and imposed a duty

on TransCanada then to pursue the Contract rejection claim—and conclude that TransCanada lost a valuable right by choosing one approach over the other.   In Canadian Forest Products, the court placed great emphasis on the regulatory scheme.  Here, when the regulatory scheme is viewed in its entirety, the rationale of Canadian Forest Products does not apply.  This Court concludes that Canadian Forest Products does not support USGen's contention.

Finally, USGen contends that the dictum in ¶ 108 of Canadian Forest Products applies.[25] That paragraph states:

> If mitigation principles were applicable here, I would agree with Hall J.A. that the CVP "waterbed" effect would have to be taken into account because, to paraphrase Viscount Haldane in *British Westinghouse*, *supra*, the CVP adjustment arose out of the consequences of Canfor's negligence and was made in the ordinary course of business.  Or, in Professor Waddams' terms, the increased revenue obtained by the Crown from licensees outside the Stone Creek area under the operation of the CVP could not have been received by the Province but for the fire.

Id. at ¶ 108.  Here, while it is true that TransCanada obtained increased tolls as a result of the lost revenues from USGen's breach, it is equally true that under the regulatory scheme, when viewed as a whole, those toll increases were potentially subject to reduction in a future year by any recovery that TransCanada obtained from the Contract rejection claim.  Thus, the determination of the "mitigation" that resulted from the regulatory scheme must include any recovery that the same regulatory scheme requires TransCanada to pursue.  The Court concludes that ¶ 108 of Canadian Forest Products does not apply.

### III.    CONCLUSION

USGen shall submit the recalculation of TransCanada's claim contained in USGen Exhibit 109 with the changes to that calculation as described in Section II.A.6., hereof.  USGen shall file the recalculation within ten (10) days of the entry of this opinion.  An order consistent

---

[25] The parties agree that Supreme Court dictum is given substantial weight in Canadian law.

with this Memorandum Opinion shall be entered by the Court upon receipt of USGen's

recalculation of the claim.  For the sake of certainty among the parties, any appeal period will not

begin to run until the Court enters an order after the submission of the recalculated claim by

USGen.

cc:

Gordon A. Coffee, Esq.
Peter K. Dykema, Esq.
Winston & Strawn, LLP
1700 K Street, NW
Washington, D.C. 20005

Marc E. Richards, Esq.
Blank Rome LLP,
The Chrysler Building
405 Lexington Avenue,
New York, N.Y. 10174

David W. Elrod, Esq.
Craig Tadlock, Esq
Elrod, PLLC
500 N. Akard St., Suite 3000
Dallas, Texas 75201

Adam M. Spence, Esq.
Michael J. Lentz, Esq.
The Law Office of Adam M. Spence
P.O. Box 20369
Baltimore, MD  21284-0369

Office of the U.S. Trustee
6305 Ivy Lane, Suite 600
Greenbelt, MD 20770